067-250449-11

CAUSE NO. 067-250449-11

| | | |
|---|---|---|
| ROBERT EDWARD LEE OSWALD, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | 2nd COURT OF APPEALS |
| | § | FORT WORTH, TEXAS |
| | § | 5/4/2015 9:16:23 AM |
| v. | § | 67TH JUDICIAL DISTRICT DEBRA SPISAK |
| | § | Clerk |
| BAUMGARDNER FUNERAL HOME, INC., | § | |
| ALLEN S. BAUMGARDNER, SR., AND | § | |
| NATE D. SANDERS, INC., | § | |
| | § | |
| Defendants. | § | TARRANT COUNTY, TEXAS |

### NOTICE OF APPEAL

Defendant Nate D. Sanders, Inc., herein, hereby gives notice of its appeal of the Judgment

of the Court signed and entered on January 30, 2015, and would show as follows:

1.       This case was filed in the 67th Judicial District, Tarrant County, Texas, and assigned

case number 067-250449-11, and styled *Robert Edward Lee Oswald v. Baumgardner Funeral Home,*

*Inc., Allen S. Baumgardner, Sr., and Nate D. Sanders*, on January 30, 2015.

2.       The Judgment of the Court was signed on January 30, 2015.  Sanders' Motion for

New Trial was filed February 17, 2015, and denied by Order signed April 23, 2015.

3.       Defendant Nate D. Sanders, Inc., desires to appeal the Judgment of the Court entered

on January 30, 2015, insofar as it denies Sanders recovery of its reasonable and necessary attorneys'

fees.

4.       Appeal is taken to the Second Court of Appeals, Fort Worth, Texas.

5.       The party filing this notice is Defendant Nate D. Sanders, Inc., herein.

SIGNED this 30th  day of April, 2015.

**NOTICE OF APPEAL– Page 1**

067-250449-11

Respectfully submitted,

LAW OFFICES OF LIPPE & ASSOCIATES


By:      /s/ Emil Lippe, Jr.
         Emil Lippe, Jr.
         State Bar No. 12398300
         emil@texaslaw.com
         Plaza of the Americas, South Tower
         600 N. Pearl Street, Suite S2460
         Dallas, Texas  75201
         Phone: 214-855-1850
         Fax:     214-720-6074

         ATTORNEYS FOR DEFENDANT
         NATE D. SANDERS, INC.

**NOTICE OF APPEAL– Page 2**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, pursuant to the Texas Rules of Civil Procedure, true and correct copies of the above and foregoing instrument were served by facsimile upon counsel of record on this 30th day of April, 2015, to the following:

Gant Grimes, Esq.
Gibson Davenport Anderson
807-8th St., 8th Floor
Wichita Falls, TX 76301-3368
*Counsel for Plaintiff, Robert Edward Lee Oswald*

Brett L. Myers, Esq.
Fox Rothschild LLP
Two Lincoln Centre
5420 LBJ Freeway, Suite 1200
Dallas, TX 75240
*Counsel for Defendants Baumgardner Funeral Home, Inc.,*
*and Allen S. Baumgardner, Sr.*

　　　　　　　　　　　　　　 /s/ Emil Lippe, Jr.

CAUSE NO. 067-250449-11

| | | |
|---|---|---|
| ROBERT EDWARD LEE OSWALD | § § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | TARRANT COUNTY, TEXAS |
| BAUMGARDNER FUNERAL HOME, INC., ALLEN S. BAUMGARDNER, SR, AND NATE D. SANDERS, INC. | § § § | 67TH JUDICIAL DISTRICT |

## <u>JUDGMENT OF THE COURT</u>

On December 8, 2014 came before this Court final trial of this matter. Plaintiff Robert Edward Lee Oswald (herein referred as "Oswald"), Defendant Allen S. Baumgardner, Sr. ("herein referred as Baumgardner"), Defendant Baumgardner Funeral Home, Inc. (herein refrred as "Baumgardner Funeral") and Defendant Nate D. Sanders, Inc. (herein referred as "Sanders") and their attorneys announced ready to proceed to final trial. A record was made. This matter was tried before the judge after each party waived their right to have this matter tried before a jury. After hearing the evidence presented at trial, as well as after a lengthy and careful review of the arguments of counsel, case law and statutes cited, this Court enters its Judgment of the Court as follows:

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the #31 pine bluff casket purchased by Oswald on November 24, 1963 for the burial of his brother, Lee Harvey Oswald (the "1963 casket") is the personal property of Oswald. Oswald is the owner of the 1963 casket.

IT IS ORDERED, ADJUDGED and DECREED that Oswald have and recover a judgment against Baumgardner and Baumgardner Funeral for wrongful conversion of the 1963 casket.

IT IS ORDERED, ADJUDGED and DECREED that Oswald is entitled to have Baumgardner and Baumgardner Funeral pay all expenses for the return of the 1963 casket to Oswald.

IT IS ORDERED, ADJUDGED and DECREED that Baumgardner and Baumgardner Funeral must pay to Sanders by no later than February 12, 2015 by cash, certified or cashier's check all expenses to be incurred for, and amounts necessary to have, the 1963 casket shipped to Oswald. Additional expenses to be paid by Baumgardner and Baumgardner Funeral will include packing, transportation, insurance, transfer fees, any required taxes, fees or other governmental assessments. The insurance on the 1963 casket shall not be less than $100,000.00. The 1963 casket shall be delivered to Oswald to an address provided by Oswald.

IT IS ORDERED, ADJUDGED and DECREED that Baumgardner and Baumgardner Funeral shall pay to Oswald all reasonable travel expenses necessary for 2 people to accompany the 1963 casket to its destination, if such decision to travel is made. Such expenses must be paid no later than 15 days after receipt of all travel expenses from Robert or Robert's attorneys.

IT IS ORDERED, ADJUDGED and DECREED that, as exemplary damages, Oswald shall have and recover a judgment against Baumgardner and Baumgardner Funeral, jointly and severally, for their malicious and wanton conduct in the wrongful conversion, the sum of EIGHTY SEVEN THOUSAND FOUR HUNDRED SIXTY EIGHT DOLLARS and NO/100 CENTS ($87,468.00).

IT IS ORDERED, ADJUDGED and DECREED that Oswald have and recover a take nothing judgment as to Oswald's claims for breach of contract, breach of fiduciary claim, negligence and negligence per se.

IT IS ORDERED, ADJUDGED and DECREED that all affirmative defenses and relief pled and requested by Baumgardner and Baumgardner Funeral are DENIED.

IT IS ORDERED, ADJUDGED and DECREED that Sanders have and recover a judgment in the amount of ELEVEN THOUSAND THREE HUNDRED EIGHTY TWO DOLLARS and 40/100 CENTS ($ 11,382.40) against Baumgardner and Baumgardner Funeral, jointly and severally, for its indemnity claim.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Sanders shall recover an additional sum of SEVEN DOLLARS and 20/100 CENTS per diem storage charges beginning February 1, 2015 until the 1963 casket is removed from storage for transfer to Oswald.

IT IS ORDERED, ADJUDGED and DECREED that Sanders, upon receipt of all expenses related to the transfer of the 1963 casket to Oswald from Baumgardner and Baumgardner Funeral shall use its best efforts to have the 1963 casket shipped to Oswald by no later than 10 days after its receipt of funds necessary to cover these shipping and related expenses, including the per diem storage charges assessed herein.

IT IS ORDERED, ADJUDGED and DECREED that Sanders have and recover a take nothing judgment for its indemnity claim related to its attorneys fees and expenses.

IT IS ORDERED, ADJUDGED and DECREED that the judgments awarded to Oswald and Sanders shall accrue post judgment interest at 5% per annum until paid.

All other relief requested by the parties is DENIED.

All costs of court are taxed against Baumgardner and Baumgardner Funeral, jointly and severally.

All writs and other execution necessary to collect the judgments herein shall issue immediately.

This is a final and appealable judgment..

EXECUTED this _____ day of January, 2015.


Donald J. Cosby
Presiding Judge

067-250449-11

FILED
TARRANT COUNTY
2/17/2015 1:06:02 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 067-250449-11

| | | |
|---|---|---|
| ROBERT EDWARD LEE OSWALD, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 67TH JUDICIAL DISTRICT |
| | § | |
| BAUMGARDNER FUNERAL HOME, INC., | § | |
| ALLEN S. BAUMGARDNER, SR., AND | § | |
| NATE D. SANDERS, INC., | § | |
| | § | |
| Defendants. | § | TARRANT COUNTY, TEXAS |

## MOTION FOR NEW TRIAL OF DEFENDANT NATE D. SANDERS, INC.

TO THE HONORABLE JUDGE OF SAID COURT:

Nate D. Sanders, Inc., Defendant, Cross-claimant, and Counter-claimant ("Sanders") hereby files, pursuant to Rule 329(b) of the Texas Rules of Civil Procedure, this its Motion for New Trial, and states the following.

## BACKGROUND FACTS

Following the trial of this case, the Court took the evidence and briefing under submission. On January 30,2 015, the Court issued its Findings and Final Judgment. With respect to the cross claims of Defendant Sanders against Baumgardner, the Court made the following findings of fact and conclusions of law:

[findings of fact]

67. The Sanders Contract included an indemnity provision between Sanders and Baumgardner.

74. Sanders reasonably relied upon representations of Baumgardner that he had title to, or authority to sell, all items presented to Sanders for auction.

81. Baumgardner breached its agreement with Sanders by failing to show that Baumgardner was the owner of the 1963 casket and therefore did not have authority to sell the 1963 casket.

**MOTION FOR NEW TRIAL OF DEFENDANT NATE D. SANDERS, INC.– Page 1**

82. Sanders is awarded a judgment on its indemnity claim against Baumgardner.

83. Through January 31, 2015 Sanders has incurred reasonable and necessary storage charges in the amount of $10,771.00 to preserve and protect the 1963 casket during the pendency of this lawsuit.

84. Sanders has incurred reasonable and necessary business expenses other than attorney's fees and storage fees in the amount of $611.40 for airline travel to defend itself in this lawsuit.

85. Sanders has incurred attorneys' fees and expenses in the amount of $85,204.84 defending itself against the competing claims of Robert, Baumgardner and Baumgardner Funeral; however, there was no evidence that such expenses and fees were reasonable and necessary.

86. Sanders is entitled to recover from Baumgardner and Baumgardner the sum of $215.42 for each month that the 1963 casket remains in Sanders' possession.

88. Sanders has suffered damages for which Baumgardner is liable, pursuant to the terms of the Sanders Contract including indemnity for all expenses.

89. Sanders has incurred storage fees in the amount of $10,771.00 and travel expenses of $611.40 to which Baumgardner is liable pursuant to its indemnity with Sanders. Sanders is entitled to recover additional storage fees at the rate of $215.42 per month from Baumgardner starting February 1, 2015.

[conclusions of law]

16. Sanders is entitled to indemnity for all expenses incurred by it in this lawsuit except attorney's fees.

19. Sanders has satisfied the fair doctrine notice in order for it to recover its expenses against Baumgardner and Baumgardner Funeral.

Findings of Fact and Conclusions of Law.

As a result of such findings, and pursuant to the Final Judgment, Sanders has obtained recovery for the storage fees and other expenses associated with storage of the casket and defending this lawsuit, except recovery of its attorneys fees, apparently due to the failure timely to designate an expert witness to testify as to the reasonableness and necessity of such fees. The Court has found

**MOTION FOR NEW TRIAL OF DEFENDANT NATE D. SANDERS, INC.– Page 2**

the amount of attorneys' fees incurred by Sanders, but has held that there is no evidence to support reasonableness. Sanders is seeking, by this Motion, that the Findings and Judgment be amended to include recovery for Sanders of its reasonable and necessary attorneys' fees, in the amount of $85,204.84, based upon the following.

## RELIEF REQUESTED

Sanders hereby moves for a new trial, in part, and for modification of the Findings and Final Judgment of the Court to provide for a finding that the reasonable amount of attorneys' fees incurred by Sanders as a result of Baumgardner's breach of his warranty of title is the sum of $85,204.84, and amend the Judgment to award Sanders recovery of such amount of attorneys' fees, in addition to the amounts already included in the Judgment, based upon the following argumentation.

## ARGUMENT & AUTHORITIES

### I.

### THERE WAS ADEQUATE EVIDENCE CONCERNING THE REASONABLENESS OF SANDERS' FEES BASED UPON JUDICIAL NOTICE OF REASONABLE FEES

At the conclusion of the trial, counsel for Sanders requested that the Court take judicial notice of the entire file in this case and of what would be a reasonable attorneys' fee in this case, as authorized by §38.004 of the Texas Civil Practice and Remedies Code. The overwhelming authority under §38.004 emphasizes that such judicial notice alone is sufficient to support a finding of reasonableness and necessity of attorneys' fees sought under §38.001 of the Civil Practice and Remedies Code. Therefore, the fact that the Court excluded Sanders' proffered expert witness testimony as to the reasonableness and necessity of the attorneys' fees incurred by Sanders is of no consequence, because judicial notice alone under §38.004 and §38.003 will provide adequate

**MOTION FOR NEW TRIAL OF DEFENDANT NATE D. SANDERS, INC.– Page 3**

evidence of reasonableness to support an award of attorneys' fees.

As one Court of Appeals has held, citing a Texas Supreme Court case in support of its conclusion:

> When *section 38.001* applies, a trial court can take judicial notice of the case file and of the usual and customary attorney's fees, and the usual and customary fees are presumed to be reasonable. *See id*. *§§ 38.003*, *.004(1)*. **Taking judicial notice of these two things is legally sufficient to support a determination that the attorney's fees award was reasonable**. *Gill Sav. Ass'n, 797 S.W.2d at 32*.

*Kendrick v Seibert*, 439 S.W.3d 408, 412 (Tex.App.-Houston [1st Dist.] 2014, no pet.)(emphasis added).[1]

The Fort Worth Court of Appeals has held that, even in a case not governed by §38.001 of the Texas Civil Practice and Remedies Code, the trial court may take judicial notice of the court file and of what is a reasonable and necessary fee, and **award attorneys' fees on such basis alone**. *Matelski v. Matelski*, 840 S.W.2d 124, 130 (Tex.App.-Fort Worth 1992, no pet.).[2]

In *The Long Trusts v . Atlantic Richfield Company*, 893 S.W.2d 686, 688-689 (Tex.App.-Texarkana 1995, no writ), the Court held that the trial court is **presumed** to have taken such judicial notice, and that **such judicial notice is in and of itself sufficient evidence** to support an award of attorneys' fees.[3]

Furthermore, in *Cox v. Wilkins*, 2006 Tex.App. LEXIS 2598 (Tex.App.-Austin 2006, pet.

---

[1]    A copy of the decision in *Kendrick v Seibert* is attached hereto as Exhibit "A" and incorporated by this reference.

[2]    A copy of the decision in *Matelski v. Matelski* is attached hereto as Exhibit "B" and incorporated by this reference.

[3]    A copy of the decision in *The Long Trusts v . Atlantic Richfield Company* is attached hereto as Exhibit "C" and incorporated by this reference.

**MOTION FOR NEW TRIAL OF DEFENDANT NATE D. SANDERS, INC.– Page 4**

denied), the Court of Appeals emphasized that the trial court is not required to state that it was taking judicial notice, and emphasized that in a case for breach of a contract under §38.001 of the Civil Practice and Remedies Code, **an award of attorneys' fees was *not* discretionary.**[4]

In *Lacy v. First National Bank of Livingston, Texas*, 809 S.W.2d 362, 238 (Tex.App.-Beaumont 1991, no pet.), the Court was presented with a situation similar to that which occurred herein. In *Lacy,* there was evidence presented of the amount of attorneys' fees, but objection was made when testimony was presented concerning attorneys' fees on the basis that no expert had been designated. There, the Court of Appeals held that the trial court is presumed to have taken judicial notice of the reasonable and customary attorneys' fee and the contents of the file, and that such judicial notice in and of itself is sufficient to support an award of attorneys' fees.[5]

## II.

### SANDERS' CLAIM WAS PRESENTED UNDER §38.001 OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE

There is a conflict among the Texas Courts of Appeals concerning whether or not the judicial notice provisions discussed above apply to cases outside of §38.001 of the Civil Practice and Remedies Code. One court has summarized the conflicting cases as follows:

> *Section 38.004* does not allow courts to take judicial notice of reasonableness; rather, it allows a court to take judicial notice of "the usual and customary attorney's fee" in a bench trial. *See TEX. CIV. PRAC. & REM. CODE ANN. § 38.004*. Because *section 38.003* is limited to claims described in *section 38.001*, and because *section 38.004* does not speak to judicial notice of reasonableness, this court has held that trial courts

---

[4]    A copy of the decision in *Cox v. Wilkins* is attached hereto as Exhibit "D" and incorporated by this reference. *See* argument at section III below citing additional authorities.

[5]    A copy of the decision in *Lacy v. First National Bank of Livingston, Texas* is attached hereto as Exhibit "E" and incorporated by this reference.

**MOTION FOR NEW TRIAL OF DEFENDANT NATE D. SANDERS, INC.– Page 5**

may not use *section 38.004* to take judicial notice of the reasonableness of attorney's fees awarded under a statute other than *section 38.001*. *London v. London,* 94 S.W.3d 139, 147-49 (Tex. App.--Houston [14th Dist.] 2002, no pet.). Though there is currently a split on this issue among the courts of appeals, this court, of course, follows its own precedent. *Compare London,* 94 S.W.3d at 147-48 (rejecting argument that trial court could take judicial notice of reasonable attorney's fees recovered outside of *section 38.001*), *In re T.L.K.,* 90 S.W.3d 833, 841 (Tex. App.--San Antonio 2002, no pet.) (same), *Valdez v. Valdez,* 930 S.W.2d 725, 732-33 (Tex. App.--Houston [1st Dist.] 1996, no writ) (same), *Hasty, Inc. v. Inwood Buckhorn Jt.V.,* 908 S.W.2d 494, 503 (Tex. App.--Dallas 1995, writ denied) (same), *Richards v. Mena,* 907 S.W.2d 566, 573-74 (Tex. App.--Corpus Christi 1995, writ dism'd) (same), *with Matelski v. Matelski,* 840 S.W.2d 124 (Tex. App.--Fort Worth 1992, no writ) (holding that, under section 38.004, trial courts can take judicial notice of the amount of reasonable attorney's fees, even when fees are recovered under the Family Code), and *In re Estate of Kidd,* 812 S.W.2d 356, 359 (Tex. App.--Amarillo 1991, writ denied) (applying *sections 38.003* and *38.004* in a will-contest case).

*Charette v. Fitzgerald*, 213 S.W.3d 505, 514-515 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (Denying recovery of attorneys' fees sought under certain sections of the Texas Property Code).

This conflict is inconsequential here, however, because the leading case in this Court of Appeals is *Matelski v. Matelski*, which does not restrict recovery under the concept of judicial notice alone to cases under §38.001 of the Civil Practice and Remedies Code.

Furthermore, in this case, Sanders' claim for indemnity expressly plead that Baumgardner had breached specific contractual provisions (First Amended Answer, Counterclaim, and Cross-Claim at 6-7), and expressly plead for recovery of attorneys' fees under §38.001 of the Civil Practice and Remedies Code. (*Id.* at 8). Sanders presented proof of presentment (Sanders Trial Ex. 11), and of the amounts of attorneys' fees expended (Sanders Trial Exhibits 7 and 8). The Court found that Baumgardner had breached its express contractual warranty to Sanders and that Sanders was entitled to judgment for indemnity (Finding of Fact No.81). There can be no doubt whatsoever that Sanders is seeking recovery, and is entitled to recovery, of its reasonable attorneys' fees under §§38.001-

38.004 of the Civil Practice and Remedies Code.

## III.

### AWARD OF SANDERS' REASONABLE ATTORNEYS' FEES WAS NOT DISCRETIONARY

The courts have universally held that in a claim for breach of contract, where there is proof of presentment and payment of the just amount owed is not tendered within thirty days after presentment, that an award of reasonable attorneys' fees is mandatory. As the Fort Worth Court of Appeals has held:

> When a prevailing party in a breach of contract suit seeks attorney's fees, an award of reasonable fees is mandatory under *section 38.001* if there is proof of the reasonableness of the fees. *See Atlantic Richfield Co. v. Long Trusts,* 860 S.W.2d 439, 449 (Tex. App.--Texarkana 1993, writ denied); *Budd v. Gay,* 846 S.W.2d 521, 524 (Tex. App.--Houston [14th Dist.] 1993, no writ.). **A trial court** has discretion to fix the amount of attorney's fees, but it **does not have the discretion to completely deny attorney's fees if they are proper under** *section 38.001*. *See Budd,* 846 S.W.2d at 524.

*World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 683 (Tex.App.-Fort Worth 1998, pet. den.)(emphasis added)[6]; *accord, Recognition Communications Inc., v. AAA*, 154 S.W.3d 878, 891 (Tex.App.-Dallas 2005, pet dis.)[7]; *Maynard v. Booth*, 421 S.W.3d 182, 186 (Tex.App.-San Antonio 2013, pet. den.).[8] This was also the holding in *Cox v. Wilkins*, 2006 Tex.App. LEXIS 2598 (Tex.App.-Austin 2006, pet. denied), cited above, where the only evidence of reasonableness was

---

[6] A copy of the decision in *World Help v. Leisure Lifestyles, Inc.*, is attached hereto as Exhibit "F" and incorporated by this reference.

[7] A copy of the decision in *Recognition Communications Inc., v. AAA* is attached hereto as Exhibit "G" and incorported by this reference.

[8] A copy of the decision in *Maynard v. Booth* is attached hereto as Exhibit "H" and incorporated by this reference.

the judicial notice authorized by §§38.001-38.004 of the Civil Practice and Remedies Code.

Based upon these authorities, it is clear that this Court was obligated to take judicial notice of what is a customary fee for the services rendered in this case for Sanders, and of the court file, and, upon doing so, award Sanders its reasonable and necessary attorneys' fees as proved at trial.

## CONCLUSION

WHEREFORE, Defendant, Nate D. Sanders, Inc., prays that the Court grant this Motion for New Trial, and that Defendant Sanders be granted general relief.

Respectfully submitted,

LAW OFFICES OF LIPPE & ASSOCIATES

By:    /s/  Emil Lippe, Jr.
Emil Lippe, Jr.
State Bar No. 12398300
emil@texaslaw.com
Corey Hyden
State Bar No. 24074465
chyden@texaslaw.com
Plaza of the Americas, South Tower
600 N. Pearl Street, Suite S2460
Dallas, Texas 75201
Phone: 214-855-1850
Fax: 214-720-6074

ATTORNEYS FOR DEFENDANT
NATE D. SANDERS, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, pursuant to the Texas Rules of Civil Procedure, true and correct copies of the above and foregoing instrument were served by facsimile upon counsel of

record on this __17th__ day of February, 2015, to the following:

Gant Grimes, Esq.
Gibson Davenport Anderson
807-8th St., 8th Floor
Wichita Falls, TX 76301-3368
*Counsel for Plaintiff, Robert Edward Lee Oswald*

Brett L. Myers, Esq.
Fox Rothschild LLP
Two Lincoln Centre
5420 LBJ Freeway, Suite 1200
Dallas, TX 75240
*Counsel for Defendants Baumgardner Funeral Home, Inc.,
and Allen S. Baumgardner, Sr.*

/s/ Emil Lippe, Jr.

4 of 100 DOCUMENTS

**NANCY C. KENDRICK, Appellant v. PAUL SEIBERT, Appellee**

**NO. 01-13-00848-CV**

**COURT OF APPEALS OF TEXAS, FIRST DISTRICT, HOUSTON**

*439 S.W.3d 408*; *2014 Tex. App. LEXIS 6391*

**June 12, 2014, Opinion Issued**

**PRIOR HISTORY:** [**1]

On Appeal from the 311th District Court, Harris County, Texas. Trial Court Case No. 2009-30034.

**CASE SUMMARY:**

**OVERVIEW:** HOLDINGS: [1]-Evidence was legally sufficient to establish that the court's award of attorney's fees incurred in enforcing the passport provision, because the wife violated the contract's terms concerning delivery of the children's passports, and the husband filed suit seeking enforcement of the passport provisions; the divorce decree was agreed to by the parties and the passport provision did not concern a matter that could not be enforced as a contract, and *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (2008) applied.

**OUTCOME:** Judgment affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN1] The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. In performing a legal-sufficiency review, the appellate court must credit favorable evidence if reasonable fact finders could credit it and disregard contrary evidence unless reasonable fact finders could not disregard it. If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then fact finders must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. Although the reviewing court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support the verdict, if the evidence allows only one inference, neither fact finder nor the reviewing court may disregard the inference. An appellant attacking the legal sufficiency of an adverse finding on an issue for which she did not have the burden of proof must demonstrate that there is no evidence to support the adverse finding.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Contracts Law > Remedies > General Overview*
[HN2] Generally, attorney's fees are not recoverable from an opposing party unless authorized by statute or contract.

*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > General Overview*
*Family Law > Child Custody > General Overview*
[HN3] In a divorce proceeding, the parties can enter into an agreement over the matters to be resolved in the divorce. *Tex. Fam. Code Ann. § 7.006* (2006). Similarly, the parties can enter into agreements concerning matters affecting the parent-child relationship. *Tex. Fam. Code Ann. §§ 153.007, 154.124* (2014). For matters concerning the divorce and determination of the marital estate, the agreement is enforceable as a contract.

*Family Law > Child Custody > General Overview*
*Family Law > Child Support > General Overview*
[HN4] For matters concerning the parent-child relationship, terms of the agreement concerning conservatorship, access to the child, or child support are not enforceable as a contract. *Tex. Fam. Code Ann. §§ 153.007(c), 154.124(c)*. Any other terms concerning the parent-child relationship can be enforced as a contract.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Contracts Law > Remedies > General Overview*

EXHIBIT "A"

[HN5] *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (2008) provides that a person may recover reasonable attorney's fees from an individual in addition to the amount of a valid claim and costs, if the claim is for an oral or written contract. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)*.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Evidence > Inferences & Presumptions > Presumptions > Rebuttal of Presumptions*
*Evidence > Judicial Notice > General Overview*

[HN6] The court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in a proceeding before the court. *Tex. Civ. Prac. & Rem. Code Ann. § 38.004(1)* (2008). It is presumed that the usual and customary attorney's fees for a claim of the type described in *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (2008) are reasonable. The presumption may be rebutted. *Tex. Civ. Prac. & Rem. Code Ann. § 38.003* (2008). The trial court's own proceedings together with the fact that it may take judicial notice of usual and customary fees constitute some evidence to support the award of appellate attorney's fees. Appellate courts can presume that the trial court took judicial notice of the case file and of the usual and customary fees pursuant to *Tex. Civ. Prac. & Rem. Code Ann. § 38.004*. When there is no evidence to rebut the presumption in *Tex. Civ. Prac. & Rem. Code Ann. § 38.003*, no further evidence is required to establish reasonableness of attorney's fees.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Contracts Law > Remedies > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Evidence > Judicial Notice > General Overview*

[HN7] *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (2008) allows a party to recover reasonable attorney's fees for a written contract. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)*. When *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* applies, a trial court can take judicial notice of the case file and of the usual and customary attorney's fees, and the usual and customary fees are presumed to be reasonable. *Tex. Civ. Prac. & Rem. Code Ann. §§ 38.003, 38.004(1)*. Taking judicial notice of these two things is legally sufficient to support a determination that the attorney's fees award was reasonable.

**COUNSEL:** For APPELLANT: Rebecca L. Reitz, John F. Gay, GAY & REITZ ATTORNEYS AT LAW, Houston, TX.

For APPELLEE: Marcela Ortiz-Taing, ORTIZ-TAING LAW FIRM, P.C., League City, TX.

**JUDGES:** Panel consists of Justices Jennings, Higley, and Sharp.

**OPINION BY:** Laura Carter Higley

**OPINION**

[*409] Appellant, Nancy C. Kendrick, appeals the trial court's judgment in a suit to modify the parent-child relationship and agreement incident to divorce. In three issues, Kendrick argues the evidence is legally insufficient to establish that the attorney's fees awarded were reasonable.

We affirm.

**Background**

Paul Seibert and Nancy Kendrick's divorce was finalized on December 22, 2009. Seibert and Kendrick agreed to the divorce decree, and both approved the decree as to both form and substance. The agreement provides, "To the extent permitted by law, the parties stipulate the agreement is enforceable as a contract."

The agreement gave Kendrick the right to maintain possession of their children's passports. The passports provision required Kendrick to deliver the passports to Seibert within ten days of proper notification of intent to travel outside the United States with the children. The passports provision also established that, if Kendrick or Seibert violated those provisions, he or she would be liable for costs incurred due [**2] to noncompliance, including attorney's fees.

In January 2013, Seibert provided Kendrick with notice of his intent to take their children to Canada for three days in June 2013. Although she signed the notice before a notary and returned it to Seibert, Kendrick told Seibert that she would not deliver the children's passports to him. Seibert sent Kendrick another notice of his intent to take the children out of the country by certified mail. Seibert then filed a suit to modify the parent child relationship and agreement incident to divorce. Kendrick was served on June 3, 2013.

Kendrick did not file an answer to the suit, but she did deliver the children's passports to Seibert two days before the travel date. The trial court held a trial on September 6, 2013. Kendrick did not appear. [*410] Among other matters, Seibert testified about the attorney's fees incurred due to Kendrick's violation of the passport provision in the agreed divorce decree. Seibert testified that he had paid his attorney $2,500 in fees and $262 in other costs in his efforts to obtain the passports from Kendrick.

The trial court rendered judgment on the matter. In pertinent part, the trial court ordered Kendrick to pay Seibert's [**3] attorney $2,500 in attorney's fees and $262 in costs. Kendrick subsequently filed this notice of

EXHIBIT "A"

appeal.

**Standard of Review**

[HN1] "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)*. In performing a legal-sufficiency review, we must credit favorable evidence if reasonable fact finders could credit it and disregard contrary evidence unless reasonable fact finders could not disregard it. *Id.* "If the evidence . . . would enable reasonable and fair-minded people to differ in their conclusions, then [fact finders] must be allowed to do so." *Id. at 822*. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id*. Although the reviewing court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support the verdict, if the evidence allows only one inference, neither fact finder nor the reviewing court may disregard the inference. *Id*. An appellant attacking the legal sufficiency [**4] of an adverse finding on an issue for which she did not have the burden of proof must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983)*.

**Attorney's Fees**

In her three issues, Kendrick argues the evidence is legally insufficient to support the award of attorney's fees because there is no evidence that the fees were reasonable. Seibert acknowledges that there was no evidence of the reasonableness of the attorney's fees presented at trial but argues that such evidence was not necessary to support the award.

[HN2] Generally, attorney's fees are not recoverable from an opposing party unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 310 (Tex. 2006)*. Critical to our inquiry, then, is the determination of under what authority Seibert sought and obtained attorney's fees. Seibert argues that the agreed decree is enforceable as a contract, and, accordingly, he can recover attorney's fees pursuant to *section 38.001 of the Texas Civil Practice and Remedies Code. See TEX. CIV. PRAC. & REM. CODE ANN. § 38.001* (Vernon 2008). Kendrick argues that this section is inapplicable in this case because, [**5] "[t]his is a suit to enforce court orders," not "a suit based on contract." We hold that those two are not necessarily mutually exclusive.

[HN3] In a divorce proceeding, the parties can enter into an agreement over the matters to be resolved in the divorce. *See TEX. FAM. CODE ANN. § 7.006* (Vernon 2006). Similarly, the parties can enter into agreements concerning matters affecting the parent-child relation-

ship. *See TEX. FAM. CODE ANN. §§ 153.007, 154.124* (Vernon 2014). For matters concerning the divorce and determination of the marital estate, the agreement is enforceable as a contract. *Allen v. Allen, 717 S.W.2d 311, 313 (Tex. 1986)*; *Schwartz v. Schwartz, 247 S.W.3d 804, 806 (Tex. App.--Dallas 2008)*; see also [*411] *Rich v. Rich, No. 01-03-00078-CV, 2003 Tex. App. LEXIS 4027, 2003 WL 21027940, at *2 (Tex. App.--Houston [1st Dist.] May 8, 2003, no pet.)* (holding agreed divorce decree is enforceable as contract and as judgment); *Hicks v. Hicks, 348 S.W.3d 281, 283 (Tex. App.--Houston [14th Dist.] 2011, no pet.)* (holding, because parties entered into agreed divorce decree, it is treated as contract between parties).

[HN4] For matters concerning the parent-child relationship, terms of the agreement concerning conservatorship, access to [**6] the child, or child support are not enforceable as a contract. *See TEX. FAM. CODE ANN. §§ 153.007(c), 154.124(c)*. Any other terms concerning the parent-child relationship can be enforced as a contract. *See In re W.R.B., No. 05-12-00776-CV, 2014 Tex. App. LEXIS 2004, 2014 WL 1008222, at *4 (Tex. App.--Dallas Feb. 20, 2014, no pet. h.)* (holding term concerning post-majority support is enforceable as contract).

The divorce decree was agreed to by the parties. It was signed by Kendrick and Seibert, both of them approving the decree as to form and substance. The agreement specifically provides, "To the extent permitted by law, the parties stipulate the agreement is enforceable as a contract." The provision at issue--the passport provision--concerns the parent-child relationship, but it does not concern conservatorship, access to the child, or child support. Because the divorce decree was agreed to by the parties and the passport provision does not concern a matter that cannot be enforced as a contract, we hold it is enforceable as a contract.

[HN5] *Section 38.001* provides, "A person may recover reasonable attorney's fees from an individual . . . in addition to the amount of a valid claim and costs, if the claim is for . . . [**7] an oral or written contract." *TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8)*. Kendrick argues that Seibert did not present any evidence to establish that the $2,500 in attorney's fees was reasonable. Siebert acknowledges that he did not present any evidence of the reasonableness of the fees at trial but argues the evidence is still legally sufficient. We agree.

[HN6] "The court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in a proceeding before the court." *TEX. CIV. PRAC. & REM. CODE ANN. § 38.004(1)* (Vernon 2008). "It is presumed that the usual and customary attorney's fees for a claim of the type described in *Section 38.001* are reasonable. The presumption may be rebutted." *TEX. CIV. PRAC. & REM. CODE ANN. § 38.003* (Vernon 2008). "The trial court's

EXHIBIT "A"

own proceedings together with the fact that it may take judicial notice of usual and customary fees constitute some evidence to support the award of appellate attorney's fees." *Gill Sav. Ass'n v. Chair King, Inc., 797 S.W.2d 31, 32 (Tex. 1990)*. Appellate courts can presume that the trial court took judicial notice of the case file and of the usual and [**8] customary fees pursuant to *section 38.004. Vaughn v. Tex. Emp't Comm'n, 792 S.W.2d 139, 144 (Tex. App.--Houston [1st Dist.] 1990, no writ)*. When there is no evidence to rebut the presumption in *section 38.003*, "no further evidence [is] required to establish reasonableness of attorney's fees." *Id*.

Kendrick argues that these statutory provisions do not apply because the trial court can only take judicial notice of the case file and usual and customary fees in "a proceeding before the court" or "a jury case in which the amount of attorney's fees is submitted to the court by agreement." *TEX. CIV. PRAC. & REM. CODE ANN. § 38.004*. It is undisputed that there was no jury trial, so the second option is not applicable. *See id*. *§ 38.004(2)*. Kendrick argues the first option is not available either, relying [*412] on cases establishing that these provisions do not apply to summary judgment proceedings. *See Coward v. Gateway Nat'l Bank of Beaumont, 525 S.W.2d 857, 858 (Tex. 1975)*; *Gen. Elec. Supply Co. v. Gulf Electroquip, Inc., 857 S.W.2d 591, 601 (Tex. App.--Houston [1st Dist.] 1993, writ denied)*. Seibert did not obtain attorney's fees in a summary judgment proceeding. Accordingly, these cases are inapplicable.

Regardless [**9] of whether the proceeding below is characterized as a hearing or a trial, it indisputable that it was "a proceeding before the court." There was no jury. Evidence was presented.[1] The trial court made factual determinations and ruled accordingly. We hold *section 38.004* applies. *See TEX. CIV. PRAC. & REM. CODE ANN. § 38.004(1)*.

    1   Kendrick also relies on *Garcia v. Martinez,*

*894 S.W.2d 806, 807 (Tex. App.--Corpus Christi 1994, no writ)* for the proposition that a trial court cannot determine reasonableness of attorney's fees based on judicial knowledge without the benefit of an evidentiary hearing on the matter of attorney's fees. Given that evidence of attorney's fees was presented, we hold this case also has no application here.

Kendrick and Seibert's divorce decree was an agreed decree, making it both a contract and a judgment. *See Schwartz, 247 S.W.3d at 806*; *Rich, 2003 Tex. App. LEXIS 4027, 2003 WL 21027940, at *2*. Kendrick violated the contract's terms concerning delivery of the children's passports. Seibert filed suit seeking enforcement of the passport provisions. Accordingly, Seibert's suit included a claim for a written contract. [HN7] *Section 38.001* allows a party to recover reasonable attorney's fees for such a [**10] claim. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8)*. When *section 38.001* applies, a trial court can take judicial notice of the case file and of the usual and customary attorney's fees, and the usual and customary fees are presumed to be reasonable. *See id*. *§§ 38.003*, *.004(1)*. Taking judicial notice of these two things is legally sufficient to support a determination that the attorney's fees award was reasonable. *Gill Sav. Ass'n, 797 S.W.2d at 32*.

We hold the evidence is legally sufficient to establish that the trial court's award of attorney's fees incurred in enforcing the passport provision. We overrule Kendrick's three issues.

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley

Justice

EXHIBIT "A"



# DWAIN E. MATELSKI APPELLANT VS. SHARON MATELSKI APPELLEE

## NO. 2-91-273-CV

## COURT OF APPEALS OF TEXAS, SECOND DISTRICT, FORT WORTH

*840 S.W.2d 124*; *1992 Tex. App. LEXIS 2650*

**October 14, 1992, Decided**
**October 14, 1992, FILED**

**PRIOR HISTORY:** [**1] FROM THE 231ST DISTRICT COURT OF TARRANT COUNTY. TRIAL COURT JUDGE HON. MARYELLEN HICKS

**DISPOSITION:** We find that the issue of the amount of money, if any, due to Sharon with respect to the division of certificates of deposit that were part of Dwain's corporate pension plan, affects only a part of the matter in controversy and is clearly separable without unfairness to the parties. Consequently, we reverse and remand as to that issue only. We affirm the remainder of the judgment. Costs are charged 10% to Sharon Matelski, the appellee, and 90% to Dwain E. Matelski, the appellant.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant husband sought review of a judgment of the 231st District Court of Tarrant County (Texas), which enforced and clarified his final divorce decree against appellee wife.

**OVERVIEW:** Appellant husband sought review of a judgment enforcing his final divorce decree. On appeal, appellant argued allegations against the lower court's findings of fact and conclusions of law, error in applying Tex. Fam. Code Ann. § 3.70 (1992), granting appellee more time to answer admissions, finding no duress in execution of agreement, and awarding attorney's fees to appellee. The court reversed the portion of the judgment dealing with the amount of money appellant owed appellee in certificates of deposit because of lack of evidence to support the conclusion that appellant owed appellee $ 75,000.00 for her interest. The court affirmed the remainder of the judgment because the property agreement was incident to a divorce and enforceable under the Texas Family Code, there was no abuse of

discretion in giving appellee more time to answer admissions or finding that appellant was not under duress when he signed the agreement in question, there was no error in award of attorney's fees, and the numerous findings of fact and conclusions of law complained of were not, if in error, findings that were reasonably calculated to cause and probably did cause the rendition of an improper judgment.

**OUTCOME:** In an action to reverse judgment of a final decree of divorce, the court reversed the portion dealing with how much money appellant husband owed through certificates of deposit, but affirmed the remainder of the judgment. The court found no abuse of discretion and no error in the findings of fact or conclusions of law because the findings were not so contrary to the great weight and preponderance of the evidence as to be manifestly unjust.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
*Contracts Law > Defenses > Duress & Undue Influence > General Overview*
[HN1] In order to be a final judgment, a judgment must dispose of all parties and of all issues involved in the suit. However, it is not essential that the judgment expressly dispose of each issue. Rather, the disposition of a particular issue may be inferred from the other provisions of the judgment, provided that the inference follows as a necessary implication.

*Civil Procedure > Judgments > Entry of Judgments > General Overview*
*Civil Procedure > Judgments > Preclusion & Effect of*

EXHIBIT "B"

*Judgments > General Overview*
[HN2] Even if a trial court makes a docket entry on an oral order, the judgment will control over the docket entry.

*Family Law > Marital Duties & Rights > Property Rights > Characterization > Community Property*
*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Jurisdiction > General Overview*
*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > Characterization > Community Property*
[HN3] When the jurisdiction of a trial court is invoked in a divorce proceeding by the pleadings of either spouse, the court must decree a division of the community property.

*Civil Procedure > Pleading & Practice > Pleadings > Time Limitations > Extensions*
*Civil Procedure > Discovery > Methods > Admissions > Responses*
[HN4] Where the plaintiff is not injured and the trial is not delayed, even a slight excuse for the original failure to answer a request for admissions is sufficient.

*Contracts Law > Defenses > Duress & Undue Influence > General Overview*
*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > General Overview*
[HN5] A partition agreement is not enforceable if the party against whom enforcement is sought proves that he or she did not execute the agreement voluntarily. Tex. Fam. Code Ann. § 5.55(a)(1) (1992).

*Civil Procedure > Appeals > Standards of Review*
[HN6] An appellate court must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. So considering the evidence, if a trial court's finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*
*Contracts Law > Defenses > Duress & Undue Influence > General Overview*
[HN7] There can be no duress unless there is a threat to do some act which the party threatening has no legal right to do. Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. The restraint caused by such threat must be imminent. It must be such that the person to whom it is directed has no present means of protection.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN8] An appellate court will first consider only the evidence and inferences that tend to support the trial court's finding and disregard all evidence and inferences to the contrary. If there is any evidence of probative force to support the finding, the legal insufficiency point must be overruled and the finding upheld.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Evidence > Judicial Notice > General Overview*
[HN9] In a trial before the court, the trial court may review the case file and take judicial notice of the amount of reasonable attorney's fees, whether or not requested by a party to do so. *Tex. Civ. Prac. & Rem. Code Ann. § 38.004* (1986).

**COUNSEL:** FOR APPELLANT: RICHARD C. PRICE, FORT WORTH, TEXAS.

FOR APPELLEE: CLARKE & TIFFANY, AND CARL T. CLARKE AND DEFORREST N. TIFFANY, FORT WORTH, TEXAS.

**JUDGES:** PANEL B, HILL, AND FARRIS, JJ. ASHWORTH, J. (retired, sitting by assignment)

**OPINION BY:** JOHN G. HILL

**OPINION**

 [*125] OPINION

Dwain E. Matelski appeals from a judgment following the motion of Sharon Matelski, Dwain's ex-wife and the appellee, to enforce and clarify their final divorce decree.

Dwain contends in nine points of error that the trial court erred: (1) in signing the judgment of August 8, 1991 and the findings of fact and conclusions of [**2] law of August 8, 1991, because the August 8, 1991 judgment was not a final judgment; (2) in allowing Sharon to proceed under TEX. FAM. CODE ANN. § 3.70 (Vernon Supp. 1992) because that section does not

EXHIBIT "B"

apply to the enforcement of a partition agreement; (3) when it entered its findings of fact and conclusions of law that the partition agreement dated April 4, 1985, was incorporated by reference into the decree of divorce dated September 26, 1986, and [*126] that the partition agreement therefore became part of the judgment of the court as set forth in the decree of divorce; (4) in granting Sharon's motion to extend time to answer his request for admissions because she did not demonstrate good cause for such relief; (5) in finding that there was no duress in the execution of the partition agreement because it was contrary to the evidence; (6) when it entered its findings of fact that Dwain was in default in paying retirement benefits in the amount of $ 75,000 because the evidence is legally, or, alternatively, factually insufficient to support the findings; (7) in awarding Sharon her attorney's fees; and (8) when it entered its findings of fact and conclusions of law because the [**3] evidence is legally insufficient, and, in the alternative, factually insufficient to support the findings and conclusions.

We reverse that portion of the judgment dealing with the amount of money Dwain owes Sharon with respect to the partition of their interest in the certificates of deposit in Dwain's corporate pension plan because there is no evidence to support the trial court's conclusion that Dwain owed Sharon $ 75,000 for her interest in those certificates. We affirm the remainder of the judgment because: (1) the judgment is a final judgment because it necessarily disposes of all parties and issues involved in the suit; (2) those portions of the partition agreement that do not constitute a partition of property may properly be considered an agreement incident to divorce enforceable under the provisions of section 3.70 of the Texas Family Code; (3) Dwain makes no argument as to why those portions of the agreement that did constitute a partition of property could not be enforced as an agreement independently of the divorce decree, relief that Sharon alternatively sought; therefore, there is no showing that any error of the trial court in determining that the portion of the [**4] agreement partitioning the property was enforceable as part of the divorce decree was such an error as was reasonably calculated to cause and probably did cause the rendition of an improper judgment; (4) the trial court did not abuse its discretion in holding that there was good cause in granting Sharon's request for an extension of time to answer Dwain's first request for admissions where they were not answered due to confusion caused by a quick succession of requests and new, inexperienced office personnel; (5) the trial court's finding that Dwain was not under duress when he signed the partition agreement is not contrary to the great weight and preponderance of the evidence; (6) the trial court did not err in awarding Sharon her attorney's fees because in a trial before the court the trial court may review the file and take judicial notice of the amount of reasonable attorney's fees; and (7) numerous findings of fact and

conclusions of law complained of by Dwain are not, if in error, findings that are reasonably calculated to cause and probably did cause the rendition of an improper judgment.

Dwain contends in points of error numbers one and two that the trial court erred in signing [**5] the judgment of August 6, 1991, and the findings of fact and conclusions of law of August 8, 1991, because the August 8, 1991 judgment was not a final judgment. Sharon had previously filed her motion for enforcement and clarification of final decree of divorce. An instrument entitled a partition agreement was incorporated by reference into the decree, although apparently never attached to the decree. Sharon's motion was amended several times. Dwain contended by way of cross-action that he was under duress when he signed the partition agreement. On August 8, 1991, the trial court signed its judgment granting Sharon's motion. In that judgment the trial court enforced the partition agreement. It did not specifically refer to Dwain's cross-action.

[HN1] In order to be a final judgment, a judgment must dispose of all parties and of all issues involved in the suit. *Davis v. McCray Refrigerator Sales Corp., 136 Tex. 296, 150 S.W.2d 377 (Tex. 1941)*. As the supreme court stated in *Davis,* however, it is not essential that the judgment expressly dispose of each issue. *Id. at 378*. Rather, the disposition of a particular issue may be inferred from the other provisions [*127] [**6] of the judgment, provided that the inference follows as a necessary implication. *Id.* In this case, the trial court necessarily denied Dwain's claim that he was under duress when he signed the partition agreement when the court signed the judgment enforcing that agreement.

Dwain points out that the trial court orally said that there would be a later jury trial on the issue of duress. [HN2] Even if the trial court had made a docket entry to that effect, the judgment would control over the docket entry. *Hamilton v. Empire Gas & Fuel Co., 134 Tex. 377, 110 S.W.2d 561, 566 (1937)*; *Harrington v. Harrington, 742 S.W.2d 722* (Tex. App.--Houston [1st Dist.] 1987, no writ). We assume that the same rule would apply as to oral pronouncements of the court.

Dwain's contention that the trial court erred by prematurely making findings of fact and conclusions of law is based upon the premise that the judgment of August 8, 1991, was not final. We overrule points of error numbers one and two.

Dwain urges in points of error numbers three and four that the trial court erred in allowing Sharon to proceed under section 3.70 of the Texas Family Code because that section does not apply [**7] to enforcement of a partition agreement, and that the trial court erred when it entered its findings of fact and conclusions of law that the partition agreement dated April 4, 1985, was

EXHIBIT "B"

incorporated by reference and became part of the divorce decree dated September 26, 1986.

Dwain contends that because the agreement in question was a partition agreement pursuant to TEX. FAM. CODE ANN. § 5.52 (Vernon Supp. 1992) that it could not also be an agreement incident to divorce enforceable under the provisions of section 3.70 of the Family Code. An examination of the instrument styled "partition agreement" shows that a portion is indeed a partition agreement, but that a large portion of the instrument deals with matters, such as child support, visitation, and alimony that would be part of an agreement incident to divorce.

Dwain's argument that a partition agreement may not be enforced under the provisions of section 3.70 of the Family Code is not effective as to those portions of the agreement that did not constitute a partition of the Matelskis' property under section 5.52 of the Family Code, but were instead provisions that would normally be part of an agreement incident to a divorce.

[**8] Dwain is correct in stating that the portion of the agreement that was a partition agreement divided the parties' property at the time of its execution and that the trial court at the time of divorce had no jurisdiction over the division of separate property that had already been divided because the trial court only has the authority to divide the community estate of the parties. *See Cameron v. Cameron, 641 S.W.2d 210, 214 (Tex. 1982).* [HN3] When the jurisdiction of a trial court is invoked in a divorce proceeding by the pleadings of either spouse, the court must decree a division of the community property. *See Hailey v. Hailey, 160 Tex. 372, 331 S.W.2d 299, 302 (1960)*; *Whitehill v. Whitehill, 628 S.W.2d 148, 150* (Tex. App.--Houston [14th Dist.] 1982, no writ). Of course, the lack of a community estate to be divided does not, as claimed by Dwain, nullify a divorce. If this were not true, only persons owning property could ever be divorced.

However, as to those portions of the agreement that do constitute a partition agreement, Sharon, as an alternative to enforcing the agreement as a part of the divorce decree, sought enforcement of the agreement as an agreement [**9] independently of the divorce decree. Dwain makes no argument in his brief as to why the agreement was not properly enforceable as an agreement independently of the decree. Consequently, if the trial court erred by determining that the partition portions of the agreement were enforceable as part of the divorce decree, we hold that Dwain has failed to establish that such an error was reasonably calculated to cause and probably did cause an improper judgment. *See* TEX. R. APP. P. 81(b)(1). The same rule would apply as to Dwain's argument that the agreement was not attached to the [*128] decree. We overrule points of error numbers three and four.

Dwain urges in point of error number five that the trial court abused its discretion in granting Sharon's motion to extend time to answer Dwain's request for admissions because Sharon did not demonstrate good cause for such relief.

Dwain served requests for admissions on Sharon on January 10, 1989, and another set on January 12, 1989. Sharon answered both requests on Monday, February 13, 1989, the date that the response to the second set of requests was due, but several days after the response to the first set of requests would [**10] have been due. She timely filed a motion to extend time to answer the first set of requests. After the hearing, the trial court granted her motion.

Sharon's attorney testified at the hearing on her motion to extend the time to respond to the first request for admissions that the two sets of requests were delivered while he was in trial, and that when he got back out of trial, it was his impression, because the two sets were received in such "close conjunction," that they had both been delivered at the same time. He also stated that the person at the front desk of his office on the day the first request was delivered was brand new and did not know the correct procedures.

It has been held that [HN4] where the plaintiff is not injured and the trial not delayed, even a slight excuse for the original failure to answer a request for admissions will suffice. *Esparza v. Diaz, 802 S.W.2d 772, 776 (Tex. App.--Houston [14th Dist.] 1990, no writ).* We therefore hold that the trial court did not abuse its discretion in holding that there was good cause in granting Sharon's request for an extension of time to answer Dwain's first request for admissions.

Dwain argues that a busy court [**11] schedule is not a sufficient reason to set aside deemed findings, relying on *Curry v. Clayton, 715 S.W.2d 77 (Tex. App.--Dallas 1986, no writ).* In that case the trial court found that a showing that the late filing of a response to a request for admissions was due to an attorney's busy schedule was, without more, insufficient to show good cause for the late filing. *Id. at 79.* We hold that in this case there was more because, not only was the attorney busy, but there was confusion caused by a quick succession of requests and new, inexperienced office personnel. We overrule point of error number five.

Dwain insists in point of error number six that the trial court erred in finding that there was no duress in the execution of the partition agreement because it was contrary to the evidence. We must first determine which party had the burden of proof at trial on the issue of duress.

At the time of trial, the enforceability of a partition agreement was governed by section 5.55 of the Texas Family Code. That section holds that such [HN5] an agreement is not enforceable if the party against whom

EXHIBIT "B"

enforcement is sought proves that he or she did not execute the agreement voluntarily. [**12] TEX. FAM. CODE ANN. § 5.55(a)(1) (Vernon Supp. 1992). Consequently, at the time of trial, Dwain had the burden of proving that his execution of the agreement was not voluntary due to duress.

Dwain relies on the opinion in *Matthews v. Matthews, 725 S.W.2d 275, 279* (Tex. App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.) for his contention that Sharon had the burden of proof to prove by clear and convincing evidence that his consent was not procured by duress. We first note that the issue as to the burden of proof was not directly at issue in that case but also note that the opinion in the case preceded the adoption of section 5.55(a)(1) of the Texas Family Code.

We construe Dwain's point of error as an assertion that the trial court's finding of no duress is contrary to the great weight and preponderance of the evidence. In reviewing such a point of error, [HN6] we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)* (per curiam). So considering the evidence, if the trial court's finding is so contrary [**13] to [*129] the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt, 159 Tex. 305, 320 S.W.2d 815, 816 (1959)* (per curiam).

[HN7] There can be no duress unless there is a threat to do some act which the party threatening has no legal right to do. Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. The restraint caused by such threat must be imminent. It must be such that the person to whom it is directed has no present means of protection.

*Dale v. Simon, 267 S.W. 467, 470* (Tex. Comm'n App. 1924, judgm't adopted); *Matthews, 725 S.W.2d at 278*.

According to the evidence, the parties during the pendency of the divorce were in the process of negotiating a property settlement agreement. Progress was being made in the negotiations. DeForrest Tiffany was acting as the attorney for Sharon, but Dwain had known him longer than Sharon had.

While negotiations [**14] were proceeding toward settling the property division issues in the pending divorce, Dwain was proceeding with the building of a lake house at the Fort Worth Boat Club. Under the agreement he had with the club, he would have a long-term lease on a lot at the club, and the club would allow him to build a lake house on the lot. He would not obtain any ownership rights to the land. Dwain hoped to move into the house with an employee with whom he had developed a relationship.

Dwain's bank informed him that it would not go through with permanent financing on the lake house. Someone involved in the construction of the house had a mechanics and materialmen's lien placed on the house. Thereafter, approximately thirty days before his interim financing was to lapse, the Fort Worth Boat Club sent Dwain a letter stating that it would confiscate the house if the lien were not lifted within thirty days.

Dwain's bank informed him that it would not provide permanent financing for the lake house as he had understood that it would. When he went to another bank to seek permanent financing, bank officials informed him that he would have to come up with a considerable amount of money and some [**15] collateral to obtain the financing because of the arrangement with the club that prohibited there being a lien on the house. The officials also informed him that the temporary orders that Sharon had obtained in the divorce proceeding would make it difficult for Dwain to arrange the needed financing on his own.

Dwain informed Sharon about the lien and the possible forfeiture of the house. Subsequently, Dwain obtained an agreement from Sharon that he could use $ 50,000 from his retirement plan and use other property covered by the temporary restraining order to obtain the needed permanent financing. He said that his decision to continue at that time without counsel was of his own volition, and that he did not know of the possibility of seeking court approval for what he wished to do rather than reach an agreement with Sharon.

Following meetings of Tiffany, the parties, and occasionally others, Sharon agreed to approve of the measures necessary to obtain the permanent financing on the lake house and Dwain agreed to sign the partition agreement. The partition agreement was signed either on the way to the bank to sign the papers for the permanent financing or at the bank itself. [**16] There was no physical or other abuse by Sharon or anyone else prior to the signing.

Sharon testified that Dwain was enthused to sign the partition agreement so that he could get his house. She also said that it was not really his motivation for signing it at that time, that the two things just coincided. She said that she did not remember telling Dwain that she could not agree to the measures necessary to obtain the permanent financing unless he signed the agreement.

[*130] Dwain and Sharon left the bank together. Sharon testified that Dwain did not appear distressed, but instead was smiling and friendly toward her. He said nothing about her having pushed him into an unfair

EXHIBIT "B"

situation. She related that he thanked her for lifting the injunction so he could get his house and she thanked him for signing the partition agreement. In response, he reminded her of his promise to always take care of her.

Dwain testified that he thinks that Sharon's actions constituted extortion and that she did not deal with him fairly. He said that he did not know whether Sharon had threatened to do something she had no legal right to do. He inferred that she refused to sign the agreement [**17] if he would not sign the partition agreement. He said he signed the agreement because he would have lost the house and had to pay the bank back if he had not.

The partition agreement was signed on April 4, 1985. The divorce decree was not signed until September 22, 1986. During that time Dwain continued to represent himself after voluntarily choosing not to obtain counsel. Dwain acknowledged that one of the purposes of the divorce decree was to incorporate the partition agreement into the decree. He indicated that he understood that he did not have to sign the decree.

Although Tiffany had made it clear to Dwain that he was representing Sharon and could not represent him, Dwain thought that Tiffany's actions in helping him to obtain permanent financing for the lake house and on other matters were in his best interest.

We hold that the trial court's finding that there was no duress is not contrary to the great weight and preponderance of the evidence, in view of the evidence indicating that Dwain signed the agreement because he wanted to and that he was pleased with the arrangement. We overrule point of error number six.

Dwain urges in point of error number seven that the [**18] evidence is legally and, in the alternative, factually insufficient to support the trial court's finding that he was in default in paying retirement benefits to Sharon in the amount of $ 75,000.

[HN8] We will first consider only the evidence and inferences that tend to support the trial court's finding and disregard all evidence and inferences to the contrary. *See Larson v. Cook Consultants, Inc., 690 S.W.2d 567, 568 (Tex. 1985)*; *In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951)* (per curiam). If there is any evidence of probative force to support the finding, the legal insufficiency point must be overruled and the finding upheld. *Id.*

The partition agreement provided that Dwain and Sharon were each to receive 50% of the certificates of deposit derived from Dwain's corporate pension plan, with interest accrued from January 1, 1985. The agreement was to have an Exhibit E attached to it listing those certificates but the copy in our record has no such exhibit attached.

We have examined the testimony of the parties and can find no evidence of $ 150,000 worth of certificates of deposit that might be considered to be divided by the partition agreement, resulting [**19] in a share for Sharon in the amount of $ 75,000. We have examined the evidence that Sharon refers to in her brief but our most careful analysis, and giving Sharon the benefit of every question, shows that the amount due Sharon would be far short of the $ 75,000 found by the court. We sustain point of error number seven.

Dwain argues in point of error number eight that the trial court erred in awarding her attorney's fees. He points out that there was no testimony that the amount of attorney's fees found by the court was reasonable. [HN9] In a trial before the court, the trial court may review the case file and take judicial notice of the amount of reasonable attorney's fees, whether or not requested by a party to do so. *Lacy v. First Nat. Bank, 809 S.W.2d 362, 367* (Tex. App.--Beaumont 1991, no writ); *TEX. CIV. PRAC. & REM. CODE ANN. § 38.004* (Vernon 1986). We overrule point of error number eight.

Dwain contends in point of error number nine that the trial court erred when it entered [*131] several of the trial court's findings of fact and conclusions of law because the evidence is legally insufficient, or, alternatively, factually insufficient to support them. We have [**20] examined all sixteen findings and find that as to all except finding 6j none of these findings, if error, is such a finding as was reasonably calculated to cause or probably did cause the rendition of an improper judgment.

In its finding 6j, the court found that Dwain was in default by failing to transfer $ 75,000, representing 50% of the certificates of deposit in his corporate pension plan. As previously noted, there is no evidence to support the trial court's finding. We sustain point of error number nine as to this finding; otherwise we overrule point of error number nine.

We find that the issue of the amount of money, if any, due to Sharon with respect to the division of certificates of deposit that were part of Dwain's corporate pension plan, affects only a part of the matter in controversy and is clearly separable without unfairness to the parties. Consequently, we reverse and remand as to that issue only. We affirm the remainder of the judgment. Costs are charged 10% to Sharon Matelski, the appellee, and 90% to Dwain E. Matelski, the appellant.

JOHN G. HILL

JUSTICE

PANEL B

HILL, AND FARRIS, JJ.

ASHWORTH, J. (retired, sitting by assignment)

OCT 14 [**21] 1992

EXHIBIT "B"

EXHIBIT "B"

2 of 100 DOCUMENTS

**THE LONG TRUSTS, Appellants v. ATLANTIC RICHFIELD COMPANY, Appellee**

**No. 06-94-00087-CV**

**COURT OF APPEALS OF TEXAS, SIXTH DISTRICT, TEXARKANA**

**893 S.W.2d 686; 1995 Tex. App. LEXIS 47**

**December 1, 1994, Submitted**
**January 12, 1995, Decided**
**January 12, 1995, Filed**

**PRIOR HISTORY:** [**1] On Appeal from the 4th Judicial District Court. Rusk County, Texas. Trial Court No. 88-07-233.
*Atlantic Richfield Co. v. Long Trusts, 860 S.W.2d 439, 1993 Tex. App. LEXIS 1203 (Tex. App. Texarkana, 1993)*

**DISPOSITION:** AFFIRMED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant trusts challenged an order of the 4th District Court (Texas), awarding attorney's fees to appellee corporation in a breach of contract action. Appellants contended the trial court erred in awarding attorney's fees without taking evidence at the motion hearing, and that testimony about fees from the original trial constituted inadmissible hearsay at the hearing on remand.

**OVERVIEW:** This cause of action arose over disputes between appellant trusts and appellee corporation involving the parties' rights and obligations under six joint operating agreements. On remand from the appeals court, the trial court determined the proper amount of attorney's fees recoverable by appellee. Appellants sought further review, arguing that the trial court erred in awarding attorney's fees without taking evidence at the motion hearing and that testimony about fees from the original trial constituted inadmissible hearsay at the hearing on remand. The appeals court affirmed the order. The court reasoned that the trial court acted in compliance with Tex. Civ. Prac. & Rem. Code Ann. ch. 38.004(2), which allows the court to take judicial notice of the usual and customary fees and of the contents of the case file and set the fees based on such judicial notice without receiving further evidence, in cases where the parties agree to submit the amount of attorney's fees to the court. The court also ruled that appellants were not entitled to present new evidence at the hearing on remand because the reversal was because of legal error rather than because of evidentiary insufficiency.

**OUTCOME:** The order awarding attorney's fees to appellee corporation in a breach of contract action was affirmed. The court ruled that the trial court did not err in taking judicial notice of the usual and customary fees and the contents of the case file, and in setting the fees based on judicial notice without receiving further evidence, because it constituted sufficient evidence on which to base an award.

**LexisNexis(R) Headnotes**

*Evidence > Judicial Notice > General Overview*
*Governments > Legislation > General Overview*
*Legal Ethics > Client Relations > Attorney Fees > Fee Agreements*
[HN1] A party may recover reasonable attorney's fees on a contract claim and the court may presume that the usual and customary charges for the work performed are reasonable. The presumption may be rebutted. In a jury case where the parties agree to submit the amount of attorney's fees to the court, the court may take judicial notice of the usual and customary fees and of the contents of the case file and set the fees based on such judicial notice without receiving further evidence. The statute permitting that procedure is to be liberally construed to promote its underlying purposes.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Civil Procedure > Appeals > General Overview*
*Evidence > Judicial Notice > General Overview*
[HN2] In the absence of other evidence supporting an award of attorney's fees, the reviewing court will presume that the trial court took judicial notice of the usual and customary fees and of the contents of the case file in determining the amount of attorney's fees awarded.

EXHIBIT "C"

Judicial notice of the usual and customary fees constitutes some evidence on which the trial court may base an award.

***Civil Procedure > Remedies > Costs & Attorney Fees > General Overview***
***Civil Procedure > Appeals > Standards of Review > Abuse of Discretion***

[HN3] A reviewing court will not overturn a trial court's allowance of attorney's fees unless the award constitutes a clear abuse of discretion. The test for whether the trial court abused its discretion is whether it acted without reference to any guiding rules and principles, that is, whether the court's action was arbitrary or unreasonable.

***Civil Procedure > Remedies > Costs & Attorney Fees > General Overview***
***Evidence > Judicial Notice > Domestic Laws***

[HN4] Taking judicial notice of the case file and of the usual and customary fees constitutes some evidence, and no further evidence is needed. The trial court can also apportion attorney's fees by judicial notice.

***Civil Procedure > Appeals > Frivolous Appeals***

[HN5] Where the reviewing court determines that the appellant has taken the appeal for delay and without sufficient cause, it may award the appellee up to 10 times the total taxable costs as damages. An appellant's right of review will not be penalized unless there is a clear showing that he had no reasonable ground to believe that the judgment would be reversed. If the argument on appeal, even if it fails to convince the court, has a reasonable basis in law and constitutes an informed, good-faith challenge to the trial court's judgment, Tex. R. App. P. 84 damages are not appropriate.

**COUNSEL:** Hon. F. Franklin Honea, Payne & Vendig, Dallas, TX.

Hon. Rex. A. Nichols, Attorney at Law, Longview, TX.

Hon. Mike A. Hatchell, Ramey & Flock, Tyler, TX.

Hon. Bryant Boren, Jr., Baker & Botts, Dallas, TX.

**JUDGES:** Before Cornelius, C.J., Bleil and Grant, JJ. Opinion by Chief Justice Cornelius

**OPINION BY:** William J. Cornelius

**OPINION**

 [*687] OPINION

Opinion by Chief Justice Cornelius

The Long Trusts appeal from the trial court's order awarding attorney's fees to Atlantic Richfield Company.

This case has a long history. It originated with several disputes among The Long Trusts, Atlantic Richfield Company (ARCO), B & A Pipeline Company, and Ensearch, Inc. The disputes included various claims for debt and alleged breaches of contract involving the parties' rights and obligations under six joint operating agreements governing the development of several gas units in Rusk County.

At the original jury trial the, parties agreed to have the court decide the attorney's fee issues. All issues were disposed of in the court's final judgment dated December 18, 1991. This Court affirmed that judgment in all respects except the failure to award attorney's fees to [**2] ARCO. We held that ARCO was entitled to recover its attorney's fees, and we remanded that portion of the cause to the trial court to determine the proper amount of those fees. *Atlantic Richfield Co. v. Long Trusts, 860 S.W.2d 439* (Tex. App.--Texarkana 1993, writ denied). After remand of that portion of the case, ARCO filed a motion for judgment for attorney's fees, attaching to its motion a copy of some testimony on reasonable fees that was given at the original trial. The Trusts filed a response and opposition to ARCO's motion for judgment, and the trial court held a hearing on March 30, 1994. No evidence was offered at the hearing, but ARCO asked the court to take judicial notice that $ 304,000.00 was a reasonable amount for its attorney's fees. The court granted ARCO's motion and rendered judgment for the attorney's fees in the amount of $ 303,759.00.

On appeal the Trusts present eight complaints, most of which are based on their argument that the trial court erred in awarding attorney's fees without taking evidence at the March 30, 1994 hearing.

[HN1] A party may recover reasonable attorney's fees on a contract claim, *TEX. CIV. PRAC. & REM. CODE ANN. § [**3] 38.001(8)* (Vernon 1986), and the court may presume that the usual and customary charges for the work performed are reasonable. The presumption may be rebutted. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.003* (Vernon 1986). In a jury case where the parties agree to submit the amount of attorney's fees to the court, as they did here, the court may take judicial notice of the usual and customary fees and of the contents of the case file and set the fees based on such judicial notice without receiving further evidence. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.004(2)* (Vernon 1986). The statute permitting that procedure is to be  [*688]  liberally construed to promote its underlying purposes. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.005* (Vernon 1986).

[HN2] In the absence of other evidence supporting an award of attorney's fees, the reviewing court will presume that the trial court took judicial notice of the usual and customary fees and of the contents of the case file in determining the amount of attorney's fees awarded. *Bloom v. Bloom, 767 S.W.2d 463, 471* (Tex. App.--San Antonio 1989, writ denied); *Flint & Associates v.*

EXHIBIT "C"

*Intercontinental Pipe & Steel, 739 S.W.2d 622* [**4] (Tex. App.--Dallas 1987, writ denied). Judicial notice of the usual and customary fees constitutes some evidence on which the trial court may base an award. *Coward v. Gateway Nat'l Bank of Beaumont, 525 S.W.2d 857 (Tex. 1975)*; *Superior Ironworks v. Roll Form Products, 789 S.W.2d 430* (Tex. App.--Houston [1st Dist.] 1990, no writ).

[HN3] A reviewing court will not overturn a trial court's allowance of attorney's fees unless the award constitutes a clear abuse of discretion. *Ross v. 3D Tower Ltd.,* 824 S.W.2d 270, 273 (Tex. App.--Houston [14th Dist.] 1992, writ denied). The test for whether the trial court abused its discretion is whether it acted without reference to any guiding rules and principles, that is, whether the court's action was arbitrary or unreasonable. *Griggs v. Capitol Machine Works, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985)*.

The trial court here did not act without reference to guiding rules and principles. It took judicial notice of the contents of the case file and the usual and customary attorney's fees, which are presumed to be reasonable. It exercised [**5] its discretion in setting the fees, and it acted within the plain language of the statutes in Chapter 38 of the Civil Practice & Remedies Code.

The Trusts, however, argue that the evidence was legally and factually insufficient to support the award of attorney's fees because there was no evidence adduced at the March 30 hearing. They also argue that, because we severed the claim for attorney's fees from the main action when we remanded it, and because the statement of facts in the main action has remained in this Court, the trial court had no case file available to judicially notice and, for that additional reason, there was no evidence to support the award. They also contend that, even if the court could take judicial notice of the statement of facts and the file of the original trial, there was no testimony or other evidence in those papers that supported the amount of attorney's fees that should be awarded or the manner in which they should be apportioned among the claims involved in the original suit.

Most of the Trusts' arguments are based on their premise that there must have been some sort of evidentiary hearing on remand and some evidence produced at that hearing to support [**6] the attorney's fee award. The statutes and the case law, however, do not require that. [HN4] Taking judicial notice of the case file and of the usual and customary fees constitutes some evidence, *Bloom v. Bloom, supra,* and no further evidence is needed. *Superior Ironworks v. Roll Form Products, supra.* The trial court can also apportion attorney's fees by judicial notice. *See Flint & Associates v. Intercontinental Pipe & Steel, supra.*

The Trusts argue that the trial court erred in awarding and apportioning attorney's fees because the testimony about fees from the original trial constituted inadmissible hearsay at the hearing on remand. We disagree. The evidence was not hearsay. It was part of the case file, of which the court took judicial notice. Evidence that is judicially noticed does not constitute hearsay.

We also disagree with the Trusts' contention that, because we severed the issue of attorney's fees and there was no testimony at the hearing on remand, there was no case record or testimony in this case for the trial court to judicially notice. When the statute speaks of the contents of the [**7] "case file," it means the file of the case for which the attorney's fees were incurred and in which the issue of attorney's fees was first joined, that is, the original trial. The trial court here had the record of that trial available to it, even though some of that record may have still been physically located in another court.

Moreover, while that part of the case we severed and affirmed is now considered a [*689] separate case with a final judgment, the part we remanded remained a part of the original case. The testimony and record of that original case also remained as the testimony and the record as far as the remanded portion is concerned. Therefore, the trial court properly considered the testimony and other matters in the case file.

The Trusts also argue that the court erred in refusing to let them present evidence on the attorney's fees issue at the hearing on remand. We overrule this contention.

This Court reversed the failure to award ARCO attorney's fees because of the trial court's legal error in refusing to award them, not because there was insufficient evidence to sustain them. Since the reversal was because of a legal error rather than because of evidentiary insufficiency, [**8] the remand did not require a factual retrial of the issue, but only a determination by the court of the proper fees based on the evidence adduced at the original trial and a consideration of the case file. Thus, the Trusts were not entitled to present new evidence at the hearing on remand. The issue was to be decided on the evidence and records that were before the court at the original trial. If the Trusts desired to put on additional evidence regarding the proper amount of attorney's fees, they should have done so at the original trial when the issue was first joined.

The Trusts also challenge the award as being excessive and supported by insufficient evidence in the case file. Although because the matter had been submitted by agreement to the trial court it was not necessary for ARCO to present testimony at the original trial on the amount of reasonable attorney's fees, ARCO did present such testimony. That testimony dealt with the complexity of the case, with the time spent on it, with

EXHIBIT "C"

reasonable charges, and with the particular claims to which the work applied. That testimony, a copy of which was attached to ARCO's motion for judgment on the remand hearing, is sufficient to support [**9] the court's award, and we do not find the amount set by the court to be excessive or to constitute an abuse of the trial court's discretion.

ARCO in a cross-point complains that the Trusts took this appeal for delay and without sufficient cause, and it asks us to award damages as sanctions. [HN5] Where the reviewing court determines that the appellant has taken the appeal for delay and without sufficient cause, it may award the appellee up to ten times the total taxable costs as damages. TEX. R. APP. P. 84. An appellant's right of review will not be penalized unless there is a clear showing that he had no reasonable ground to believe that the judgment would be reversed. *Beago v. Ceres, 619 S.W.2d 293, 295* (Tex. Civ. App.--Houston [1st Dist.] 1981, no writ). If the argument on appeal,

even if it fails to convince the court, has a reasonable basis in law and constitutes an informed, good-faith challenge to the trial court's judgment, Rule 84 damages are not appropriate. *General Electric Credit Corp. v. Midland Central Appraisal Dist., 826 S.W.2d 124, 125 (Tex. 1991).* Considering the entire record and all of the circumstances, we [**10] do not conclude that this appeal was taken for delay or without sufficient cause, and we therefore decline to assess damages.

For the reasons stated, the judgment of the trial court is affirmed.

William J. Cornelius

Chief Justice

Date Submitted: December 1, 1994

Date Decided: January 12, 1995

EXHIBIT "C"

067-250449-11

6 of 100 DOCUMENTS

**James E. Cox; James E. Cox d/b/a European Import Car Repair; and European Import Car Repair, Inc., Appellants v. Doug Wilkins, CPA, Appellee**

**NO. 03-05-00110-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

*2006 Tex. App. LEXIS 2598*

**March 31, 2006, Filed**

**SUBSEQUENT HISTORY:** [*1]
Petition for review denied by *Cox v. Wilkins, 2006 Tex. LEXIS 760 (Tex., Aug. 25, 2006)*

**PRIOR HISTORY:** FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY, NO. 278796, HONORABLE ORLINDA L. NARANJO, JUDGE PRESIDING.

**DISPOSITION:** Modified and, as Modified, Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellants, a repair company and its president, challenge only that part of the decision of the County Court at Law, No. 2 of Travis County (Texas), which awarded attorney fees to appellee accountant. The trial court had awarded the accountant actual damages, plus post-judgment interest, and attorney fees in his action against the owner and company for breach of contract, quantum meruit, and promissory estoppel.

**OVERVIEW:** A dispute arose over the accountant's fee for tax returns and he filed this action and was awarded damages and attorney fees. On appeal, the court modified the judgment and affirmed. The court was free to presume that the trial court took judicial notice of the usual and customary fees pursuant to *Tex. Civ. Prac. & Rem. Code Ann. § 38.004* (1997) even if the trial court did not state that it was doing so, and the trial court was not required by statute or rule to give notice that it was taking such judicial notice. There was sufficient evidence to support the award of attorney fees under *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)* (1997), which award was not discretionary. There was no basis for the trial court to render judgment against the president doing business as the company and accordingly, the court modified the judgment to strike any reference to the president doing business as the company. The court held

that the final judgment was actually rendered on November 30, and thus post-judgment interest began to accrue on November 30, for purposes of *Tex. Fin. Code Ann. § 304.005(a)* (Supp. 2005), and the court modified the judgment accordingly.

**OUTCOME:** The court modified the judgment to reflect that post-judgment interest began to accrue on November 30, not November 3, and the court also struck any reference to the president doing business as the company. As modified, the court affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Testimony > Presentation of Evidence*
[HN1] *Tex. R. Civ. P. 270* allows a trial court to permit additional evidence to be offered at any time when it clearly appears to be necessary to the due administration of justice. *Tex. R. Civ. P. 270*. A trial court should exercise its discretion liberally in the interest of justice so that both parties are permitted to fully develop their case. Unless the trial court has clearly abused its discretion, an appellate court should not disturb its refusal to reopen a case for the purpose of admitting additional evidence.

*Civil Procedure > Appeals > Standards of Review > General Overview*
*Evidence > Testimony > Presentation of Evidence*
[HN2] In determining whether to permit additional evidence, a trial court may consider the following factors: (1) the moving party's due diligence in obtaining the evidence; (2) the decisiveness of the proffered evidence; (3) any undue delay the reception of the evidence could cause; and (4) any injustice the granting of the motion could cause. Where these factors are present, it may be a trial court's duty to grant a party's motion to offer additional evidence. These are just

EXHIBIT "D"

factors to be considered, and even if all of the factors are not satisfied, a trial court's ruling on a party's motion to reopen the evidence should not be disturbed.

***Evidence > Testimony > Presentation of Evidence***
[HN3] *Tex. R. Civ. P. 270* does not explicitly set forth any factors necessary to reopen a case; instead it places the decision to reopen within the trial court's discretion. Rule 270 provides that a court may permit additional evidence to be offered at any time.

***Civil Procedure > Appeals > Standards of Review > Abuse of Discretion***
***Evidence > Procedural Considerations > Rulings on Evidence***
[HN4] In reviewing a trial court's decision to admit evidence, the appellate court utilizes an abuse of discretion standard. A trial court abuses its discretion when it rules without regard for any guiding rules or principles. The appellate court must uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling.

***Evidence > Hearsay > Rule Components > General Overview***
[HN5] See *Tex. R. Evid. 801(d)*.

***Evidence > Hearsay > Exceptions > General Overview***
***Evidence > Procedural Considerations > Burdens of Proof > General Overview***
[HN6] The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence.

***Evidence > Hearsay > Exceptions > Business Records > General Overview***
[HN7] *Tex. R. Evid. 803(6)*, the business records exception, provides that evidence meeting certain criteria should not be excluded under the hearsay rule.

***Evidence > Hearsay > Exceptions > Business Records > General Overview***
[HN8] See *Tex. R. Evid. 803(6)*.

***Evidence > Hearsay > Exceptions > Business Records > General Overview***
[HN9] The foundation for the business records exception has four requirements: (1) the records were made and kept in the course of a regularly conducted business activity, (2) it was the regular practice of the business activity to make the records, (3) the records were made at or near the time of the event that they record, and (4) the records were made by a person with knowledge who was acting in the regular course of business.

***Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards***
***Evidence > Judicial Notice > General Overview***
[HN10] Generally, a trial court may take judicial notice of certain facts, whether requested or not. *Tex. R. Evid. 201(c)*. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. *Tex. R. Evid. 201(e). Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (1997) provides that a party may recover reasonable attorney's fees if the claim is for an oral or written contract. The Texas Civil Practice and Remedies Code contains a more specific judicial notice provision.

***Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards***
***Evidence > Judicial Notice > General Overview***
[HN11] See *Tex. Civ. Prac. & Rem. Code Ann. § 38.004(1)* (1997).

***Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards***
***Civil Procedure > Appeals > Standards of Review > General Overview***
***Evidence > Judicial Notice > General Overview***
[HN12] The appellate court may presume that a trial court took judicial notice of the usual and customary fees pursuant to *Tex. Civ. Prac. & Rem. Code Ann. § 38.004(1)* (1997) even if it did not state that it was doing so.

***Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards***
***Evidence > Judicial Notice > General Overview***
***Governments > Legislation > Interpretation***
[HN13] Because *Tex. Civ. Prac. & Rem. Code Ann. § 38.004* (1997) is more specific than *Tex. R. Evid. 201*, it controls in all claims for attorney's fees made under Tex. Civ. Prac. & Rem. Code Ann. ch. 38. Specific statutes control over general ones.

***Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards***
***Evidence > Judicial Notice > General Overview***
[HN14] *Tex. Civ. Prac. & Rem. Code Ann. § 38.004* (1997) explicitly informs litigants that a court may do so in a claim for attorney's fees brought under Tex. Civ. Prac. & Rem. Code Ann. ch. 38.

***Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > General Overview***

EXHIBIT "D"

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*

[HN15] Generally, the appellate court reviews a trial court's decision to grant or deny attorney's fees for an abuse of discretion, and the appellate court reviews the amount awarded as attorney's fees under a sufficiency of the evidence standard. A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. It is an abuse of discretion to award attorney's fees if there is no evidence or insufficient evidence to support the award.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*

[HN16] Statutes stating that a court "may" award attorney's fees give courts the discretion to award attorney's fees, but statutes stating that a party "may recover," "shall be awarded," or "is entitled to" attorney's fees are not discretionary.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*

[HN17] Because *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)* (1997) specifies that a party may recover reasonable attorney's fees if the claim is for an oral or written contract, the award is not discretionary.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*

[HN18] The Texas Supreme Court has identified various factors to consider when determining what a reasonable award of attorney's fees should be. They include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. Not all of the factors must be considered in every case. They are general guidelines that the supreme court has stated should be taken into account when determining the reasonableness of attorney's fees. Evidence of attorney's fees that is clear, direct, and uncontroverted is taken as true as a matter of law, especially where the opposing party had the means and opportunity of disproving the evidence but did not.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*

[HN19] In a challenge to legal sufficiency, the appellate court reviews the evidence in the light most favorable to the challenged finding and indulges every reasonable inference that would support it. The appellate court credits favorable evidence if a reasonable fact finder could do so and disregards contrary evidence unless a reasonable fact finder could not. The evidence is legally sufficient if it would enable fair-minded people to reach the verdict under review.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*

[HN20] In reviewing the factual sufficiency of the evidence, the appellate court considers and weighs all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. The appellate court may not substitute its own judgment for that of the trier of fact, even if the appellate court would have reached a different result on the evidence. Therefore, the appellate court will reverse only if the overwhelming weight of the evidence indicates the trial court's judgment was clearly wrong and unjust.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*

[HN21] See *Tex. Civ. Prac. & Rem. Code Ann. § 38.003* (1997).

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*

[HN22] A trial court need not consider every factor of a certain list of factors when determining reasonableness of attorney's fees.

*Civil Procedure > Remedies > Judgment Interest > Postjudgment Interest*

[HN23] See *Tex. Fin. Code Ann. § 304.005(a)* (Supp. 2005).

*Civil Procedure > Judgments > Entry of Judgments > General Overview*

[HN24] Generally, a judgment is rendered when the decision is officially announced orally in open court, by memorandum filed with the clerk, or otherwise announced publicly. An intent to render judgment in the

EXHIBIT "D"

future does not satisfy this test.

*Civil Procedure > Judgments > Entry of Judgments > General Overview*

[HN25] When there is a question concerning the date judgment was rendered, the date the judgment was signed prevails over a conflicting docket sheet entry.

**COUNSEL:** For APPELLANTS: Mr. John A. Mead, Mr. R. Robert Willmann, Jr., AGE DISCRIMINATION in EMPLOYMENT ACT, San Antonio, TX.

For APPELLEE: Mr. J.P. Cody, THE LAWRENCE FIRM, Austin, TX.

**JUDGES:** Before Justices B. A. Smith, Puryear and Pemberton.

**OPINION BY:** Bea Ann Smith

**OPINION**

**MEMORANDUM OPINION**

Appellants James E. Cox and European Import Car Repair, Inc. (collectively "Cox"), challenge only the trial court's award of attorney's fees to appellee Doug Wilkins. Cox hired Wilkins to prepare income tax returns for himself and his corporate business, but did not pay Wilkins for his services. After unsuccessful attempts at collecting the debt and settling the dispute, Wilkins brought suit alleging breach of contract, quantum meruit and promissory estoppel. The trial court awarded Wilkins actual damages and attorney's fees. Cox does not appeal the damages awarded, but in his first three issues on appeal he contends that the trial court erred by (1) allowing Wilkins to reopen his case to present evidence of attorney's fees, (2) admitting a detailed invoice describing Wilkins's time and charges in the matter, [*2] and (3) awarding attorney's fees without taking judicial notice of the usual and customary attorney's fees for this type of case. In issues four through eight, Cox challenges the sufficiency of the evidence supporting the trial court's award of attorney's fees. In issues nine and ten, Cox insists that the trial court's final judgment assesses liability against a non-existent party. In his final issue, Cox claims that the trial court erroneously awarded post-judgment interest prior to the date on which the final judgment was rendered. We will modify the judgment and affirm it as modified.

**BACKGROUND**

James Cox is the president of European Import Car Repair, Inc. In 2002, Cox hired Doug Wilkins, CPA, to prepare and file his individual income tax return and the corporate income tax return for his business for 2001. Wilkins charged Cox approximately $ 3,300 to complete both returns. Cox testified that he was surprised by the amount of the bill because in the past he had paid substantially less. Wilkins explained to Cox that the corporation's books were not in order and consequently it took extra time to prepare the forms. Cox acknowledged that the bookkeeping discrepancies could [*3] have been due to a recent fire at his business, or to the fact that a former employee had been embezzling funds from the corporation. Cox also asserted that Wilkins took time to teach the corporation's bookkeeper how to properly categorize expenses so that the following year's taxes could be prepared more efficiently. Despite his reservations, Cox paid Wilkins the amount billed for his services.

The following year, Cox again hired Wilkins to prepare and file his individual and corporate income tax returns for 2002. Wilkins testified that he sent Cox a bill for his services around the end of May 2003; Wilkins charged $ 3,200, $ 450 for preparation of the individual return and $ 2,750 for the corporate return. When Cox did not respond, Wilkins sent a second invoice in August 2003. On both bills, Wilkins noted that the "invoices are seriously past due." Again, Cox failed to respond.

In December 2003, Wilkins sent Cox two final demand notices, one for the individual return and the other for the corporate return. Cox testified that in January 2004 the parties agreed to settle the dispute for $ 1,950--$ 450 for the individual income taxes and $ 1,500 for the corporate income taxes. Cox [*4] then sent Wilkins two checks, a personal check for $ 450 and a corporate check for $ 1,500. Wilkins admits that Cox did tender these two checks to Wilkins's attorney, J.P. Cody, who drafted a settlement agreement and sent it to Cox on February 6, 2004. Cox insisted at trial that he signed the agreement and faxed it back to Wilkins's attorney that day. Wilkins maintained that neither he nor Cody ever received the signed agreement. Diana Anderson, Cody's paralegal, testified that in early February 2004, Cox telephoned to complain that the settlement agreement was not in proper form and had to be renegotiated. On February 11, Anderson e-mailed Cody that Cox had called to say that the agreement incorrectly named the parties, the time period for settlement had passed, and the settlement agreement had to be renegotiated. Anderson's e-mail was admitted into evidence at trial. In response, Wilkins filed suit.

Initially, Cox did not obtain counsel. Between January 2004 and August 2004, Cox made several phone calls to Cody's office and sent a series of letters in which he accused Wilkins of overcharging him for the tax preparation services. He also threatened to file a complaint with the Attorney [*5] General's office and a counter-suit alleging violations of the deceptive trade practices act. Wilkins sought a temporary restraining order to enjoin Cox from publicly disparaging his reputation.

On August 4, 2004, Cox was notified that the case had been set for trial on August 12. Cox filed a motion for continuance alleging inadequate notice. On August 12, the trial court held a hearing only on Wilkins's

EXHIBIT "D"

application for a temporary restraining order. At that hearing, Cox claimed that he could not proceed because his counsel, John Mead, was unavailable. However, the trial judge telephoned Mead and discovered that he had not been hired to represent Cox. At the trial judge's urging, Mead agreed to represent Cox from that date forward.

A bench trial was held in October 2004. After closing arguments, the trial judge asked the parties if they had agreed to submit evidence of attorney's fees by affidavit, as had been suggested earlier in the trial. Cox's attorney denied any such agreement. Wilkins asked to reopen on the issue of attorney's fees. Despite objection, the trial court allowed Wilkins to reopen for the "limited purposes of offering the attorney's fees." Cody testified that he [*6] had spent a total of 54 hours on the case incurring fees of $ 11,235. He then produced a detailed invoice which described each task performed, the amount of time spent, who performed the task (Cody or one of his paralegals), and the rate charged. Cox objected that Cody had not established that the document fell under the business record exception to the hearsay rule. The trial judge overruled the objection and admitted the invoice. Cody then testified:

This has been a more difficult case than normally, I would expected. I've done a lot of work with collection cases. I've never had to go through I can't even say how may letters--I can, if you want me to count them--that I've had to write back and forth corresponding with the defense prior to obtaining an attorney. Once you did appoint an attorney, things did run smoothly, and we have, I think, cooperated with each other to that extent. I think, normally, I would not be asking for as high an attorney award, except for the conduct here of the Defendant.

On cross-examination, Cox asked Cody three questions regarding the initials by each entry on the invoice, but did not controvert the amount or the reasonableness of the [*7] fees alleged. However, Cox continued to insist that the evidence remained insufficient to support an award of attorney's fees. The trial concluded and the court took the matter under advisement.

On November 3, 2004, the trial judge sent a letter to the parties advising them of her decision. The final judgment reflecting that decision was signed on November 30 and provided:

1. Plaintiff shall have judgment against Defendant James E. Cox, individually, for actual damages in the amount of $ 450,

and interest on that amount at the annual rate of five (5%) percent from November 3, 2004, until paid in full; and

2. Plaintiff shall have judgment against Defendant James E. Cox dba European Import Car Repair & European Import Car Repair, Inc., for actual damages in the amount of $ 2,750, and interest on that amount at the annual rate of five (5%) percent from November 3, 2004, until paid in full; and,

3. Plaintiff shall have judgment against Defendants James E. Cox dba European Import Car Repair & European Import Car Repair, Inc. for reasonable and necessary attorney's fees in the amount of $ 8,535 for which the Defendants are equally responsible.

Cox filed a motion [*8] for remittitur and for new trial. The trial court denied both motions. This appeal followed.

## DISCUSSION

In eleven issues, Cox challenges the trial court's award of attorney's fees. We address each issue in turn.

### Motion to reopen

In his first issue, Cox argues that the trial court erred by allowing Wilkins to reopen on the issue of attorney's fees because he failed to show due diligence or any of the required factors to justify reopening. [HN1] *Rule 270 of the Texas Rules of Civil Procedure* allows a trial court to permit additional evidence to be offered at any time "when it clearly appears to be necessary to the due administration of justice." *Tex. R. Civ. P. 270*. A trial court should exercise its discretion liberally in the interest of justice so that both parties are permitted to fully develop their case. *Naguib v. Naguib, 137 S.W.3d 367, 372 (Tex. App.--Dallas 2004, pet. denied)*. Unless the trial court has clearly abused its discretion, an appellate court should not disturb its refusal to reopen a case for the purpose of admitting additional evidence. *Id*.

[HN2] In determining whether to permit additional [*9] evidence, a trial court may consider the following factors: (1) the moving party's due diligence in obtaining the evidence; (2) the decisiveness of the proffered evidence; (3) any undue delay the reception of the evidence could cause; and (4) any injustice the granting of the motion could cause. *Id. at 373*. Where these factors are present, it may be a trial court's duty to grant a party's motion to offer additional evidence. *Id*. These are just factors to be considered, and even if all of the factors

EXHIBIT "D"

are not satisfied, a trial court's ruling on a party's motion to reopen the evidence should not be disturbed. *Id*.

Cox contends that Wilkins failed to present evidence on any of the required factors to reopen under *rule 270*. However, [HN3] *rule 270* does not explicitly set forth any factors necessary to reopen a case; instead it places the decision to reopen within the trial court's discretion. *See Tex. R. Civ. P. 270* (providing that court *may* permit additional evidence to be offered at any time). Wilkins requested attorney's fees in his original petition. He also discussed attorney's fees in his opening statement at trial and Cox responded [*10] during his opening argument. The trial judge noted that it should not come as a surprise to Cox that Wilkins was seeking attorney's fees. The trial judge limited the presentation of new evidence to the issue of attorney's fees. Finally, the additional testimony spanning only six pages of the reporter's record, caused no undue delay to the parties. Accordingly, we hold that the trial court did not abuse its discretion by allowing Wilkins to reopen on the sole issue of attorney's fees.

**Business records**

In his second issue, Cox insists that the trial court erred by admitting the invoice detailing the time spent on the case by Wilkins's attorney or his paralegals, the tasks performed, and the corresponding rate charged. Cox claims that Wilkins failed to lay the proper predicate for admission of the invoice as a business record.

[HN4] In reviewing a trial court's decision to admit evidence, we utilize an abuse of discretion standard. *See In re J.F.C., 96 S.W.3d 256, 285, 46 Tex. Sup. Ct. J. 328 (Tex. 2002)*; *National Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527-28, 43 Tex. Sup. Ct. J. 690 (Tex. 2000)*. A trial court abuses its discretion when it rules without regard for any guiding rules or [*11] principles. *Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43, 41 Tex. Sup. Ct. J. 877 (Tex. 1998)*. We must uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Id*. [HN5] "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Tex. R. Evid. 801(d)*. [HN6] The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 908 n.5, 48 Tex. Sup. Ct. J. 256 (Tex. 2004)*.

[HN7] *Rule 803(6) of the Texas Rules of Evidence*, the business records exception, provides that evidence meeting the following criteria should not be excluded under the hearsay rule:

> [HN8] A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a

regularly conducted business activity, and if it was the regular practice of that [*12] business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. "Business" as used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.

Thus, [HN9] the foundation for the business records exception has four requirements: (1) the records were made and kept in the course of a regularly conducted business activity, (2) it was the regular practice of the business activity to make the records, (3) the records were made at or near the time of the event that they record, and (4) the records were made by a person with knowledge who was acting in the regular course of business. *Powell v. Vavro, McDonald, & Assocs., L.L.C., 136 S.W.3d 762, 765 (Tex. App.--Dallas 2004, no pet.)*; *Daimler-Benz Aktiengesellschaft v. Olson, 21 S.W.3d 707, 716 (Tex. App.--Austin 2000, pet. dism'd w.o.j.)*.

Wilkins's attorney, J.P. Cody, testified that (1) the spreadsheet "is [*13] a printout of the records . . . prepared in the ordinary course of business;" (2) the records "include data entries that I personally give to the administrative assistant who then enters them into the record;" (3) "I personally have approved the entries;" and (4) "I have personal knowledge about the time and the records that are listed because those are my descriptions, what I have done for each period of time." On this record, we hold that the trial court did not abuse its discretion in finding that this testimony meets the requirements of *Texas Rule of Evidence 803(6)*.

**Judicial notice**

In his third issue, Cox contends that the trial court erred in awarding attorney's fees without taking judicial notice of usual and customary fees prior to signing the final judgment. Cox claims that the trial court could not have taken judicial notice here because it did not inform the parties it was doing so and that due process required the trial court to notify the parties if judicial notice had been taken.

[HN10] Generally, a trial court may take judicial notice of certain facts, whether requested or not. *Tex. R. Evid. 201(c)*. A party is entitled [*14] upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. *Id*. at 201(e). However, Wilkins's claim was made under the civil practices and remedies code. *See*

EXHIBIT "D"

*Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (West 1997) (providing that party may recover reasonable attorney's fees . . . if claim is for: . . . *(8)* an oral or written contract). The civil practices and remedies code contains a more specific judicial notice provision: [HN11] "The court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in a proceeding before the court." *Id. § 38.004(1)* (West 1997). [HN12] We may presume that the trial court took judicial notice of the usual and customary fees pursuant to *section 38.004 of the civil practices and remedies code* even if it did not state that it was doing so. *See Lefton v. Griffith, 136 S.W.3d 271, 279-80 (Tex. App.--San Antonio 2000, no pet.).*

[HN13] Because *civil practices and remedies code section 38.004* is more specific than evidence *rule 201*, it controls in all claims for attorney's [*15] fees made under chapter 38 of the civil practices and remedies code. *See Sultan v. Mathew, 178 S.W.3d 747, 751, 49 Tex. Sup. Ct. J. 97 (Tex. 2005)* (noting principle that specific statutes control over general ones); *Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 901, 43 Tex. Sup. Ct. J. 1151 (Tex. 2000).* Accordingly, we hold that the trial court was not required by statute or rule to give notice that it was taking judicial notice of usual and customary attorney's fees.

We may presume that the trial court took judicial notice of usual and customary attorney's fees. *Lefton, 136 S.W.3d at 279-80.* There is no due process concern in the failure of the trial court to inform the parties that it was taking judicial notice of such fees because [HN14] *section 38.004 of the civil practices and remedies code* explicitly informs litigants that a court may do so in a claim for attorney's fees brought under chapter 38. Therefore, due process was not violated and the trial court did not err by awarding attorney's fees on this record.

**Attorney's fees**

In issues five through seven, Cox challenges the sufficiency of the evidence supporting the trial court's award of attorney's fees. [1] Specifically, [*16] he contends that Wilkins presented no evidence establishing that the attorney's fees were both reasonable and reasonable for Travis County. He avers further that even if the record contains some evidence pertaining to the reasonableness of the attorney's fees, it is insufficient to support the trial court's award. In issue eight, Cox contends that if there is sufficient evidence to support an award of attorney's fees, the trial court's award is excessive.

1    In issue four, Cox argues that there is no evidence to support the award of attorney's fees

because Wilkins's attorney's invoice was improperly admitted. We have held that the trial court did not abuse its discretion by admitting the invoice and need not address this issue.

[HN15] Generally, we review a trial court's decision to grant or deny attorney's fees for an abuse of discretion, and we review the amount awarded as attorney's fees under a sufficiency of the evidence standard. *See Bocquet v. Herring, 972 S.W.2d 19, 21, 41 Tex. Sup. Ct. J. 650 (Tex. 1998); EMC Mortgage Corp. v. Davis, 167 S.W.3d 406, 418* [*17] *(Tex. App.--Austin 2005, pet. filed).* A trial court abuses its discretion if its decision "is arbitrary, unreasonable, and without reference to guiding principles." *Goode v. Shoukfeh, 943 S.W.2d 441, 446, 40 Tex. Sup. Ct. J. 487 (Tex. 1997)* (quoting *Mercedes-Benz Credit Corp. v. Rhyne, 925 S.W.2d 664, 666, 39 Tex. Sup. Ct. J. 1016 (Tex. 1996)).* It is an abuse of discretion to award attorney's fees if there is no evidence or insufficient evidence to support the award. *Bocquet, 972 S.W.2d at 21.*

In *Bocquet*, the supreme court distinguished between statutes that vest a trial court with the discretion to award attorney's fees and statutes that require the court to award attorney's fees. *See id. at 20; compare Tex. Civ. Prac. & Rem. Code Ann. § 37.009* (West 1997) (court may award reasonable and necessary attorney's fees), *with Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (person may recover attorney's fees). [HN16] Statutes stating that a court "may" award attorney's fees give courts the discretion to award attorney's fees, but statutes stating that a party "may recover," "shall be awarded," or "is [*18] entitled to" attorney's fees are not discretionary. *Bocquet, 972 S.W.2d at 20.*

[HN17] Because *section 38.001(8) of the civil practices and remedies code* specifies that a party "may recover reasonable attorney's fees . . . if the claim is for an oral or written contract," the award is not discretionary. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8); Bocquet, 972 S.W.2d at 20.* We need only determine if there is sufficient evidence that the fees awarded were reasonable.

[HN18] The supreme court has identified various factors to consider when determining what a reasonable award of attorney's fees should be. They include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship [*19] with the client; (7) the experience, reputation and ability of the lawyer or

lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818, 40 Tex. Sup. Ct. J. 591 (Tex. 1997).* Not all of the factors must be considered in every case. *Petco Animal Supplies, Inc. v. Schuster, 144 S.W.3d 554, 567 (Tex. App.--Austin 2004, no pet.).* They are general guidelines that the supreme court has stated should be taken into account when determining the reasonableness of attorney's fees. *Id.* Evidence of attorney's fees that is clear, direct, and uncontroverted is taken as true as a matter of law, especially where the opposing party had the means and opportunity of disproving the evidence but did not. *Ragsdale v. Progressive Voters League, 801 S.W.2d 880, 882, 34 Tex. Sup. Ct. J. 254 (Tex. 1990).*

[HN19] In a challenge to legal sufficiency, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson, 168 S.W.3d 802, 822, 48 Tex. Sup. Ct. J. 848 (Tex. 2005).* [*20] We credit favorable evidence if a reasonable fact finder could do so and disregard contrary evidence unless a reasonable fact finder could not. *Id. at 827.* The evidence is legally sufficient if it would enable fair-minded people to reach the verdict under review. *Id.*

[HN20] In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain, 709 S.W.2d 175, 176, 29 Tex. Sup. Ct. J. 214 (Tex. 1986).* We may not substitute our own judgment for that of the trier of fact, even if we would have reached a different result on the evidence. *Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 407, 41 Tex. Sup. Ct. J. 683 (Tex. 1998).* Therefore, we will reverse only if the overwhelming weight of the evidence indicates the trial court's judgment was clearly wrong and unjust.

Here, Wilkins requested $ 11,235.57 in attorney's fees. In support, he admitted his attorney's detailed invoice which explicitly described each task performed while working on the case, the amount of time spent on each task, whether the task was performed [*21] by the attorney or one of his paralegals, and the hourly rate charged for each. Wilkins's attorney also testified that he spent more time than he would have expected on a collection case of this type because Cox acted *pro se* for much of the underlying proceedings. The record also indicates that Cox's behavior, such as lying to the court in seeking a continuance, resulted in a waste of resources. As stated earlier, the trial court may take judicial notice of usual and customary attorney's fees under these circumstances and that we may presume that it did so. *Tex. Civ. Prac. & Rem. Code Ann. § 38.004; Lefton, 136 S.W.3d at 279-80.* Additionally, *civil practices and remedies code section 38.003* states, [HN21] "It is presumed that the usual and customary

attorney's fees for a claim of the type described in *Section 38.001* are reasonable." *Tex. Civ. Prac. & Rem. Code Ann. § 38.003* (West 1997). Cox did not put forth any contrary evidence indicating that the fees Wilkins's attorney charged were excessive or unreasonable for Travis County. Nor did he attempt to rebut the presumption that the usual and customary [*22] attorney's fees were reasonable. Cox merely argues that Wilkins failed to prove reasonableness and that the trial court's award of attorney's fees is excessive for this simple and uncomplicated debt collection case.

Ultimately, the trial court awarded Wilkins $ 8,535 in attorney's fees, approximately $ 2,700 less than he requested. We recognize that Wilkins did not put forth any evidence indicating that the legal fees requested were similar to those customarily charged for equivalent legal services provided in Travis County. However, [HN22] a trial court need not consider every *Arthur Andersen* factor when determining reasonableness of attorney's fees. *Petco Animal Supplies, 144 S.W.3d at 567.* Viewing the evidence in the light most favorable to the trial court's award of attorney's fees, we find it sufficient to enable fair-minded people to reach a similar conclusion. *City of Keller, 168 S.W.3d at 822, 827* (summarizing legal sufficiency standard of review). Moreover, after reviewing all of the evidence and considering the *Arthur Andersen* factors we cannot conclude that the trial court's attorney's fees award is so contrary to the overwhelming weight [*23] of the evidence as to be clearly wrong and unjust. *Cain, 709 S.W.2d at 176* (summarizing factual sufficiency standard of review). Accordingly, we hold that legally and factually sufficient evidence supports the trial court's award of attorney's fees. Cox's fifth, sixth, seventh and eighth issues are overruled.

### Erroneous judgment

In issues nine and ten, Cox claims that the trial court erred in entering judgment against James E. Cox d/b/a European Import Car Repair for actual damages and attorney's fees because there is either no evidence or insufficient evidence that the "party existed or was liable."

Wilkins sued Cox, individually, and the corporate entity European Import Car Repair, Inc. In his original petition, Wilkins alleged that he performed services for "James E. Cox d/b/a European Import Car Repair." Wilkins also alleged that European Import Car Repair, Inc., was Cox's alter ego; however, he did not produce any evidence at trial in support of such an allegation. After reviewing the record, we find that there is no evidence to support a corporate veil-piercing theory such as alter ego. Nor was there evidence that European Import Car Repair, Inc. [*24] , operated as any business entity other than a validly incorporated Texas corporation. Therefore, there was no basis upon which the trial court could render judgment against "James E. Cox d/b/a European Import Car Repair."

EXHIBIT "D"

On appeal, neither Cox nor European Import Car Repair, Inc., challenges their own liability. Accordingly, we modify the trial court's judgment to strike any reference to James E. Cox d/b/a European Import Car Repair. *See Tex. R. App. P. 43.2(b).*

**Post-judgment interest**

In his eleventh issue, Cox asserts that the trial court erred in ordering post-judgment interest at the annual rate of five percent to run from November 3, 2004, because the judgment was not signed until November 30, 2004.

In this case, the finance code governs the accrual of post-judgment interest. *See Office of the Attorney Gen. v. Lee, 92 S.W.3d 526, 528 n.2, 46 Tex. Sup. Ct. J. 221 (Tex. 2002). Finance code section 304.005* states that [HN23] "post-judgment interest on a money judgment of a court in this state accrues during the period beginning on the date the judgment is rendered and ending on the date the judgment is satisfied." *Tex. Fin. Code Ann. § 304.005(a)* [*25] (West Supp. 2005). [HN24] Generally, a judgment is rendered when the decision is officially announced orally in open court, by memorandum filed with the clerk, or otherwise announced publicly. *Garza v. Texas Alcoholic Beverage Comm'n, 89 S.W.3d 1, 6, 45 Tex. Sup. Ct. J. 1014 (Tex. 2002).* An intent to render judgment in the future does not satisfy this test. *Woods v. Woods, 167 S.W.3d 932, 933 (Tex. App.--Amarillo 2005, no pet.).*

The trial court's docket sheet entry on November 3 notes, "COURT RULES IN FAVOR OF PLTF. [Wilkins] ORDER FORTHCOMING. SENT BY FAX & MAIL TO BOTH PARTIES." There is no indication on the docket sheet that the trial court filed with the clerk a copy of either the letter or the facsimile containing its decision. The trial court's decision was not orally announced in open court and the only written reflection of the trial court's decision is the November 3 docket entry. However, the November 3 docket entry explicitly states that the order is forthcoming. This language suggests that the court intended to render judgment in the future. This suggestion is bolstered by the November 30 docket entry stating, "FINAL JUDGMENT AFTER NON JURY TRIAL." In addition, the [*26] trial court signed the final judgment on November 30. [HN25] "When there is a question concerning the date judgment was rendered, the date the judgment was signed prevails over a conflicting docket sheet entry." *In re R.A.H., 130 S.W.3d 68, 69-70, 47 Tex. Sup. Ct. J. 293 (Tex. 2004)* (quoting *Garza, 89 S.W.3d at 7*). Therefore, we hold that the trial court's final judgment was rendered on November 30. Accordingly, we modify the judgment to reflect that post-judgment interest begins to accrue on November 30, not November 3. *Tex. R. App. P. 43.2(b).* The modified judgment should read as follows:

> 1. Plaintiff shall have judgment against Defendant James E. Cox, individually, for actual damages in the amount of $ 450, and interest on that amount at the annual rate of five (5%) percent from November 30, 2004, until paid in full; and

> 2. Plaintiff shall have judgment against Defendant European Import Car Repair, Inc., for actual damages in the amount of $ 2,750, and interest on that amount at the annual rate of five (5%) percent from November 30, 2004, until paid in full; and

> 3. Plaintiff shall have judgment against Defendants James E. Cox [*27] individually European Import Car Repair, Inc. for reasonable and necessary attorney's fees in the amount of $ 8,535 for which the Defendants are equally responsible.

The stricken language has been removed from the judgment and the underlined language has been added in response to Cox's ninth, tenth and eleventh issues.

**CONCLUSION**

We modify the trial court's judgment and affirm the judgment as modified.

Bea Ann Smith, Justice

EXHIBIT "D"

3 of 100 DOCUMENTS

**DEWITT L. LACY, Appellant v. FIRST NATIONAL BANK OF LIVINGSTON, TEXAS, Appellee**

**No. 09-90-099 CV**

**COURT OF APPEALS OF TEXAS, Ninth District, Beaumont**

***809 S.W.2d 362***; *1991 Tex. App. LEXIS 1443*

**May 9, 1991, Delivered**
**May 9, 1991, Filed**

**PRIOR HISTORY:** [**1] Appealed from the 9th Judicial District Court of Polk County, Texas; Trial Cause No. 11,201; Erwin Ernst, Judge.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant challenged a judgment of the 9th Judicial District Court of Polk County, Texas, that awarded a deficiency judgment, prejudgment interest, attorney fees, and costs and interest to appellee bank.

**OVERVIEW:** Appellee bank filed suit against appellant, seeking to obtain a judgment for a deficiency that remained after the sale of collateral secured by a promissory note. The trial court awarded appellee a deficiency judgment, prejudgment interest, attorney fees, and costs and interest. On review, appellant raised seven points of error. The appellate court affirmed. The trial court properly admitted into evidence appellee's exhibit containing a letter notifying appellant that he was in default on payment of the note. There was sufficient evidence to support the trial court's finding that the collateral was disposed of in a commercially reasonable manner. The trial court properly awarded attorney fees and prejudgment interest. The trial court's findings of fact were supported by sufficient evidence, and its conclusions of law were correct.

**OUTCOME:** The court affirmed the trial court's judgment awarding appellee bank a deficiency judgment, plus interest, fees, and costs; the trial court did not err in its evidentiary rulings or in awarding interest and fees, its findings of fact were supported by sufficient evidence, and its conclusions of law were correct.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN1] In a determination of whether issues and pleadings and questions are supported by the pleadings at the trial level, the trial court will supply omissions in the pleading of one party by referring to the allegations contained in the pleadings of another party.

*Civil Procedure > Trials > Bench Trials*
[HN2] The findings of fact of the trial judge, who has a chance to observe the actual demeanor and actions, tone of voice and mannerism of all the witnesses, are of a very high dignity. According to some decisional law, they are of an equal dignity with jury answers to special questions or issues.

*Civil Procedure > Appeals > Standards of Review*
[HN3] When an intermediate appellate court considers no evidence points or legal insufficiency points, the court is permitted to consider only the evidence favorable to the findings below. If there is any probative evidence in the record to support the trial judge's findings, the court is not to overrule them. The acceptable and universally recognized standard for review of factual sufficiency points requires that the court consider the whole record. A trial court's findings should be sustained unless, considering all evidence, the intermediate appellate court determines that the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust and clearly wrong.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Evidence > Judicial Notice > Adjudicative Facts > Public Records*
[HN4] *Tex. Civ. Prac. & Rem. Code Ann. § 38.004* (1986) permits the trial court to take judicial notice of the

EXHIBIT "E"

contents of the official file before the trial court and the usual, customary and reasonable attorney fees. The usual and customary fees are also presumed to be reasonable.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*

[HN5] A recovery of an attorney's fees may be awarded against a person, an individual or a corporation in addition to the amount of the claim and costs if the litigation is based on an oral or written contract. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (1986).

*Civil Procedure > Trials > Bench Trials*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Evidence > Judicial Notice > General Overview*

[HN6] *Tex. Civ. Prac. & Rem. Code Ann. § 38.004* provides that the trial court may take judicial notice of the usual and customary attorney fees and of the contents of the case file without receiving further evidence in a bench trial. The trial court may observe the efforts and work of the lawyers in front of it.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*

[HN7] The entire chapter on attorney fees shall be liberally construed to promote its underlying purposes. *Tex. Civ. Prac. & Rem. Code Ann. § 38.005*. Strong authority exists that it is within a court's discretion to award attorney fees in the event of an appeal being taken even though there was no evidence offered on that matter.

*Evidence > Judicial Notice > General Overview*

[HN8] The trial court may take judicial notice and is presumed to have taken judicial notice whether requested to do so by a party or not. Judicial notice, of course, may be taken at any stage of the proceedings.

**COUNSEL:** Bill Jones, Livingston, Texas, for appellant.

Tom Brown, Livingston, Texas, for appellee.

**JUDGES:** Ronald L. Walker, C.J., Jack Brookshire and Don Burgess, JJ. Don Burgess, J., concurring.

**OPINION BY:** BROOKSHIRE

**OPINION**

 [*363] *OPINION*

In the proceeding below, the First National Bank of Livingston, Texas (First Bank), as plaintiff, brought suit against Dewitt L. Lacy (Lacy), the defendant, seeking to obtain a judgment for a certain deficiency which remained after the sale of collateral. The collateral had been given to secure a certain promissory note. The briefs acknowledged that no jury had been demanded and that all issues of fact as well as of law were affirmatively submitted to the trial judge. After a full hearing on the merits, First Bank was awarded a judgment against Lacy for debt in the amount of $ 16,430.00, prejudgment interest of $ 9,587.12, and attorney's fees of $ 675.00. Court costs and interest after the signing and entry of the judgment was also provided for. The trial court filed certain findings of fact separate [**2] from certain conclusions of law, pursuant to the rule.

Lacy brought forward and argues seven points of error. Point one is that the trial court committed reversible error in admitting into evidence the Plaintiff's Exhibit Number Two because the waiver of notice had not been specifically pleaded by First Bank.

In the bench trial, one of the first offers of evidence was a request for admission that the document marked Exhibit A and attached to the request for admissions was and is a true and genuine copy of a promissory note executed by Lacy. The answer to that request was "admitted". First Bank's Exhibit Number One, being the same as Exhibit A, was admitted. No objection was leveled. It was admitted that First Bank had delivered a valuable exchange for the promissory note. It was admitted that by the execution of the promissory note Lacy unconditionally promised to pay $ 20,622.66 to the order of First Bank. The final request for admission was numbered five. It read in substance that except as alleged and set out in the First Bank's original petition in this suit, no payments had been made to retire the principal or accrued interest on the promissory note. The answer was "yes, admitted".

 [**3] The first contested piece of evidence was a document identified as Plaintiff's Exhibit Number Two. It was a letter signed by Dewitt Lacy dated April 15, 1987. It was addressed to the First National Bank of Livingston in re Note Number 537142. The letter was not lengthy. The letter of April 15, 1987, stated that Lacy had been notified that he was in default on the payment of the note and/or the security agreement, both of which were covered by certain following described property called collateral. Generally, the property was a 1981 Ford 3/4 ton pick-up truck with identification number, a Triggs horse trailer with a specific serial number, and a Klosel horse trailer with a specific serial number. In the said letter, Lacy unequivocally and voluntarily gave up any right that he might have to further notice and to a hearing. Lacy had recited in capital letters that he knew he may have a constitutional right to a court hearing to determine whether he was in default and whether First Bank was entitled to the possession of the collateral at the time of the letter. The letter recited that Lacy thereby delivered possession of the above described collateral to the bank. The collateral was described [**4] with intensive specificity. Further, Lacy wrote:

I agree that you have the right to sell it totally and

**EXHIBIT "E"**

finally pursuant to the terms of the security agreement between us without any further obligation from you [First Bank] to me [Lacy]. I agree that I am responsible to you for any part of the debt that remains unpaid after the sale of this collateral.

[*364] I have removed all of my other personal property from the collateral.

Signed this 15th day of April, 1987.

/s/ Dewitt Lacy

---------------

Dewitt Lacy

The sole objection to the introduction of this Plaintiff's Exhibit Number Two was that it had not been specifically pleaded. The execution of the letter was not challenged, nor was Lacy's complete knowledge of the letter and the contents. The contents therein were not disputed.

The letter waived any further obligations from First Bank to Lacy. An official of the bank personally saw Lacy execute the document, being the letter, Plaintiff's Exhibit Number Two. The objection of Lacy was based on no specific pleadings. In First Bank's pleading, the security agreement or note is referred to. Also, First Bank alleged that it was authorized by the security agreement [**5] to repossess the collateral and that the collateral was sold on June 3, 1987. The resulting net sales proceeds of $ 3,600 were raised. Attached to the Plaintiff's Original Petition was an Exhibit, being Exhibit A. It was a security agreement and made a part of the Plaintiff's Original Petition. The note and security agreement provide as follows:

DEFAULT - I will be in default on this note and any agreement securing this note if any one or more of the following occurs:

(a) I fail to make one or more payments on time on in the amount due;

. . . .

(c) I fail to keep any promise contained in this note, any agreement securing this note, or any other written agreement with you;

. . . .

(i) any fact appears or event occurs that causes you to consider yourself insecure, or the prospect of payment, performance, or realization on the collateral is impaired.

If any of us are in default on this note or any security agreement, you may exercise your remedies against any or all of us.

REMEDIES - If I am in default on the note or any agreement securing this note, you have the following remedies:

. . . .

(d) You may use any remedy you may have under [**6] state or federal law.

(e) You may use any remedy given to you under any agreement securing this note.

There is a separate and distinct paragraph in the security agreement generally entitled "DEFAULT AND REMEDIES". DEFAULT AND REMEDIES provides:

I will be in default on this agreement if any event specified in the "Default" paragraph of the note occurs. If I am in default on this agreement or on any secured obligation, you have all of the remedies provided in the note or other obligation and all of the remedies provided below and by law. You may:

. . . .

(c) take immediate possession of the property, but in doing so you may not breach the peace or unlawfully enter onto my premises. You may then sell, lease or dispose of the property, as provided by law. . . . You may obtain a deficiency judgment if the proceeds do not satisfy the debt.

We conclude that the pleadings of First Bank, including the Exhibit, was adequate to permit the introduction of Plaintiff's Exhibit Number Two, the letter of April 15, 1987. Lacy knew of the letter he signed directed to the bank. The pleadings are sufficient to state a cause of action. No special exceptions were leveled. The pleadings [**7] set forth that First Bank could pursue any remedy it had under the security agreement or that it had by law. The First Bank's pleadings are entitled to all reasonable entendments. But we conclude that resort to the entendment rule is not necessary. The trial court below specifically found and held that the pleadings would support the admission of the waiver document, Plaintiff's Exhibit Number Two. We agree with the trial judge. We view the pleadings and the exhibits as giving fair notice of the claim involved. Absent special exceptions, First Bank complied [*365] with *TEX. R. CIV. P. 47*. Again, we find no special exceptions in the pleadings of Lacy.

We conclude that our immediately preceding ruling is sufficient in and of itself. However, we point out that [HN1] in a determination of whether issues and pleadings and questions are supported by the pleadings at the trial level, the trial court will supply omissions in the pleading of one party by referring to the allegations contained in the pleadings of another party. *Land Title Co. of Dallas v. F.M. Stigler, Inc., 609 S.W.2d 754 (Tex. 1980)*; *Whittington v. Glazier, 81 S.W.2d 543* (Tex. Civ. App.--Texarkana 1935, *writ ref'd)*. [**8] Point of error number one is overruled.

EXHIBIT "E"

Appellant's points of error two and three are that there is no evidence in the record to support the verdict of the trial court that the plaintiff's sales of the goods were commercially reasonable and, independently, that the evidence is insufficient to support the concept that the plaintiff's sales of the goods were commercially reasonable. Lacy briefs points of error two and three together. There is evidence in the record of affirmative probative force and valuation that the note matured in middle March 1987, and therefore, the letter of April 15, 1987, was subsequent to the maturing of the note. The Appellant voluntarily surrendered the property to First Bank. The property surrendered was the entirety of the three elements of collateral. After the voluntary surrender of all the collateral, the collateral was placed on the west side of the bank where there was a heavy traffic flow. "For Sale" signs were placed on the collateral. Bids were taken. There were numerous bids taken. Probably at least eight in number. Bids were taken for a period of time of about a month and a half. The collateral was sold to the highest bidder.

There is definite [**9] evidence the truck was in bad shape. It had in excess of 100,000 miles of use and mileage on it. The two trailers were used trailers. They were not new trailers. They did not have a recent paint job on them. The trailers had scratches and other defects. The highest bid received was $ 3,600.00 which was applied to the balance due on the note. After the deduction the record reflects cogent evidence that the remaining principal due and owing on the note was $ 16,430.00. After computation, the interest on the note as of time of trial was $ 9,587.12. Hence, as of the date of trial, there was affirmative probative evidence that the total amount due and owing by Lacy to First Bank was $ 26,017.12.

The First Bank was the present legal owner and holder of the note. Other than the credit for the collateral, there had not been any payments whatsoever made upon the principal of this note, according to the bank's records and the record before us. The total amount immediately stated above was still due and owing directly to First Bank. Again, the collateral was placed in a position to face a major highway. The highway was a major thoroughfare through Livingston. The collateral was on a lot having [**10] the most exposure to the public and the public traffic. Lacy saw the collateral on the lot. He made no protest. Interested persons would and could see the collateral and inspect the collateral. They were at liberty to come into the bank and make written bids. This collateral was sold in the same manner as many other pieces of collateral had been sold by the bank. This method of sale was used on all of the automobiles that the bank had apparently repossessed and sold. Again, there is testimony that the lot where the collateral was placed had the most exposure. The method of sale of the collateral was the normal practice.

The trial court found that the collateral was disposed of in a commercially reasonable manner. We agree under this record.

[HN2] The findings of fact of the trial judge, who had a chance to observe the actual demeanor and actions, tone of voice and mannerism of all the witnesses, are of a very high dignity. According to some decisional law, they are of an equal dignity with jury answers to special questions or issues. *See National Pump Co., Inc. v. C & L Mach. Co., Inc. 565 S.W.2d 331* (Tex. Civ. App.-- Amarillo 1978, no writ). [HN3] When an intermediate appellate court considers [**11] [*366] no evidence points or legal insufficiency points, we are permitted to consider only the evidence favorable to the findings below. If there is any probative evidence in the record to support the trial judge's findings, we are not to overrule them. *See Ray v. Farmers State Bank of Hart, 576 S.W.2d 607 (Tex. 1979)*. The acceptable and universally recognized standard for review of factual sufficiency points requires that we consider the whole record. We have done so. A trial court's findings should be sustained unless, considering all evidence, the intermediate appellate court determines that the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust and clearly wrong. *Garza v. Alviar, 395 S.W.2d 821 (Tex. 1965)*; *In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951)*; *Potter v. Garner, 407 S.W.2d 537* (Tex. Civ. App.--Tyler 1966, *writ ref'd n.r.e.);* R. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEXAS L. REV. 361 (1960); W. Garwood, *The Question of Insufficient Evidence on Appeal,* 30 TEXAS L. REV. 803 (1952). Following the accepted standards of intermediate review and [**12] after reviewing the entire record, we overrule Appellant's points of error number two and three.

Lacy testified for the defense. He said the horse trailers were about six years old. He had not bought one of them new. He did not know how many miles were shown on the odometer of the pick-up truck. Lacy had seen the collateral on the lot next to the bank. He did not complain to anyone in the bank about the way the collateral had been placed for the purpose of selling it or obtaining bids on the collateral. He said, however, that he did complain to himself, but that, nevertheless, he did not complain to anyone in the bank. Lacy acknowledged on cross-examination that he had signed the note and that he had not made any payments on the principal of the note. Lacy had made the interest payments only. Lacy acknowledged that the note came due on March 15th and he did not pay it. Lacy was the only witness for the defense. The trial judge had the right and duty to weigh his testimony and credibility and to analyze his answers. The trial judge, sitting without a jury, could have weighed the fact that Lacy, of course, was an interested witness. This gave the trial judge very broad latitude in [**13] the weighing of Lacy's testimony.

It does not seem to us that the testimonies on the attorney's fees issue was seriously challenged. The amount of time employed and the other efforts of the attorney or attorneys for the First Bank, we perceive,

EXHIBIT "E"

were not seriously questioned. The cross-examination on this point was minimal.

The record reflects clearly that the testimony concerning the attorney's fees was not proffered as expert testimony. It was a mere recital of the hours and efforts expended on the case. The evidence was factual. We simply find no error in the awarding of the attorney's fees in this case which were also reasonable and necessary. TEXAS CIVIL PRACTICE & REMEDIES CODE and portions thereof, especially *Section 38.004*, permit certain recoveries in a bench trial. See, [HN4] *TEX. CIV. PRAC. & REM. CODE ANN. § 38.004* (Vernon 1986). This section permits the trial court to take judicial notice of the contents of the official file before the trial court and the usual, customary and reasonable attorney's fees. The usual and customary fees are also presumed to be reasonable. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.003* (Vernon 1986). In this record the Appellee's attorney offered himself [**14] as a lay, fact witness only. He did not express an expert opinion. He did express specifically the time that he had expended and for which he had billed First Bank. He did testify as a fact witness as to what had been paid to counsel. The testimony offered was factual testimony. We conclude that if there was any error on the issue of attorney's fees that such error was harmless under this entire record. However, we wish to make it clear that we do not think the trial court erred. We further conclude that sufficient evidence of strong probative force was presented to allow the court to calculate the amount of prejudgment interest.

[*367] We have reviewed and analyzed the findings of fact and the separately filed conclusions of law. The findings of fact are nine in number and the conclusions of law are four in number. They were signed in the middle part of May of 1990. Findings of fact and conclusions of law were made, signed and filed in response to a request from Appellant. From the entirety of the record before us we conclude that each of the findings of fact is supported by sufficient and ample evidence of probative force and value. We determine that each of the conclusions [**15] of law is correct and proper.

[HN5] A recovery of an attorney's fees may be awarded against a person, an individual or a corporation in addition to the amount of the claim and costs if the litigation is based on an oral or written contract. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.001* (Vernon 1986). The suit was based on a rather lengthy contract in writing. The attorney's fees were pleaded for in the original petition. Lacy had agreed to pay reasonable, contractual attorney's fees. Under the remedies in Exhibit A which were before the court, Lacy promised this:

You [the bank] may, without notice . . . make all unpaid principal, earned interest and all other agreed charges immediately payable.

You [the bank] may use any remedy given you under any agreement securing this note.

Lacy agreed to pay any reasonable and/or contractual amount that the bank incurred in collecting this note as and for attorney's fees if assessed by a court. The attorney's fees involved were assessed by the court and Lacy had been served with a pleading that a reasonable attorney's fee for attorney services rendered and to be rendered would be in the amount of $ 5,000, although the judgment itself permits [**16] only $ 675. *See and compare Paramount Pipe & Supply Co., Inc. v. Muhr, 749 S.W.2d 491 (Tex. 1988)*; *Commercial Union Ins. Co. v. La Villa Sch. D., 779 S.W.2d 102* (Tex. App.--Corpus Christi 1989, no writ).

The trial judge may properly take into consideration the file which is before him in his court as well as the proceedings that are conducted in his presence. *See and compare Carrington v. Hart, 703 S.W.2d 814* (Tex. App.--Austin 1986, no writ). *See also Lewis v. Deaf Smith Elec. Co-Op., Inc., 768 S.W.2d 511* (Tex. App.--Amarillo 1989, no writ). And the trial court under these circumstances is presumed to have taken judicial notice. The bank was represented by two attorneys in this case. *TEX. CIV. PRAC. & REM. CODE ANN § 38.002* (Vernon 1986). There exists a presumption that the usual and customary attorney's fees for any type of claim that is set out in *section 38.001* are reasonable. *Section 38.003*. [HN6] *Section 38.004* provides that the trial court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in a bench trial. The trial court may observe the efforts and work of the lawyers in [**17] front of it.

[HN7] The entire chapter on attorney's fees shall be liberally construed to promote its underlying purposes. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.005*. Strong authority exists that it is within a court's discretion to award attorney's fees in the event of an appeal being taken even though there was no evidence offered on that matter. There is a viable, vital presumption that the trial court did take judicial notice of the full file in front of it and the trial before it as well as the usual and customary attorney's fees in awarding attorney's fees. *See Bloom v. Bloom, 767 S.W.2d 463* (Tex. App.--San Antonio 1989, writ denied, mand. overr.).

Of course, [HN8] the trial court may take judicial notice and is presumed to have taken judicial notice whether requested to do so by a party or not. Judicial notice, of course, may be taken at any stage of the proceedings. A reasonable construction of *TEX. R. CIV. P. 201(c)* would be, we perceive, that since the court may take judicial notice whether requested or not that the litigants would be aware of same. From the manner in

EXHIBIT "E"

which this case was tried, it certainly appears, the parties were aware that the trial court would take judicial [**18] notice. The necessity of taking judicial notice, we respectfully say, was brought about by or caused by Appellant.

[*368] Touching upon the reasonableness and necessity of an attorney's fees in this matter, it appears from the transcript that at the very least an attorney of record with an appropriate and proper bar number drew and filed a plaintiff's original petition with very important attachments with which he obviously acquainted himself. We glean this conclusion from the allegations of Appellee's pleadings. This defendant's original answer is not verified. We perceive that *TEX. R. CIV. P. 93* was not followed. Additionally, important and cogent plaintiff's requests for admissions and interrogatories were drawn up and filed in behalf of the plaintiff bank by an attorney of record for the bank. It is correct that a defendant's first amended answer was filed which was verified but complained that the bank failed to give notice of the intended disposition of the collateral which was the subject of the suit. And further, the disposition of the collateral was not commercially reasonable.

We do not find any answers of defendant Lacy to the request for admissions and interrogatories [**19] in the transcript which was applied for by the attorney of record for Appellant Lacy. A trial was held on the merits of the litigation on or about March 15, 1990. As we perceive the statement of facts, the objection to the attorney's fees made at trial was that there was a failure to identify any experts as related to the question of attorney's fees. The bank's trial attorney requested the trial judge to take judicial notice of what was reasonable on this issue. The bank's second attorney testified as a fact witness. As we read the record we do not see that there was any objection made at trial to the trial court's taking judicial notice. There was no cross-examination of the bank's trial attorney on the attorney's fees issue.

We perceive that the court was asked to take judicial notice of the reasonableness and necessity on the issue of attorney's fees. But the note and its attachments clearly provide, we think, that in case of any default the bank could without notice make all unpaid principal, earned interest and any and all other agreed charges immediately payable. And further, the bank could use any remedy given to it under any agreement securing the note and Lacy agreed to pay [**20] reasonable amounts that the bank incurred in the collection of this note as attorney's fees.

In view of the entirety of the record before us, at least to the writer, it seems arbitrary and unreasonable to disallow the attorney's fees; and that there is no evidence on which to base the award of the attorney's fees.

As a separate and distinct basis for our affirmance is that after reviewing the entire record before us, as we must do, we conclude that any irregularities (we decide there were none) that took place at trial did not amount to such a denial of the rights of the Appellant as were reasonably calculated to cause and probably did cause the rendition of an improper judgment in the litigation. TEX. R. APP. P. 81(b)(1). In candor, under this record, we opine that the bank's attorney's fees were modest.

We overrule Appellant's points of error number four and five attacking the granting of attorney's fees. We overrule also Appellant's points of error number six and seven attacking and challenging the granting of prejudgment interest on the promissory note. We conclude the judgment entered below was correct. The said judgment is hereby affirmed.

The concurring opinion insisted [**21] upon publication.

The writer of this opinion realistically pronounces that, in effect, we are making a favorable ruling to and for Appellant Lacy by overruling his point of error concerning the attorney's fees for the bank. It certainly appears that if the bank's attorney's fees question is relitigated, then the able attorneys, having the benefit of these opinions, would then, in all probability, petition for an additional trial fee plus either one or two fees for appellate work. Of course, the attorney's fees for appellate work vary; but the variance usually runs between $ 1,500 to $ 2,500 or in some cases considerably higher. Logically then, the Appellant Lacy would be possibly, if not probably, subjected to additional attorney's fees for [*369] the bank's attorneys in a very substantial amount. But we do not rule on Appellant's point of error on this basis. Nevertheless, it is a very practical and favorable consideration for Appellant.

AFFIRMED.

**CONCUR BY:** BURGESS

**CONCUR**

*CONCURRING OPINION*

Don Burgess, Justice, concurring.

I concur in the majority's holding regarding the attorney's fees because appellant only attacked the awarding of the attorney's fees by a no evidence [**22] point. Our supreme court in *Gill Sav. Ass'n. v. Chair King, Inc., 797 S.W.2d 31, 32 (Tex. 1990)* stated: "The trial court's own proceedings together with the fact that it may take judicial notice of usual and customary fees constitute some evidence to support the award of appellate attorney's fees." (emphasis mine). Since appellant did not raise factual insufficiency, we cannot consider that issue. Therefore, I must concur in the affirmance.

I would, however, offer this additional analysis. While *TEX. CIV. PRAC. & REM. CODE ANN. § 38.004* (Vernon 1986) permits a trial court to take judicial notice of the usual and customary attorney's fees and the

EXHIBIT "E"

contents of a case file, one should then turn to TEX. R. CIV. EVID. 201 to determine the correct procedure. (emphasis mine)

Rule 201(c) allows a court to take judicial notice, whether requested or not. Rule 201(d) requires a court to take judicial notice if requested by a party and supplied with the necessary information. Rule 201(e) provides a party with the opportunity to be heard as to the propriety of taking judicial notice and, "In the absence of prior notification, the request may be made after judicial notice has [**23] been taken." While the rule is not explicit, implicit in subsection (e) is some type of notice to the parties that the court will or has taken judicial notice. Basic fairness would seem to dictate such an action. *See* 1 R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL §§ 152-211 (Texas Practice 3d ed. 1980) and Wellborn, *Judicial Notice Under Article II of the Texas Rules of Evidence,* 19 ST. MARY'S L.J. 1 (1987). The Texas Supreme Court should re-examine Rule 201 in this context.

EXHIBIT "E"



**WORLD HELP, APPELLANT v. LEISURE LIFESTYLES, INC., APPELLEES KINGDOM PROPERTIES, INC. AND TURNER CONSTRUCTION COMPANY OF TEXAS, INC.**

**NO. 2-96-260-CV**

**COURT OF APPEALS OF TEXAS, SECOND DISTRICT, FORT WORTH**

*977 S.W.2d 662*; *1998 Tex. App. LEXIS 3352*

**June 4, 1998, Delivered**

**SUBSEQUENT HISTORY:** [**1] Motion for Rehearing of Petition for Review Overruled May 27, 1999. Petition for Review Denied March 25, 1999.

**PRIOR HISTORY:** FROM THE 355TH DISTRICT COURT OF HOOD COUNTY.

**DISPOSITION:** Ttrial court's judgment affirmed in part, reversed and remanded in part, and reversed and renderd in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff assignee sought review of a judgment from the 355th District Court of Hood County (Texas), contending that the trial court erred in granting summary judgment for defendant contractor and developer and denying summary judgment for plaintiff on the issue of lien priority.

**OVERVIEW:** In a suit involving lien priority and breach of contract issues, plaintiff assignee moved for summary judgment that vendor's and deed of trust liens acquired from a bankrupt lender had priority over defendant contractor's and developer's mechanic's and materialman's liens. The trial court entered a partial summary judgment, ruling that defendant contractor's and developer's liens were superior to plaintiff's liens. In its final judgment, the trial court reaffirmed the lien priorities. On appeal, the court affirmed in part, reversed and remanded in part, and reversed and rendered in part. The trial court's summary judgment granting defendant contractor and defendant developer superior lien status was erroneous because defendants failed to establish that the lender's conduct was so inequitable as to warrant subordination of its or plaintiff's mortgage lien rights.

Although defendant contractor's and developer's evidence did not establish their entitlement to summary judgment, the evidence raised factual issues regarding the lender's fraud, harm to defendants, and the extent of the harm that precluded the entry of summary judgment for plaintiff on the lien priority issue.

**OUTCOME:** The court affirmed in part, reversed and remanded in part, and reversed and rendered in part the judgment. Plaintiff assignee failed to establish its superior lien priorities as a matter of law in light of factual issues raised by defendant contractor's and developer's evidence of lender's fraud, harm to defendants, and the extent of the harm.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN1] In a summary judgment case, the issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Tex. R. Civ. P. 166a(c)*. The burden of proof is on the movant and all doubts about the existence of a genuine issue of a material fact are resolved against the movant. Therefore, appellate courts must view the evidence and its reasonable inferences in the light most favorable to the nonmovant.

EXHIBIT "F"

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > Materiality*

[HN2] In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true. Evidence that favors the movant's position is not considered unless it is uncontroverted. The summary judgment is affirmed only if the record establishes that the movant has conclusively proved all essential elements of its cause of action or defense as a matter of law.

*Contracts Law > Secured Transactions > Perfection & Priority > Priority > Liens > Mechanics' Liens*
*Real Property Law > Construction Law > Contractors & Subcontractors*
*Real Property Law > Nonmortgage Liens > Lien Priorities*

[HN3] In a contest over rights or interests in property, ordinarily the party that is first in time is first in right.

*Real Property Law > Nonmortgage Liens > Lien Priorities*

[HN4] Equitable subordination is not a cause of action; it is a remedy. This remedy is not available absent a finding that the party with a superior lien or claim engaged in false or inequitable conduct that conferred an unfair advantage on itself or injured third parties.

*Real Property Law > Nonmortgage Liens > Lien Priorities*

[HN5] Whether inequitable conduct has occurred sufficient to warrant equitable subordination is a fact question. Thus, a trial court's decision to subordinate lien rights under this doctrine must be based upon fact findings that inequitable conduct occurred and that the conduct was so inequitable that it warrants lien subordination.

*Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Subordination*
*Real Property Law > Nonmortgage Liens > Lien Priorities*

[HN6] A lender's failure to fund a loan, without more, does not support equitable subordination. Rather, to establish its entitlement to this remedy, an injured party must prove conduct so inequitable that it "shocks one's good conscience."

*Governments > Fiduciary Responsibilities*
*Real Property Law > Nonmortgage Liens > Lien Priorities*

[HN7] Because equitable subordination is an extraordinary remedy, courts have limited its application to three categories of cases: those in which a fiduciary of the debtor misuses its position to the disadvantage of other creditors; those in which a third party, in effect, controls the debtor to the disadvantage of others; and those in which a third party defrauds other creditors.

*Bankruptcy Law > Claims > Types > Unsecured Priority Claims > Subordination*
*Evidence > Relevance > Spoliation*
*Real Property Law > Nonmortgage Liens > Lien Priorities*

[HN8] Although actual fraud need not be shown to obtain equitable subordination, cases in which no showing of fraud is required are generally bankruptcy cases involving insider misconduct. In the bankruptcy context, "insiders" include a corporate debtor's directors and officers, persons in control of the corporation, and their relatives. If a claimant is not an insider, then evidence of more egregious conduct, such as fraud, spoliation, or overreaching is necessary.

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*

[HN9] The elements of fraud are: (1) a false, material representation; (2) that was either known to be false when made or was made without knowledge of its truth; (3) that was intended to be acted upon; (4) that was relied upon; and (5) that caused injury. The mere failure to perform a contract is not evidence of fraud. But a promise of future performance is actionable if at the time the promise was made the promisor intended to deceive and had no intention of performing.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*

[HN10] Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. A party's intent is determined at the time of the representation, but it may be inferred from the party's acts after the representation was made. Although the failure to perform, standing alone, is not evidence of a promisor's intent not to perform, it may be considered with other factors to establish intent.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*

EXHIBIT "F"

[HN11] False representations can arise from silence as well as affirmative statements. When the particular circumstances impose on a person a duty to speak and he deliberately remains silent, his silence is equivalent to a false representation. A party has an affirmative duty to disclose where there is a confidential or fiduciary relationship or where a party later learns that a previous affirmative representation was false or misleading. A duty to disclose also arises when one party knows that the other party is relying on the concealed fact, provided that he knows that the relying party is ignorant of the facts and does not have an equal opportunity to discover the truth. In addition, when one voluntarily discloses information, he has a duty to disclose the whole truth rather than making a partial disclosure that conveys a false impression.

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Criminal Law & Procedure > Appeals > Reviewability > Waiver > Admission of Evidence*
*Evidence > Testimony > Lay Witnesses > Personal Knowledge*
[HN12] Courts may consider the uncontroverted testimonial evidence of an interested witness if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. *Tex. R. Civ. P. 166a(c)*.

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Evidence > Inferences & Presumptions > Inferences*
[HN13] When reviewing summary judgment evidence, courts must view every reasonable inference in the light most favorable to the nonmovant.

*Real Property Law > Nonmortgage Liens > Lien Priorities*
[HN14] Lien priorities should be subordinated only to the extent necessary to offset the harm done by the inequitable conduct.

*Real Property Law > Nonmortgage Liens > Equitable Liens*
[HN15] A party seeking an equitable lien must request this remedy in its pleadings.

*Contracts Law > Contract Interpretation > General Overview*

[HN16] Where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they are read together although they do not expressly refer to each other.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
[HN17] Findings of fact entered in a case tried to the court are of the same force and dignity as a jury's answers to jury questions. The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer.

*Evidence > Inferences & Presumptions > General Overview*
[HN18] In determining a "no-evidence" point, courts are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN19] An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. Courts are required to consider all of the evidence in the case in making this determination.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement > Holders in Due Course > General Overview*
*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Negotiation, Transfer & Indorsement > Transfers*
[HN20] *Tex. Bus. & Com. Code Ann. § 3.203(b)* (Supp. 1998) provides that a transferee of an instrument ordinarily acquires the same rights to enforce payment of the instrument that a transferor had.

*Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > Variation by Agreement*
*Commercial Law (UCC) > General Provisions (Article 1) > Policies & Purposes > General Overview*

EXHIBIT "F"

[HN21] *Tex. Bus. & Com. Code Ann. § 1.102(c), (d)* (1994) provides that the statutory provisions may indeed be varied by agreement.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement > Holders in Due Course > General Overview*
*Contracts Law > Negotiable Instruments > Enforcement > Overdue Instruments*
[HN22] A purchaser of a note who knew at the time of purchase that the notes were overdue does not qualify as a holder in due course. *Tex. Bus. & Com. Code Ann. § 3.302(a)(2)(C)* (Supp. 1998). But the purchaser may still recover on the indebtedness, subject to any claims or defenses available to the obligor. *Tex. Bus. & Com. Code Ann. § 3.305(a)* (Supp. 1998). The obligor's defenses include those that are available at common law against enforcement of a contract. *Tex. Bus. & Com. Code Ann. § 3.305(a)(2)*.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement > Holders in Due Course > General Overview*
[HN23] A holder in due course takes an instrument free from most of the obligor's claims and defenses. *Tex. Bus. & Com. Code Ann. §§ 3.305(b)*, *3.306* (Supp. 1998).

*Contracts Law > Breach > Causes of Action > General Overview*
[HN24] Under Texas common law, a person who has breached a contract cannot recover on it.

*Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
[HN25] Ambiguity is an affirmative defense, and a person seeking to establish ambiguity in a written contract must specifically plead it at the trial court level. The pleading must set out the alleged ambiguous portion of the contract and the meaning or construction relied on by the party asserting ambiguity.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
[HN26] The parol evidence rule is a rule of substantive law; it is not a rule of pleading.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*

[HN27] *Tex. R. Civ. P. 94* require a party to affirmatively plead matters constituting an avoidance or an affirmative defense.

*Insurance Law > Claims & Contracts > Subrogation > Voluntary Payment*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Mortgagee's Interests*
*Securities Law > Investment Companies > Activities*
[HN28] Subrogation to a creditor's rights is available only when a debtor was enriched unjustly; thus, the payor who confers a benefit as a "mere volunteer" is not entitled to this remedy. A mortgagee who pays taxes that its mortgagor is under a duty to pay is not a volunteer because of the mortgagee's interest in the security of the mortgage. A mortgagee may be subrogated to a taxing authority's lien to the extent necessary for its own equitable protection. However, when not compelled by the equities of the situation, full subrogation to all special privileges accompanying a taxing authority's lien is denied.

*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
*Tax Law > State & Local Taxes > Administration & Proceedings > Failure to Pay Tax*
[HN29] If a mortgagor fails to pay taxes he has promised to pay, the mortgagee may treat the amount owed for taxes as part of the mortgage debt. If the mortgagor fails to pay the taxes, the mortgagee may pay them and the amount paid for taxes is considered to be a part of the mortgage debt. Both the mortgagor's obligation to pay the amount due on the purchase price and his obligation to pay taxes are secured by the mortgage.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
[HN30] When a prevailing party in a breach of contract suit seeks attorney's fees, an award of reasonable fees is mandatory under *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* if there is proof of the reasonableness of the fees. A trial court has discretion to fix the amount of attorney's fees, but it does not have the discretion to completely deny attorney's fees if they are proper under *§ 38.001*.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
[HN31] What amount of attorney's fees is reasonable is a question of fact. But where trial counsel's testimony concerning attorney's fees for the trial of a case is clear, positive and direct, and uncontroverted, it is taken as true as a matter of law. This is especially true where the opposing party had the means and opportunity to

EXHIBIT "F"

disprove the testimony, if it were not true, and failed to do so.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Contracts Law > Secured Transactions > Perfection & Priority > Priority > Liens > Attorneys' Liens*

[HN32] Ordinarily, a party is required to segregate fees incurred on claims allowing the recovery of fees from those that do not. But when the claims are dependent upon the same set of facts or circumstances and thus are intertwined to the point of being inseparable, the party suing for attorney's fees may recover the entire amount covering all claims.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*

[HN33] The award of appellate attorney's fees is a question for the fact finder. Appellate courts may not initiate an award of appellate fees, since that would be an exercise of original rather than appellate jurisdiction.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*

[HN34] To be entitled to attorney's fees under *Tex. Civ. Prac. & Rem. Code § 38.001*, a party is required to prevail on at least a portion of its claims.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*

[HN35] See *Tex. Prop. Code Ann. § 53.156* (1995).

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Criminal Law & Procedure > Counsel > Right to Counsel > General Overview*

[HN36] An award of attorney's fees under *Tex. Prop. Code Ann. § 53.156* (1995) is not automatic, even to a prevailing party.

**COUNSEL:** FOR APPELLANT: BOURLAND, KIRKMAN, SEIDLER & EVANS AND DAVID L. EVANS AND THOMAS M. MICHEL, OF FORT WORTH, TEXAS,

FOR APPELLEES: FLOURNEY & DEATON AND ROBERT L. FLOURNEY, AND ZELESKEY, CORNELIUS, HALLMARK, ROPER & HICKS, AND JAMES R. CORNELIUS OF LUFKIN, TEXAS, AND QUILLING, SELANDER, CUMMINSKY, CLUTTS & LOWNDS, P.C. AND BRIAN W. ERIKSON OF DALLAS, TEXAS.

**JUDGES:** PANEL A: CAYCE, C.J.; LIVINGSTON and BRIGHAM, JJ.

**OPINION BY:** JOHN CAYCE

**OPINION**

[*666] **OPINION**

**I. Introduction and Background**

This case raises numerous lien priority and breach of contract issues, primarily arising out of two loan transactions between appellee Leisure Lifestyles, Inc. (Leisure) and appellant World Help's predecessor, Church and Institutional Facilities Development Corporation (C&I). We affirm in part, reverse and remand in part, and reverse and render in part. We set out the facts pertinent to the parties' points and cross points under our discussions of those points, but an overview of the facts and this case's procedural history is also necessary.

In September 1988, Leisure and C&I closed on a loan that allowed Leisure to purchase property in Granbury, Texas known as Rylee's Landing (the acquisition loan). The acquisition loan documents gave C&I vendor's and deed of trust liens on Rylee's Landing for the full amount of the acquisition loan. In June 1989, Leisure and C&I closed on a second loan, the proceeds [**2] of which were to be used to develop Rylee's Landing as a retirement center (the development loan). The development loan documents gave C&I a deed of trust lien on Rylee's Landing for the full amount of the development loan.

In May 1989, Leisure contracted with appellee Turner Construction Company of Texas, Inc. (Turner) for Turner to construct improvements to Rylee's Landing. Turner began work on Rylee's Landing during the summer of 1989. At some point, Leisure also entered into a contract with appellee Kingdom Properties, Inc. (Kingdom) for the actual development of the retirement center. Kingdom advanced funds for the retirement center.

C&I fully funded the acquisition loan but funded only a fraction of the development loan before filing bankruptcy in early October 1989. After C&I filed bankruptcy, Leisure was unable to pay Turner's applications for progress payments under the construction contract. Because its pay applications went unpaid, Turner filed mechanic's and materialman's liens against Rylee's Landing. Turner reduced the liens to judgment in November 1993.

Kingdom also filed mechanic's and materialman's liens against Rylee's Landing because Leisure failed to

EXHIBIT "F"

pay Kingdom's [**3] development fees. Kingdom's liens were reduced to judgment in November 1993.

Meanwhile, in December 1992, World Help purchased the acquisition and development loan promissory notes, the corresponding deeds of trust, and the warranty deed with vendor's lien (collectively, the Leisure documents) from C&I's bankruptcy trustee. In February 1993, Hood County Appraisal District (HCAD) sued Leisure, C&I, Turner, and Kingdom for delinquent ad valorem taxes due on Rylee's Landing for the years 1989 through 1992. HCAD amended its petition in September 1993 to delete C&I as a party and add World Help as a party. In January 1994, World Help paid the delinquent taxes, as well as the 1993 taxes on Rylee's Landing.

In January 1995, World Help moved for summary judgment (1) that its vendor's and deed of trust liens on Rylee's Landing had priority over Turner's and Kingdom's liens, and (2) that because World Help had paid the 1989 through 1993 property taxes, it was equitably subrogated to HCAD's first priority tax liens.

In June 1995, the trial court granted World Help's motion to realign the parties and designated World Help as plaintiff and Leisure, Turner, and Kingdom as defendants. In July [**4] 1995, Turner and Kingdom moved for summary judgment that their liens had priority over World Help's liens based on the doctrine of equitable subordination.

In October 1995, the trial court entered a partial summary judgment, ruling that (1) World Help's liens were superior to Turner's and Kingdom's to the extent of $ 34,860 (the amount of the 1993 property taxes), (2) Turner's liens were superior to World Help's remaining liens and Kingdom's liens, and (3) Kingdom's liens were superior to World Help's remaining liens. In December 1995, Kingdom foreclosed on its liens and purchased Rylee's Landing at a sheriff's sale.

[*667] In January 1996, the trial court entered an order denying the rest of World Help's motion for summary judgment. The remaining issues in the case were tried to the court. In its May 1996 final judgment, the trial court:

. rendered judgment for World Help against Leisure for $ 34,860 (the amount of the 1993 ad valorem taxes);

. denied World Help's claim to recover from Leisure for payment of the 1989 through 1992 ad valorem taxes;

. rendered judgment for World Help against Leisure on the promissory notes in the amount of $ 2,101,937 plus $ 31,673 in prejudgment [**5] interest ($ 2,133,610 total);

. reaffirmed the priorities of World Help's, Turner's, and Kingdom's liens as set forth in the October 1995

interlocutory summary judgment;

. denied World Help's claim to the rental proceeds from Rylee's Landing (except to satisfy the claim for the 1993 ad valorem taxes);

. granted Turner a lien of $ 195,220 against the proceeds that World Help recovers from Leisure (a) after World Help fully recovers the 1993 ad valorem taxes, and (b) reduced by any amount Turner recovers on its liens;

. rendered judgment that World Help's lien for the 1993 ad valorem taxes survived the December 1995 foreclosure of Kingdom's liens;

. ordered Leisure and Kingdom to pay all pre- and post-foreclosure rental receipts to World Help on demand until World Help recovers the full amount of the 1993 ad valorem taxes;

. awarded World Help pre- and post-judgment interest on the judgment against Leisure for the 1993 ad valorem taxes and on the promissory notes; and

. denied all requests for attorney's fees.

## II. Summary of Appellate Issues

In this appeal we must decide whether:

. the trial court properly granted summary judgment on the priorities of World Help's, [**6] Turner's, and Kingdom's liens;

. World Help has a security interest in and is therefore entitled to the rental proceeds from Rylee's Landing;

. the trial court properly granted Turner an equitable lien on the rental proceeds;

. the acquisition and development loans constituted a single contract between Leisure and C&I;

. sufficient evidence supports the trial court's findings that C&I breached its agreement with Leisure when Leisure was not in default on its obligations to C&I;

. the trial court properly ruled that World Help is not equitably subrogated to HCAD's lien position regarding the property taxes except for the 1993 taxes;

. World Help can recover from Leisure for payment of the delinquent property taxes;

. World Help can enforce the promissory notes and deeds of trust against Leisure;

. the trial court properly denied World Help attorney's fees; and

. the trial court properly denied Turner attorney's fees.

EXHIBIT "F"

## III. Equitable Subordination

In its first point, World Help complains that the trial court erred in granting summary judgment that World Help's vendor's and deed of trust liens on Rylee's Landing are equitably subordinated to Turner's and Kingdom's [**7] liens. In point two, World Help complains that the trial court improperly rendered final judgment on this issue.

## A. Standard of Review

[HN1] In a summary judgment case, the issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *See TEX. R. CIV. P. 166a(c)*; *Cate v. Dover Corp., 790 S.W.2d 559, 562 (Tex. 1990)*; *City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979)*. The burden of proof is on the movant and all doubts about the existence of a genuine issue of a material fact are resolved against the movant. *See Acker v. Texas Water Comm'n, 790 S.W.2d 299, 301-02 (Tex. 1990)*; *Cate, 790 S.W.2d at 562*; *Great Am. Reserve Ins. Co. v. [*668] San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965)*. Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *See Great Am., 391 S.W.2d at 47*.

[HN2] In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to [**8] the nonmovant will be accepted as true. *See Harwell v. State Farm Mut. Auto Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995)*; *Montgomery v. Kennedy, 669 S.W.2d 309, 311 (Tex. 1984)*. Evidence that favors the movant's position will not be considered unless it is uncontroverted. *See Great Am., 391 S.W.2d at 47*. The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of its cause of action or defense as a matter of law. *See City of Houston, 589 S.W.2d at 678*.

The parties agree that C&I's vendor's and deed of trust liens on Rylee's Landing were prior in time to both Turner's and Kingdom's mechanic's and materialman's liens. [HN3] In a contest over rights or interests in property, ordinarily the party that is first in time is first in right. *See Church v. Western Fin. Corp., 22 S.W.2d 1074, 1075 (Tex. Civ. App.--San Antonio 1929, no writ)*. World Help acquired C&I's lien rights when it purchased the Leisure documents from C&I's bankruptcy estate. Thus, absent an exception to the general rule, World Help's lien rights would be superior to both Turner's and Kingdom's.

But Turner and Kingdom assert that the [**9] trial court properly subordinated World Help's lien rights to theirs because of C&I's inequitable conduct.

[HN4] Equitable subordination is not a cause of action; it is a remedy. *See First Heights Bank, FSB v. Gutierrez, 852 S.W.2d 596, 613 (Tex. App.--Corpus Christi 1993, writ denied)*. This remedy is not available absent a finding that the party with a superior lien or claim engaged in false or inequitable conduct that conferred an unfair advantage on itself or injured third parties. *See Farm Credit Bank v. Ogden, 886 S.W.2d 305, 313 (Tex. App.--Houston [1st Dist.] 1994, no writ)* (equitable subordination not available because lien holder did nothing inequitable); *First Heights Bank, 852 S.W.2d at 602, 604, 613* (bank's lien rights subordinated because its predecessor's president committed fraud); *see also In re Fabricators, Inc., 926 F.2d 1458, 1464-65 (5th Cir. 1991)* (applying equitable subordination to secured creditor's claims in bankruptcy proceeding). "[A] prior lien gives a prior claim . . . unless the lien be . . . displaced by some act of the party holding it, which shall postpone him in a court of law or equity to a subsequent claimant." *First Heights Bank, [**10] 852 S.W.2d at 609* (quoting *Rankin v. Scott, 25 U.S. 177, 179 (12 Wheat. 177), 6 L. Ed. 592 (1827))*.

[HN5] Whether inequitable conduct has occurred sufficient to warrant equitable subordination is a fact question. *See In re Herby's Foods, Inc., 2 F.3d 128, 130 (5th Cir. 1993)*; *Fabricators, 926 F.2d at 1465*. Thus, a trial court's decision to subordinate lien rights under this doctrine must be based upon fact findings that inequitable conduct occurred *and* that the conduct was so inequitable that it warrants lien subordination.

In their appellate brief, Turner and Kingdom assert that we must determine whether it was appropriate for the trial court to subordinate World Help's liens to theirs "based on [C&I's] breach of contracts" -- its failure to fund the development loan and its alleged breach of a letter agreement with Turner. But [HN6] a lender's failure to fund a loan, without more, does not support equitable subordination. *See In re CTS Truss, Inc., 868 F.2d 146, 149 (5th Cir. 1989)*. Rather, to establish its entitlement to this remedy, the injured party must prove conduct so inequitable that it "shocks one's good conscience." *In re Orah Wall Fin. Corp., [**11] 84 B.R. 442, 444 (Bankr. W.D. Tex. 1986)*.

[HN7] Because equitable subordination is an extraordinary remedy, courts have limited its application to three categories of cases:

. those in which a fiduciary of the debtor misuses its position to the disadvantage of other creditors;

. [*669] those in which a third party, in effect, controls the debtor to the disadvantage of others; and

. those in which a third party defrauds other

EXHIBIT "F"

creditors. *See CTS Truss, 868 F.2d at 148-49*; *see also First Heights Bank, 852 S.W.2d at 613*.

[HN8] Although actual fraud need not be shown to obtain equitable subordination, cases in which no showing of fraud is required are generally bankruptcy cases involving insider misconduct. *See Herby's Foods, 2 F.3d at 133-34* (insiders of debtor undercapitalized debtor, thereby harming unsecured creditors); *In re Multiponics, Inc., 622 F.2d 709, 715, 720-21 (5th Cir. 1980)* (founder, director, and substantial shareholder of debtor engaged in inequitable conduct). In the bankruptcy context, "insiders" include a corporate debtor's directors and officers, persons in control of the corporation, and their relatives. *See 11 U.S.C.A. § 101(31) (West 1993).* If a [**12] claimant is not an insider, then evidence of more egregious conduct, such as fraud, spoliation, or overreaching is necessary. *See Fabricators, 926 F.2d at 1465*.

We are not aware of any nonbankruptcy Texas case in which a court has equitably subordinated lien rights absent a finding of fraud on the part of the superior lien holder or its predecessor. *See First Heights Bank, 852 S.W.2d at 613* (jury found president of lien holder's predecessor committed fraud); *see also Young v. Terrace Improvement Co., 62 S.W.2d 180, 184* (Tex. Civ. App.-- El Paso 1933, no writ) (holding that evidence that bond issuer intentionally mislead investors raised fact issues as to fraud and whether bond holders were entitled to equitable subordination).

In this case, there is neither evidence nor allegation that C&I was Leisure's fiduciary or that C&I controlled Leisure, i.e., was an insider. Thus, to prevail on their motions for summary judgment, Turner and Kingdom had to establish as a matter of law that C&I defrauded them.

## B. Turner's Motion for Summary Judgment

In its motion for summary judgment, Turner contended that equitable subordination was proper because C&I induced Turner to work [**13] on Rylee's Landing by providing Turner written assurance that C&I would pay Turner for its work. Then C&I breached this commitment to Turner and did not pay Turner's pay applications. Also, because C&I breached its agreement with Leisure by failing to fund the development loan, Leisure could not pay Turner. C&I's conduct was so inequitable that it warranted subordination of C&I's lien rights. As C&I's assignee, World Help acquired no better lien rights than C&I had; therefore, World Help's lien rights should also be subordinated to Turner's. [1]

1  Turner also asserted the right to equitable subordination as follows: C&I could not recover from Leisure for breach of contract because C&I breached first; therefore World Help, as C&I's

transferee, also could not recover from Leisure. This is a defense to a breach of contract claim, not a basis for equitable subordination. The issue at summary judgment was not whether World Help could recover in contract from Leisure but whether C&I's misconduct was harmful to *Turner* and, if so, whether that conduct was so inequitable that Turner should be awarded the remedy of equitable subordination.

Further, Turner did not assert, and the trial court did not find, that Turner was a party to the Leisure-C&I contract. Therefore, Turner had no standing to assert the breach of contract defense against World Help. Leisure also asserted this defense against World Help, and we address Leisure's arguments in section VII.

[**14]  In its cross-claim against World Help, Turner asserted a claim for "equitable subordination" based on its contention that "C&I's breaches resulted from fraud, negligence, and/or other culpable conduct. . . ." Because Turner had to plead and prove fraud to obtain equitable subordination, we will treat this pleading as an allegation that C&I defrauded Leisure and Turner with respect to the development loan and the letter agreement and that Turner was harmed as a result.

[HN9] The elements of fraud are: (1) a false, material representation; (2) that was either known to be false when made or was made without knowledge of its truth; (3) that was intended to be acted upon; (4) that was relied upon; and (5) that caused injury. *See Formosa Plastics Corp. USA v. Presidio* [*670] *Eng'rs and Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998).* The mere failure to perform a contract is not evidence of fraud. But a promise of future performance is actionable if -- at the time the promise was made -- the promisor intended to deceive and had no intention of performing. *See id.; Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986).*

[HN10] Intent is a fact question "uniquely within the realm of [**15]  the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric, 708 S.W.2d at 434.* A party's intent is determined at the time of the representation, but it may be inferred from the party's acts after the representation was made. Although the failure to perform, standing alone, is not evidence of the promisor's intent not to perform, it may be considered with other factors to establish intent. *See id. at 434-35.*

[HN11] False representations can arise from silence as well as affirmative statements. "When the particular circumstances impose on a person a duty to speak and he deliberately remains silent, his silence is equivalent to a false representation." *Id. at 435.* A party has an affirmative duty to disclose where there is a confidential

EXHIBIT "F"

or fiduciary relationship or where a party later learns that a previous affirmative representation was false or misleading. *See Palm Harbor Homes, Inc. v. McCoy, 944 S.W.2d 716, 722* (Tex. App.--Fort Worth 1997, orig. proceeding); *Formosa Plastics Corp. v. Presidio Eng'rs and Contractors, Inc., 941 S.W.2d 138, 147* (Tex. App.--Corpus Christi 1995), *rev'd on other* [**16] *grounds, 960 S.W.2d 41 (Tex. 1998).* A duty to disclose also arises when one party knows that the other party is relying on the concealed fact, provided that he knows that the relying party is ignorant of the facts and does not have an equal opportunity to discover the truth. *See Libhart v. Copeland, 949 S.W.2d 783, 801* (Tex. App.--Waco 1997, no writ). In addition, when one voluntarily discloses information, he has a duty to disclose the whole truth rather than making a partial disclosure that conveys a false impression. *See Formosa Plastics, 941 S.W.2d at 147.*

To support its motion for summary judgment, Turner relied on the following evidence: Kingdom's wholly-owned subsidiary, Keechi Development Corporation (Keechi), owned Rylee's Landing. Rylee's Landing was situated on 5.748 acres of lake-front property in Granbury, Texas. Improvements on the site in 1986 included a club house, three apartment buildings, a swimming pool, tennis courts, and the 130-year-old Rylee Aiken House. Kingdom wanted to develop Rylee's Landing as a retirement center. In 1986, Kingdom obtained architectural and marketing studies to determine whether developing a retirement center was feasible.

 [**17] In early 1986, C. Frank Myer, a broker for AMI Securities, Inc. (AMI), put Kingdom in touch with AMI. AMI specialized in debt instruments issued by nonprofit corporations, primarily churches. AMI also provided financial consulting services to nonprofit issuers of financial securities. AMI wanted to market its services to issuers involved in the development of church-related facilities, such as retirement centers. Kingdom and AMI investigated and negotiated potential sources of financing for the retirement center at Rylee's Landing from early 1986 through late summer 1987. David Sanders conducted the negotiations on Kingdom's behalf and dealt primarily with AMI's president, Willard May.

Leisure was incorporated in June 1987 as a nonprofit Texas corporation to develop, own, and operate the planned retirement center. Kingdom continued to be responsible for the retirement center's actual development. Sanders supervised Leisure's corporate organization and served as its president. Thus, Sanders acted in two capacities -- as Leisure's president and as Kingdom's representative.

In late summer 1987, May told Sanders that AMI planned to form a new entity, C&I, to issue bonds and make first [**18] mortgage loans to nonprofit borrowers. C&I eventually issued a series of $ 20 million worth of bonds. AMI sold C&I's bonds and also made and administered loans on C&I's behalf.

May and Sanders considered four different plans for financing the retirement center. [*671] May told Sanders numerous times that C&I would finance, as one complete deal, the acquisition of the land and the construction of the retirement center by lending Leisure $ 10.4 million. Leisure -- through Sanders -- relied on May's assurances and entered into the transaction to acquire Rylee's Landing and complete the retirement center there. C&I loaned Leisure the money to buy Rylee's Landing from Keechi in September 1988. AMI administered the acquisition loan for C&I.

Between 1986 and September 1988, Kingdom advanced $ 250,000 for the retirement center. Although the acquisition loan funded the purchase of Rylee's Landing and its then-existing improvements, it did not provide cash so that Leisure could service its debt, fund marketing costs, or reimburse Kingdom for the $ 250,000 it had advanced towards the project. Sanders agreed to close on the acquisition loan in September 1988 only because May had assured him that a [**19] second loan would provide for debt service, marketing costs, and Kingdom's development fees and would be funded by November 1988. After September 1988, Kingdom continued to manage the project and its development with May's consent and with the promise that C&I would fund the cost for Leisure to pay Kingdom.

Although May had promised to fund a second, development loan by November 1988, he failed to do so and, despite Sanders's urging, kept postponing this financing. On March 28, 1989, May told Sanders that Trust Company of America (TCOA) was being investigated by the Texas Banking Commissioner. TCOA was the trust company for C&I's $ 20 million bond issue, out of which C&I was to provide Leisure's financing for the retirement center project. Also on March 28, 1989, May told Sanders that another creditor was in default on large amounts of money borrowed through AMI, TCOA, or C&I. May told Sanders these defaults were the reason for the delay in financing construction of the retirement center but assured Sanders he should have full confidence that the entire transaction would be financed.

On May 15, 1989, with May's and C&I's full knowledge and consent, Leisure entered into a construction [**20] contract with Turner. The construction contract provided that Turner would begin construction in June 1989 after C&I provided written assurance of adequate funding to make progress payments to Turner under the contract. C&I and Leisure finally closed on the development loan on June 8, 1989. The loan was for $ 4,855,000. AMI administered the loan for C&I.

EXHIBIT "F"

Blaine Lee, the manager of Turner's Dallas office, wrote to AMI asking for assurance that adequate funds had been set aside to make progress payments to Turner under the construction contract. In response, C&I provided Turner a letter dated June 21, 1989 that stated: (1) $ 2,652,000 of the development loan proceeds had been allocated for progress payments to Turner; and (2) C&I would make periodic payments directly to Turner upon approval of Turner's pay applications. Lee signed the letter agreement indicating Turner's acceptance and returned it to C&I. [2]

> 2 At trial, World Help objected to admission of the June 1989 letter agreement because the copy Turner offered was signed only by C&I's representative and not by Lee. But World Help did not object to Lee's statement in his summary judgment affidavit that he had signed and returned the letter. Accordingly, the objection is waived on appeal as it pertains to the summary judgment. *See Utilities Pipeline Co. v. American Petrofina Mktg., 760 S.W.2d 719, 722-23* (Tex. App.--Dallas 1988, no writ). [HN12] We may consider the uncontroverted testimonial evidence of an interested witness if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. *See TEX. R. CIV. P. 166a(c).*

[**21] Leisure asked C&I to advance $ 600,000 of the development loan proceeds. C&I made advances totaling $ 402,591 during the summer of 1989. Also during the summer of 1989, Turner submitted pay applications 1 through 3 under the construction contract for $ 45,919. Leisure paid the applications out of the advance from C&I.

In September and October 1989, Turner submitted pay applications 4 through 6 for work completed from August 26 through October [*672] 31, 1989. Turner requested a total of $ 133,705 on those applications. Although Leisure accepted the applications and submitted them to C&I for approval, C&I did not pay them or advance funds to pay them. But the summary judgment record contains some evidence that Turner did not satisfy all the prerequisites to payment listed in the letter agreement.

The summary judgment record does not show that Leisure or C&I paid Kingdom anything. C&I did not advance Leisure any more funds under the development loan. Instead, C&I filed bankruptcy on October 2, 1989.

After C&I went into bankruptcy, Sanders learned that, on March 7, 1989, the Texas Banking Commissioner had issued a cease and desist order and an order of supervision against TCOA. When May [**22]

made his March 28 representations, the Texas Banking Commissioner was suing TCOA in federal court. On March 21, 1989, the federal court had entered an agreed temporary restraining order against TCOA that, among other things, made it impossible for C&I to proceed with the $ 20 million bond issue it planned to use to finance the development of the retirement center. May did not tell Sanders about the cease and desist order, the federal lawsuit, or the temporary restraining order. If he had, Sanders never would have signed the development loan documents on Leisure's behalf in June 1989. However, the summary judgment record does not affirmatively show that May knew about the federal lawsuit or the restraining order in March 1989 when he told Sanders about the investigation of TCOA or in June 1989 when C&I and Leisure closed on the development loan.

On April 27, 1990, Turner submitted pay application 7 for work performed from October 31, 1989 through April 30, 1990. Turner requested $ 20,256 on that application. Although Leisure accepted and submitted the application, C&I's bankruptcy estate did not pay it or advance funds to pay it. Because Turner's pay applications 4 through 7 went [**23] unpaid, Turner filed mechanic's and materialman's liens against Rylee's Landing for $ 153,961, the total amount of the unpaid applications. Turner reduced the liens to judgment in November 1993.

This evidence does not establish each element of fraud as a matter of law. For instance, the evidence does not conclusively establish that C&I promised to fund the development loan with no intention of performing that promise, or that C&I entered into the letter agreement with no intention of performing it. May's March 1989 statements to Sanders, coupled with the entry of the agreed temporary restraining order in the TCOA lawsuit, are some evidence that the development loan documents and the letter agreement contained false representations that C&I knew to be false. [3] May had an affirmative duty to communicate what he knew about the TCOA lawsuit and C&I's ability to perform its commitments to Leisure and Turner. *See Libhart, 949 S.W.2d at 801*; *Formosa Plastics, 941 S.W.2d at 147*. But the summary judgment evidence does not conclusively establish that May knew about the TCOA lawsuit or the restraining order in March 1989. There is no summary judgment evidence of what relationship May [**24] had with TCOA. Also, the evidence does not show what May or C&I knew in June 1989.

> 3 C&I was formed sometime between late summer 1987 and September 1988, when it closed on the acquisition loan. We attribute May's knowledge and conduct that occurred after C&I's inception to C&I because, as AMI's president, May told Sanders that AMI planned to form C&I to make first mortgage loans to nonprofit

EXHIBIT "F"

borrowers like Leisure and because AMI later made and administered loans on C&I's behalf.

[HN13] When reviewing the summary judgment evidence, we must view every reasonable inference in the light most favorable to World Help, the nonmovant. *See Great Am., 391 S.W.2d at 47.* One inference is that May only knew about the banking commissioner's investigation of TCOA and not about the lawsuit or the restraining order. Absent uncontroverted evidence, we cannot infer that May knew in either March or June 1989 that C&I could not fund the development loan; therefore, we cannot infer that C&I did not intend to fund the loan or perform [**25] its contract with Turner.

[*673] In addition, even if Turner had established fraud as a matter of law, it did not conclusively establish that all of its liens should take priority over World Help's liens. [HN14] Lien priorities should be subordinated only to the extent necessary to offset the harm done by the inequitable conduct. [4] *See CTS Truss, 868 F.2d at 149* (citing *In re Mobile Steel Co., 563 F.2d 692, 701 (5th Cir. 1977)).* The summary judgment evidence shows that Turner submitted a pay application as late as April 1990 for work performed from October 31, 1989 through April 30, 1990, even though C&I filed bankruptcy on October 2, 1989. Thus, a fact issue exists concerning whether Turner is entitled to a superior lien position based on work performed on the retirement center *after* it knew or should have known that C&I had filed bankruptcy. The fact finder must determine whether nonpayment for Turner's continued work on the retirement center after C&I filed bankruptcy was harm caused by C&I's fraud, or whether it was merely a risk that Turner took with knowledge that it might not be paid.

> 4   In this case, the only inequitable conduct that could support equitable subordination would be C&I's fraud. *See* slip op. at 10-11.

[**26] Because the summary judgment evidence does not conclusively establish that C&I committed fraud or the extent of the harm that the alleged fraud caused Turner, the trial court erred in granting summary judgment for Turner and in ruling that World Help's mortgage liens should be subordinated to the entire amount of Turner's liens.

## C. Kingdom's Motion for Summary Judgment

In its motion for summary judgment, Kingdom adopted Turner's statement of facts and all of the exhibits Turner attached to its motion for summary judgment. Kingdom also adopted "the same position as Turner . . . as to the law and the facts . . . except Kingdom has agreed that Turner will be superior to Kingdom in payment," i.e., that Turner's liens would take priority over Kingdom's.

We hold that the trial court also erred in granting summary judgment for Kingdom. As in Turner's case, the summary judgment evidence does not show as a matter of law that C&I committed fraud that harmed Kingdom. In addition to the fact issue about C&I's intent, the summary judgment evidence does not conclusively establish that Kingdom's reliance on May's assurances of funding was reasonable. *See American Tobacco Co. v. Grinnell,* [**27] *951 S.W.2d 420, 436 (Tex. 1997)* (holding that defrauded party must show that its reliance on fraudulent representations or nondisclosure was reasonable).

Because Sanders was Kingdom's agent as well as Leisure's, we will attribute his knowledge to Kingdom. The summary judgment evidence shows that, by late March 1989, Sanders knew of the investigation of TCOA, which could negatively impact C&I's ability to fund the development loan. At that time, Sanders also knew that one of C&I's other borrowers had defaulted on its loans, forcing C&I to delay funding Leisure's loan. There is no summary judgment evidence that May or C&I ever provided information that either of these situations had been resolved in a way that would allow C&I to fully fund the development loan. Thus, we cannot infer that, from March 1989 onward, Kingdom reasonably relied on May's assurances that C&I would advance funds to pay Kingdom.

Further, Kingdom did not put on any evidence that its damages were caused by C&I's alleged fraudulent conduct. The summary judgment evidence shows only that C&I may have defrauded Leisure with regard to the *development loan,* which closed in June 1989. Yet the evidence also shows that [**28] Kingdom advanced $ 250,000 towards the retirement center project between 1986 and September 1988, when the *acquisition loan* closed. There is no evidence that any of the $ 250,000 was advanced because of C&I's fraudulent conduct. Accordingly, there is no evidence that C&I's conduct caused $ 250,000 of the damages Kindgom claims.

In his summary judgment affidavit, Sanders stated that, in hindsight, "it is now clear that May knew, before the first Note was [*674] signed, that C&I was in trouble, but he kept leading us to believe that they could and would fund the entire acquisition and construction package for the Rylee's Landing project." This statement is a speculative, conclusory allegation. It is not supported by any summary judgment evidence and is not itself summary judgment evidence. *See Texas Division-Tranter, Inc. v. Carrozza, 876 S.W.2d 312, 314 (Tex. 1994)* (holding that plaintiff's statement of his subjective beliefs will not support motion for summary judgment); *Anderson v. Snider, 808 S.W.2d 54, 55 (Tex. 1991)* (holding that conclusions are not competent summary judgment evidence). Based on the summary judgment record, evidence that C&I might not have been able to fund [**29] the development loan first appeared when

C&I did not close on the development loan in November 1988 as initially promised. In addition, C&I was not even formed until late summer 1987, at the earliest. We question how C&I could be liable automatically for amounts that Kingdom invested in the retirement center before C&I's existence.

In short, Kingdom did not put on summary judgment evidence to show what amount of its alleged damages occurred as a result of C&I's conduct. Kingdom contends C&I's failure to fund the development loan caused Leisure to be unable to pay Kingdom $ 503,747 (including the aforementioned $ 250,000) for management and property development services. The summary judgment record does not contain any evidence showing how Kingdom arrived at this figure.

Likewise, Kingdom did not put on any evidence of what amount of its alleged damages are secured by liens against Rylee's Landing. The only summary judgment evidence that Kingdom filed any liens against Rylee's Landing is the November 1993 agreed judgment between Turner, Kingdom, and Leisure. That judgment merely recites: (1) Kingdom obtained a judgment against Leisure for $ 503,747 for Leisure's breach of its development [**30] and management contracts with Kingdom; and (2) Kingdom's liens against Rylee's Landing were judicially recognized but were secondary and inferior to Turner's. The judgment does not state what amount of money was secured by Kingdom's liens. While Turner, Kingdom, and Leisure might agree on the facts underlying the agreed judgment, we cannot accept them as true for summary judgment purposes absent uncontroverted supporting evidence.

Because the summary judgment evidence does not conclusively establish that C&I's alleged fraud harmed Kingdom, the amount of Kingdom's damages, or that Kingdom's damages are secured by liens against Rylee's Landing, the trial court erred in granting summary judgment for Kingdom and in ruling that World Help's liens should be subordinated to Kingdom's liens.

We sustain World Help's first and second points.

**D. World Help's Motion for Summary Judgment**

In point three, World Help complains that the trial court erred by denying World Help's summary judgment that its mortgage liens had priority over Turner's and Kingdom's liens and in failing to incorporate that ruling into the final judgment.

World Help's motion for summary judgment preceded Turner's [**31] and Kingdom's motions chronologically. In its motion, World Help sought summary judgment that its vendor's and deed of trust liens had priority over Turner's and Kingdom's liens and that World Help became equitably subrogated to HCAD's tax liens asserted against Rylee's Landing. We discuss World Help's equitable subrogation claim in section X.

Turner and Kingdom opposed a summary judgment establishing the superiority of World Help's vendor's and deed of trust liens based on much of the same evidence that we discussed under points one and two. Although Turner and Kingdom's evidence did not establish *their* entitlement to summary judgment as a matter of law, it did raise fact issues about whether C&I committed fraud that harmed Turner and Kingdom and about the extent of that harm. Because of these fact issues, World Help, as C&I's assignee, did not establish its superior lien priorities as a matter of law and was not entitled to summary judgment on that issue. Thus, the issue of who is entitled to a final judgment on [*675] the lien priority issue is premature; it must be decided after a trial on the merits.

We overrule point three.

**IV. Turner's Equitable Lien**

In its ninth [**32] point, World Help complains that the trial court improperly granted Turner a lien against World Help because Turner had no right to such a lien. In its final judgment, the trial court granted Turner a lien of $ 195,220 [5] against the rental proceeds that World Help recovers from Leisure, (1) after World Help fully recovers the 1993 ad valorem taxes, and (2) reduced by any amounts Turner recovers on its liens against Rylee's Landing.

> 5 This is the amount of the judgment Turner obtained against Leisure in the Turner-Leisure suit.

World Help and Turner agree that Turner's lien against the rental proceeds is not a common-law possessory lien, a statutory lien, or an express contractual lien. However, Turner asserts that the trial court properly granted Turner an equitable lien "to enforce the court's priority of liens, and to atone for C&I's inequitable conduct in breaching its contracts with Turner and Leisure in the first place."

We have held that the trial court's summary judgment granting Turner superior lien [**33] status was erroneous because Turner did not establish as a matter of law that C&I's conduct was so inequitable as to warrant subordination of its -- or World Help's -- mortgage lien rights. Thus, the trial court's summary ruling on lien priorities cannot be a proper basis for awarding Turner an equitable lien against the rental proceeds.

Moreover, [HN15] a party seeking an equitable lien must request this remedy in its pleadings. *See Warner Communications, Inc. v. Keller, 888 S.W.2d 586, 598* (Tex. App.--El Paso 1994), *rev'd on other grounds, 928 S.W.2d 479 (Tex. 1996)*; *see also Hoarel Sign Co. v. Dominion Equity Corp., 910 S.W.2d 140, 143 (Tex.*

EXHIBIT "F"

App.--Amarillo 1995, writ denied). In its pleadings, Turner only asked that its mechanic's and materialman's liens be given priority over World Help's liens; Turner did not plead for an equitable lien on the rental proceeds.

Because Turner neither pleaded for nor established its entitlement to an equitable lien on the rental proceeds from Rylee's Landing, the trial court's judgment for Turner on this issue is erroneous. We sustain point nine.

## V. The Leisure-C&I Contract

In point eleven, World Help contends that the evidence is [**34] legally and factually insufficient to support the trial court's finding that the two loans between Leisure and C&I constituted one contract. However, because the documents in this case are unambiguous, their construction was -- and is -- a question of law, not of fact. *See Westwind Expl., Inc. v. Homestate Svgs. Ass'n, 696 S.W.2d 378, 381 (Tex. 1985)*; *Tubb v. Bartlett, 862 S.W.2d 740, 749* (Tex. App.--El Paso 1993, writ denied). In addition to a fact finding, the trial court also made a conclusion of law that the acquisition and development notes, deeds of trust, and other documents between C&I and Leisure "constituted one contract in several phases." We will review the conclusion of law and uphold it if it can be sustained on any legal theory applicable to the case. *See Tubb, 862 S.W.2d at 749*.

In reviewing the record and the parties' briefs, we find no dispute over the fact that, when C&I and Leisure entered into the acquisition loan, they anticipated that a development loan would also be made -- which closed in June 1989. The dispute is over whether the acquisition and development loans were two separate contracts or two parts of a single contract. Leisure contends that [**35] the loans were a single contract; World Help asserts that each loan was a separate contract. The trial court concluded that all the documents related to the two loans between C&I and Leisure constituted a single contract. We agree.

Texas courts have long applied the rule of statutory construction that "[HN16] where several instruments, executed contemporaneously or at different times, pertain to the same transaction, [*676] they will be read together although they do not expressly refer to each other." *Board of Ins. Comm'rs v. Great Southern Life Ins. Co., 150 Tex. 258, 239 S.W.2d 803, 809 (1951)*. The court in *Great Southern Life* held that multiple insurance policies, endorsements attached to the policies, a pension trust agreement, and a fully executed commitment letter were all part of the same transaction and should be construed together. *See id.; see also U.S. Life Title Co. v. Andreen, 644 S.W.2d 185, 189-90* (Tex. App.--San Antonio 1982, writ ref'd n.r.e.) (holding that warranty deed and repurchase agreement formed a single contract); *Estate of Griffin v. Sumner, 604 S.W.2d 221,*

*224, 228* (Tex. Civ. App.--San Antonio 1980, writ ref'd n.r.e.) (construing as one contract two warranty [**36] deeds dated August 22, 1960 and an option contract executed "shortly thereafter").

In this case, Leisure contends that all of the business dealings between it and C&I had a single purpose: to create a retirement center at Rylee's Landing. World Help agrees that Leisure was created to "develop, own and operate a retirement community on a lake-front site in Granbury, Texas." Further, World Help acknowledges that C&I and Leisure entered into the acquisition loan so that Leisure could purchase Rylee's Landing and into the development loan so that Leisure could develop Rylee's Landing.

The record shows:

. The acquisition loan between C&I and Leisure is evidenced by: (1) a promissory note from Leisure to C&I for $ 2,579,690; (2) a deed of trust on Rylee's Landing; (3) a warranty deed with vendor's lien on Rylee's Landing; and (4) a loan agreement between C&I and Leisure.

. Leisure used the proceeds from the acquisition loan to acquire Rylee's Landing.

. The development loan between C&I and Leisure consisted of: (1) a promissory note from Leisure to C&I for $ 4,855,000; (2) a loan agreement between C&I and Leisure; and (3) a deed of trust on Rylee's Landing.

. The proceeds from [**37] the development loan were to be used primarily to develop Rylee's Landing. In addition, $ 254,069 of the proceeds were to be applied towards the principal and interest that had accrued on the acquisition note.

World Help does not argue that the loans were made for any purpose other than to purchase and develop Rylee's Landing. Instead, World Help seems to argue that, because the loan-related documents did not expressly refer to each other or state that the two loans were part of a single transaction, the purchase of Rylee's Landing and the development of a retirement center at Rylee's Landing were two completely separate, independent transactions. As we have previously noted, instruments need not refer to each other to constitute a single transaction. Moreover, this argument does not make sense when applied to this case. If a company such as Leisure is formed solely to "develop, own, and operate" a retirement community, the purchase of real estate, in and of itself, will not accomplish this goal. It is but one step in a two-step process. The property must also be developed. Thus, under the facts of this case, the purchase of Rylee's Landing and the development of the retirement center [**38] were interdependent facets of a single transaction.

We hold that the trial court properly concluded that

EXHIBIT "F"

the acquisition and development loans between C&I and Leisure were all part of the same transaction and should be construed as a single contract. We overrule World Help's eleventh point.

## VI. Breach of the Leisure-C&I Contract

In point twelve, World Help challenges the legal and factual sufficiency of the evidence to support the trial court's findings that:

. Leisure was not in default on its obligations to C&I when C&I did not honor its financing commitment for the construction phase (i.e., development loan) and went into bankruptcy; and

. C&I breached its agreement with Leisure when it did not honor the balance of its financing commitment for the construction phase and went into bankruptcy.

[HN17] Findings of fact entered in a case tried to the court are of the same force and dignity [*677] as a jury's answers to jury questions. *See Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991)*. The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence [**39] supporting a jury's answer. *See Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996)*.

[HN18] In determining a "no-evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *See Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996)*; *In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951)*. If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *See Leitch, 935 S.W.2d at 118*.

[HN19] An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *See Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965)*. We are required to consider all of the evidence in the case in making this determination. *See Jaffe Aircraft Corp. v. Carr, 867 S.W.2d 27, 29 (Tex. 1993)*.

### A. Evidence of Leisure's Default

World Help contends: Leisure was required to make an interest payment on [**40] the development loan promissory note in July 1989 but did not; therefore, Leisure defaulted on the note. C&I's obligation to advance additional funds under the development loan would have been triggered by Leisure's interest payment. Because Leisure did not make the July 1989 interest

payment, C&I was never obligated to advance additional funds under the development loan. The promissory note for the development loan required Leisure to make monthly payments of accrued interest beginning one month after the date of the note -- June 8, 1989. Thus, Leisure's first interest payment on the development loan promissory note was due on July 8, 1989. But Leisure contends that it was not in default on the development loan promissory note, despite the monthly interest payment requirement, because C&I did not follow the provisions in the note governing default.

Regarding default, the promissory note provided:

**Default.** The occurrence of any of the following events shall be considered a default hereunder:

a. a default in the timely payment of any installment of principal or interest due hereunder;

. . . .

At the option of the holder of this note, upon the occurrence of any default, [**41] the entire principal balance and all accrued, unpaid interest . . . shall at once become due and payable, without presentment, demand, protest, notice or grace.

The failure to exercise the foregoing option upon the happening of one or more of the foregoing defaults shall not constitute a waiver of the right to exercise the same at any subsequent time in respect of the same default or any other default. . . .

. . . .

**Notice and Opportunity to Cure.** Notwithstanding any other term or condition hereof, the Payee shall give the undersigned (a) ten (10) days, after written notice ("Notice") that an event has occurred that would be a monetary default hereunder . . . to cure same before Payee declares a default hereunder . . . . The Notice shall be sent certified mail, return receipt requested, to the undersigned at its address herein provided . . . . *No default shall be deemed to have occurred unless the Notice is given* and the matter referred to in the Notice remains unremedied at the end of the applicable period for cure. . . . [Emphasis added.] [6]

> 6  The promissory note for the acquisition loan also contained these provisions.

[**42] World Help does not contend that C&I -- the Payee on the note -- gave Leisure notice that Leisure was in default under the promissory [*678] note, nor does World Help direct us to any evidence that the required notice was ever given. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that Leisure was not in default on its obligations to C&I when C&I failed to honor its financing commitment for the construction phase and

EXHIBIT "F"

went into bankruptcy.

## B. Evidence of C&I's Breach

The loan agreement for the development loan provided that Leisure, as borrower, had to satisfy certain conditions precedent before C&I would advance loan proceeds: Leisure could not be in default, and it was required to make "draw requests" "in form and content approved by [C&I], accompanied by such lien waivers and releases as [C&I] may require . . . ." The loan agreement does not specify what constituted "form and content approved by C&I."

Although C&I could "postpone the performance of any condition to any advance," C&I's advancement of loan proceeds without requiring performance of the conditions precedent did not waive the conditions or prevent C&I from [**43] later declaring a default.

The record shows that C&I funded between $ 400,000 and $ 433,000 [7] of the development loan between June 8 and July 18, 1989. On September 25, 1989, Leisure -- through Sanders -- requested an additional $ 167,237. Leisure made this draw request using a form approved and provided by AMI. C&I never requested any additional information from Leisure regarding the draw request.

> 7   The summary judgment evidence shows that C&I advanced just under $ 403,000, while evidence presented at trial indicates this figure may have been closer to $ 433,000.

Willard May told Sanders that the request could not be funded because another borrower had defaulted on several million dollars' worth of promissory notes. May stated that C&I was expecting a large payment on the defaulting borrower's notes and would fund Leisure's request as soon as that payment was made. No one from C&I ever told Sanders that Leisure's failure to perform under the development loan agreement or promissory note was the reason C&I [**44] did not fund the draw request.

The July 1989 advance was the last advance that C&I made under the development loan. C&I never funded Leisure's September 1989 draw request for $ 167,237. Instead, it filed bankruptcy in October 1989. C&I's bankruptcy estate never funded the draw request, either.

This evidence shows that, although Leisure satisfied the conditions precedent to advancement of development loan proceeds, C&I did not make any advances after July 1989. Further, C&I's reason for not advancing loan proceeds was unrelated to Leisure's performance of its obligations to C&I. We hold the evidence is legally and factually sufficient to support the trial court's finding that C&I breached its agreement with Leisure when it did not

honor the balance of its financing commitment for the construction phase and went into bankruptcy. We overrule point twelve.

## VII. World Help's Claims Against Leisure

In three cross points, Leisure contends that the trial court erred by:

. rendering judgment for World Help against Leisure on the promissory notes;

. awarding World Help any rights in the rental proceeds from Rylee's Landing; and

. rendering judgment for World Help against [**45] Leisure based on World Help's payment of the 1993 ad valorem taxes due on Rylee's Landing.

Leisure admits that the deeds of trust gave C&I a lien against the rental proceeds from Rylee's Landing and the right to pay delinquent ad valorem taxes and add the amount to the mortgage debt. But Leisure contends that C&I would not be entitled to recover anything under the promissory notes or deeds of trust because C&I breached the parties' agreement by not funding the development loan. Leisure further contends that World Help merely stands in C&I's shoes [*679] and is therefore subject to all of Leisure's defenses against C&I.

We have upheld the trial court's finding of fact that C&I breached the parties' agreement because it failed to fund Leisure's draw request even though C&I had not given Leisure written notice that it was in default on the development loan promissory note. But our holding with regard to that finding does not preclude *World Help* from enforcing the promissory notes and deeds of trust against Leisure.

The promissory notes each contained a section governing default in general (the default provision) and a section governing notice of default (the notice provision). [8] The [**46] notice provision expressly required the *Payee* of the notes to give Leisure written notice of default and an opportunity to cure before Leisure would be in default on the notes. The notes named C&I, alone, as the Payee. However, the notes did not require any *holder* of the notes except the Payee to perform the notice provision. Thus, under the express terms of the promissory notes, only C&I was a Payee, and only C&I could be bound by the notice provision's requirements.

> 8   *See* slip op. at 36-37 for the pertinent language of these provisions.

The default provision did not require written notice and an opportunity to cure before Leisure would be in default on the notes. Instead, the default provision allowed the *holder* of the notes to enforce full payment from Leisure at any time after Leisure failed to make a timely interest or principal payment. Thus, C&I and

EXHIBIT "F"

Leisure agreed that C&I, as Payee, had to give Leisure written notice of default and an opportunity to cure before Leisure would be in default [**47] on the notes as to C&I, but that no such notice would be required from subsequent holders of the notes.

[HN20] The Texas version of the Uniform Commercial Code (the UCC) provides that the transferee of an instrument (e.g., World Help) ordinarily acquires the same rights to enforce payment of the instrument that the transferor (C&I) had. *See TEX. BUS. & COM. CODE ANN. § 3.203(b)* (Vernon Supp. 1998); *Siegler v. Ginther, 680 S.W.2d 886, 890* (Tex. App.--Houston [1st Dist.] 1984, no writ). Thus, at issue is whether C&I and Leisure could vary a transferee's rights by agreement, thereby giving subsequent holders of the promissory notes greater enforcement rights than C&I had.

[HN21] The UCC provides that its effect may indeed be varied by agreement. *See TEX. BUS. & COM. CODE ANN. § 1.102(c)*, *(d)* (Vernon 1994); *Gasmark, Ltd. v. Kimball Energy Corp., 868 S.W.2d 925, 928* (Tex. App.-- Fort Worth 1994, no writ); *see also TEX. BUS. & COM. CODE ANN. § 1.102* cmt. 2 ("But an agreement can change the legal consequences which would otherwise flow from the provisions of the Act."); *Jon-T Chems., Inc. v. Freeport Chem. Co., 704 F.2d 1412, 1416 (5th Cir. 1983)*.

Because the UCC's effect [**48] may be varied by agreement, we hold that C&I and Leisure could and did contract that subsequent holders of the promissory notes would not be held to performance of the notice provision's written notice and cure requirements. The effect of this agreement is that C&I was required to give Leisure notice and an opportunity to cure before enforcing payment on the promissory notes, but World Help was not.

Our holding is also dispositive of Leisure's breach of contract defense. [HN22] The purchaser of a note who knew at the time of purchase that the notes were overdue does not qualify as a holder in due course. [9] *See TEX. BUS. & COM. CODE ANN. § 3.302(a)(2)(C)* (Vernon Supp. 1998); *Bailey, Vaught, Robertson and Co. v. Remington Inv., Inc., 888 S.W.2d 860, 868* (Tex. App.-- Dallas 1994, no writ); *Lynd v. Wesley, 705 S.W.2d 759, 763* (Tex. App.--Houston [14th Dist.] 1986, no writ). But the purchaser may still recover on the indebtedness, subject to any claims or defenses available to the obligor. *See TEX. BUS. & COM. CODE ANN. § 3.305(a)* (Vernon Supp. 1998); *Lynd, 705 S.W.2d at 763*. The obligor's defenses include those that are [*680] available at common law against enforcement of a [**49] contract. *See TEX. BUS. & COM. CODE ANN. § 3.305(a)(2)*.

9     [HN23] A holder in due course takes an instrument free from most of the obligor's claims and defenses. *See TEX. BUS. & COM. CODE ANN. §§ 3.305(b)*, *3.306* (Vernon Supp. 1998).

[HN24] Under Texas common law, a person who has breached a contract cannot recover on it. *See D.E.W., Inc. v. Depco Forms, Inc., 827 S.W.2d 379, 382* (Tex. App.--San Antonio 1992, no writ); *Dallas Mkt. Ctr. v. The Swing, Inc., 775 S.W.2d 838, 842* (Tex. App.--Dallas 1989, no writ); *Joseph v. PPG Indus., Inc., 674 S.W.2d 862, 867* (Tex. App.--Austin 1984, writ ref'd n.r.e.). C&I breached the parties' agreement because it did not fund Leisure's draw request at a time when Leisure was not formally in default on the promissory notes. Therefore, C&I would not be able to enforce payment of the promissory notes against Leisure. However, the promissory notes expressly provided that the notice provision was only enforceable against C&I; subsequent holders of the notes were not bound by [**50] it. Consequently, Leisure could assert the no notice defense against C&I but it could not assert that defense against World Help.

Because C&I and Leisure contracted to transfer to subsequent holders of the notes greater enforcement rights than C&I had, and because Leisure could not assert the no notice defense against World Help, we hold that World Help could recover from Leisure on the promissory notes and deeds of trust.

Leisure seems to argue that it was never in default on the loans because it agreed with C&I that part of the development loan proceeds -- those allocated to "contingency" and "working capital" -- would be applied towards interim interest payments on the notes. Thus, it was C&I's failure to fund the loan as agreed that caused Leisure to be unable to make the interest payments. Leisure asserts that parol evidence was admissible to explain the intended use of the "contingency" and "working capital" listed in the parties' writings. World Help contends that this evidence, which the trial court excluded, was inadmissible because it pertained to an alleged ambiguity in the agreement, and Leisure did not plead ambiguity.

[HN25] Ambiguity is an affirmative defense, and a person [**51] seeking to establish ambiguity in a written contract must specifically plead it at the trial court level. *See Gulf & Basco Co. v. Buchanan, 707 S.W.2d 655, 656* (Tex. App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Covered Bridge Condo. Ass'n v. Chambliss, 705 S.W.2d 211, 214* (Tex. App.--Houston [14th Dist.] 1985, writ ref'd n.r.e.). The pleading must set out the alleged ambiguous portion of the contract and the meaning or construction relied on by the party asserting ambiguity. *See Gulf & Basco Co., 707 S.W.2d at 656*.

Leisure contends that the parol evidence was not offered to resolve an ambiguity but to define undefined

EXHIBIT "F"

terms and thus complete the contract. [10] Leisure urges that the evidence was therefore admissible under the parol evidence rule. This argument begs the question.

> 10    Leisure makes this argument in its reply brief, but in its appellee's brief Leisure asserts that "contingency" and "working capital" are ambiguous terms.

[HN26] The parol evidence rule is a rule of substantive law; [**52] it is not a rule of pleading. *See Maranatha Temple, Inc. v. Enterprise Prods. Co., 893 S.W.2d 92, 101* (Tex. App.--Houston [1st Dist.] 1994, writ denied); *Southwest Airlines Co. v. Jaeger, 867 S.W.2d 824, 831* (Tex. App.--El Paso 1993, writ denied). The question at issue is whether Leisure had to raise in its pleadings the need for parol evidence before offering such evidence at trial.

[HN27] The Texas Rules of Civil Procedure require a party to affirmatively plead matters constituting an avoidance or an affirmative defense. *See TEX. R. CIV. P. 94*. Leisure contends that it did not breach its agreement with C&I because the terms "contingency" and "working capital" in the parties' writings "were provisions for interim interest" on Leisure's loans from C&I. Regardless of whether these terms are characterized as incomplete or ambiguous without the proffered parol evidence, Leisure's contention is a matter of avoidance, and Leisure was required to plead it in the trial court. Because Leisure did not raise the issue in its pleadings, the trial court properly excluded evidence of the terms' alleged meanings, and we [*681] will not consider it on appeal. We overrule Leisure's cross points.

### [**53] VIII. Leisure's Offset

In point ten, World Help contends that the trial court erred in granting Leisure an offset against World Help's damages award from Leisure. World Help does not cite any legal authority to support this argument, nor does it brief this complaint other than to challenge the trial court's findings of fact and conclusion of law addressed in points eleven and twelve. Because World Help has not briefed this issue, we will not address it. *See TEX. R. APP. P. 38.1(h)*; *Happy Harbor Meth. Home, Inc. v. Cowins, 903 S.W.2d 884, 886* (Tex. App.--Houston [1st Dist.] 1995, no writ) (holding that failure to cite authority to support contention on appeal waives contention); *Metzger v. Sebek, 892 S.W.2d 20, 45* (Tex. App.-- Houston [1st Dist.] 1994, writ denied) (same), *cert. denied*, 516 U.S. 868, 133 L. Ed. 2d 124, 116 S. Ct. 186 (1995). We overrule point ten.

### IX. World Help's Security Interest in the Rental Proceeds

In its fourth point, World Help asserts that the trial court improperly failed to render judgment that World Help had a security interest in the rental proceeds from Rylee's Landing and that the security interest took priority over [**54] Turner's and Kingdom's liens. The trial court's judgment limits World Help's right to rental proceeds to the amount needed to satisfy its claim for the 1993 ad valorem taxes.

The deeds of trust for the acquisition and development loans granted C&I a security interest in the rental proceeds from Rylee's Landing. In light of our holding that World Help may enforce the promissory notes and deeds of trust against Leisure, we also hold that World Help has a security interest in all of the rental proceeds from Rylee's Landing, even after its claim for the 1993 ad valorem taxes is satisfied. We hold that the security interest has the same priority as World Help's mortgage liens because the security interest was granted in the loan documents. We sustain point four in part and overrule it in part.

### X. Equitable Subrogation

In point seven, World Help contends that the trial court improperly denied its motion for summary judgment that it was equitably subrogated to HCAD's tax liens on Rylee's Landing based on World Help's payment of delinquent ad valorem taxes for 1989 through 1992.

World Help purchased the Leisure documents in December 1992. At that time, ad valorem taxes of $ 218,031 [**55] were past due on Rylee's Landing for the years 1989 through 1992. In January 1994, World Help paid the delinquent property taxes and 1993 property taxes of $ 34,860.

In conclusions of law 4 and 6, the trial court concluded that:

. World Help is deemed to have accounted for the delinquent ad valorem taxes in the price it paid to purchase the Leisure documents because World Help was charged with notice of the delinquent taxes at the time of purchase; and

. World Help has a first priority lien against Rylee's Landing for $ 34,860 -- the amount of the 1993 ad valorem taxes that accrued after World Help purchased the Leisure documents.

World Help contends that the deed of trust on the acquisition loan allowed it to pay the delinquent ad valorem taxes and add the tax amount to the mortgage amount. World Help further contends that it is entitled to be equitably subrogated to HCAD's tax liens on Rylee's Landing.

When equitable subrogation is an issue, a case is usually controlled by its facts. *See Providence Inst. for Sav. v. Sims, 441 S.W.2d 516, 519 (Tex. 1969)*; *Farm Credit Bank, 886 S.W.2d at 310*. The purpose of the

EXHIBIT "F"

doctrine is to prevent the unjust enrichment of the [**56] debtor who owed the debt that is paid. *See First Nat'l Bank v. O'Dell, 856 S.W.2d 410, 415 (Tex. 1993)*; *Farm Credit Bank, 886 S.W.2d at 310.*

[HN28] Subrogation to the creditor's rights is available only when the debtor was enriched unjustly; thus, the payor who confers a benefit as a "mere volunteer" is not [*682] entitled to this remedy. *Smart v. Tower Land and Inv. Co., 597 S.W.2d 333, 337 (Tex. 1980).* A mortgagee who pays taxes that its mortgagor is under a duty to pay is not a volunteer because of the mortgagee's interest in the security of the mortgage. *See id. at 338.* The mortgagee may be subrogated to the taxing authority's lien to the extent necessary for its own equitable protection. However, "when not compelled by the equities of the situation, full subrogation to all special privileges accompanying the taxing authority's . . . lien will be denied." *Id.*

In the *Smart* case, the mortgagee, Tower Land and Investment Company (Tower), purchased property at a foreclosure sale. After the sale, Tower paid the delinquent ad valorem taxes that had been assessed against the property while the mortgagor, Smart, owned it and then sought to recover them from Smart. *See* [**57] *597 S.W.2d at 338.* The Texas Supreme Court held that the equities of the suit did not entitle Tower to be subrogated to the taxing authority's lien. The court reasoned that Tower could have accounted for the delinquent taxes in determining its bid amount; thus, Tower was considered to have purchased the property with reference to the tax liability. *See id. at 339.*

In this case, the trial court also determined that the equities of the situation did not entitle World Help to be fully subrogated to HCAD's liens on Rylee's Landing.

Jimmy Neal Thomas, one of World Help's directors, testified that he knew at the time of purchase that the Leisure notes were in "substantial and material default" and that Rylee's Landing might be subject to liens for unpaid property taxes. Thomas testified that World Help did no investigation regarding the unpaid taxes, the loans, or any other aspect of Rylee's Landing.

In light of World Help's knowledge at the time it purchased the Leisure documents, we cannot say that the equities of the situation entitle World Help to be subrogated to HCAD's liens for the 1989 through 1992 taxes. Because World Help knew of the likelihood of the tax liens, it could have [**58] ascertained the amount of the delinquent taxes and accounted for that amount in its bid for the Leisure documents.

World Help contends that to deny it a first priority lien on the entire amount of the paid ad valorem taxes would be to grant Turner and Kingdom a windfall. Whether Turner or Kingdom benefitted by World Help's

payment of the taxes is irrelevant to the equitable subrogation issue. Rather, the inquiry is whether the *debtor* would be unjustly enriched if subrogation does not occur. *See First Nat'l Bank, 856 S.W.2d at 415.* World Help does not contend that Leisure would be unjustly enriched by the trial court's decision as to lien priorities. [11]

> 11   World Help does contend that Leisure was unjustly enriched by World Help's *payment* of the delinquent taxes. We address that argument in our discussion of World Help's eighth point.

World Help's bid amount would not have accounted for taxes due for 1993, because World Help purchased the Leisure documents in 1992 -- before the 1993 taxes were due. [**59] Thus, the trial court's ruling that World Help is equitably subrogated to HCAD's lien for the 1993 taxes is proper under the circumstances of this case.

We overrule World Help's seventh point.

## XI. World Help's Recovery of the Delinquent Tax Amount

In point eight, World Help contends the trial court erroneously refused to render judgment for World Help against Leisure based on World Help's payment of the 1989 through 1992 ad valorem taxes. In conclusion of law 4, the trial court concluded that World Help has no valid claim against Leisure for the delinquent taxes.

Although World Help was not entitled to be equitably subrogated to HCAD's tax liens on Rylee's Landing, it does not follow that World Help could not recover from Leisure for payment of the delinquent taxes. Whether Leisure was liable for nonpayment of the ad valorem taxes is a separate question from what lien priority World Help should receive based on its payment of the taxes.

The deed of trust that secured the acquisition loan promissory note allowed C&I, as mortgagee, to pay delinquent property taxes and add the amount of the taxes to the [*683] mortgage debt. Leisure acknowledges that the deed of trust gave the [**60] mortgagee of Rylee's Landing this right.

Many Texas cases have held that [HN29] if a mortgagor fails to pay taxes he has promised to pay, the mortgagee may treat the amount owed for taxes as part of the mortgage debt. . . . If the mortgagor fails to pay the taxes, the mortgagee may pay them and the amount paid for taxes is considered to be a part of the mortgage debt. Both the mortgagor's obligation to pay the amount due on the purchase price and his obligation to pay taxes are secured by the mortgage.

*Smart, 597 S.W.2d at 336.*

As successor mortgagee, World Help was permitted to pay the delinquent ad valorem taxes on Rylee's Landing and add that amount to the mortgage debt. World Help paid the taxes. Accordingly, World Help was entitled to recover the delinquent tax amount from Leisure, and the trial court erred by concluding otherwise. We sustain World Help's eighth point.

## XII. World Help's Lien Priority for the Paid Taxes

In point six, World Help contends that the trial court erred in granting Turner and Kingdom summary judgment subordinating World Help's liens for the paid ad valorem taxes to Turner's and Kingdom's liens. In its summary judgment order, the trial court [**61] ruled that World Help's "legal or equitable liens" are superior to Turner's and Kingdom's liens to the extent of $ 34,860 (the amount of the 1993 ad valorem taxes). The trial court ruled that Turner's and Kingdom's liens are superior to all of World Help's other liens.

In our discussion under point seven, we upheld the trial court's ruling that World Help is not entitled to be equitably subrogated to HCAD's first priority lien for the delinquent property taxes on Rylee's Landing. *See* at *1998 Tex. App. LEXIS 3352*, *54. But we ruled in point eight that World Help was permitted to pay delinquent taxes and add that amount to the acquisition mortgage debt. *See* at *1998 Tex. App. LEXIS 3352*, *59. Because World Help's payment of the delinquent ad valorem taxes is secured by the deed of trust on the acquisition loan, World Help's lien priority on the now-paid delinquent taxes is the same as its mortgage lien priority. However, what that priority is must be determined on remand after a trial on the merits of the equitable subordination issue. We sustain point six.

## XIII. World Help's Attorney's Fees

In its fifth point, World Help complains that the trial court improperly failed to award it attorney's fees against Leisure. [**62] World Help asserts that it is entitled to attorney's fees because it won a portion of its breach of contract claim against Leisure. *See TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8)* (Vernon 1997).

[HN30] When a prevailing party in a breach of contract suit seeks attorney's fees, an award of reasonable fees is mandatory under *section 38.001* if there is proof of the reasonableness of the fees. *See Atlantic Richfield Co. v. Long Trusts, 860 S.W.2d 439, 449* (Tex. App.--Texarkana 1993, writ denied); *Budd v. Gay, 846 S.W.2d 521, 524* (Tex. App.--Houston [14th Dist.] 1993, no writ.). A trial court has discretion to fix the amount of attorney's fees, but it does not have the discretion to completely deny attorney's fees if they are proper under *section 38.001*. *See Budd, 846 S.W.2d at 524*.

William Korb, World Help's attorney, testified at trial about the reasonableness of his firm's attorney's fees. Korb listed the work he had performed in preparation and trial of the case. He testified that he had expended 300 hours on the case at $ 150 per hour; that two paralegals had expended a total of 233 hours at $ 55 per hour; and that other attorneys in his firm had worked a total of 18 [**63] hours on the case at $ 120 per hour. The total of these amounts is $ 59,975. Korb also testified that the services provided and the hourly rates were reasonable based on the issues involved in the case. Finally, Korb testified that $ 20,000 was a reasonable legal fee to charge if the case was appealed to this court; $ 5,000 would be a reasonable fee for filing an application for writ of error with the Texas Supreme Court; and $ 5,000 would be [*684] a reasonable fee if the supreme court granted the application.

Korb's testimony was uncontroverted. On cross-examination, Leisure only asked whether World Help had actually been charged the fees about which Korb testified, or whether the case was being tried on a contingency fee basis. Korb responded that World Help was regularly paying legal fees on an hourly rate basis and had "been charged $ 60,000 for the trial of the case." Kingdom asked whether the fees had been paid, and Korb testified that all fees had been paid except for those billed during January 1996 -- the month in which the case was tried. Turner's attorney merely questioned Korb about whether $ 35,000 was a reasonable amount of attorney's fees for trying *Turner's* claims in [**64] the case. No other evidence was offered regarding the amount or reasonableness of World Help's attorney's fees.

[HN31] What amount of attorney's fees is reasonable is a question of fact. *See International Sec. Life Ins. Co. v. Spray, 468 S.W.2d 347, 349 (Tex. 1971)*. But where, as here, trial counsel's testimony concerning attorney's fees for the trial of a case is clear, positive and direct, and uncontroverted, it is taken as true as a matter of law. This is especially true where the opposing party had the means and opportunity to disprove the testimony, if it were not true, and failed to do so. *See Ragsdale v. Progressive Voters League, 801 S.W.2d 880, 882 (Tex. 1990)*; *Clary Corp. v. Smith, 949 S.W.2d 452, 469* (Tex. App.--Fort Worth 1997, pet. denied); *see also TEX. CIV. PRAC. & REM. CODE ANN. § 38.003* (Vernon 1997) (stating rebuttable presumption that usual and customary attorney's fees are reasonable). Because none of the appellees questioned or controverted Korb's testimony, even though they had the means and opportunity to do so, we hold that the testimony established World Help's legal fees through trial of the case as a matter of law.

World Help also contends [**65] that it is entitled to attorney's fees against Turner and Kingdom with regard to the lien priorities issue. Whether World Help is entitled to those attorney's fees is undecided because we

EXHIBIT "F"

are remanding the lien priorities issue for trial on the merits. [HN32] Ordinarily, a party is required to segregate fees incurred on claims allowing the recovery of fees from those that do not. *See Stewart Title Guar. Co. v. Aiello, 941 S.W.2d 68, 73 (Tex. 1997)*. But when the claims are dependent upon the same set of facts or circumstances and thus are intertwined to the point of being inseparable, the party suing for attorney's fees may recover the entire amount covering all claims. *See id.* Leisure does not contend that the attorney's fee award should be segregated, and we believe the issues are so intertwined that segregation would be impracticable. Accordingly, we hold that World Help may recover the full $ 60,000 in attorney's fees from Leisure. However, the trial court should decide on remand whether World Help is entitled to recover attorney's fees from Turner and Kingdom concerning the lien priorities issue. If the trial court decides that an award of attorney's fees against Turner and Kingdom [**66] is proper, then Leisure, Turner, and Kingdom will be jointly and severally liable for the $ 60,000 attorney's fee award.

[HN33] The award of appellate attorney's fees is also a question for the fact finder. *See id*. We may not initiate an award of appellate fees, since that would be an exercise of original rather than appellate jurisdiction. *See International Sec. Life Ins. Co., 468 S.W.2d at 349.* Korb's testimony as to appellate attorney's fees did not establish the reasonableness of the requested amounts as a matter of law. Accordingly, we will remand this portion of the attorney's fees issue to the trial court for a determination and an award.

We sustain World Help's fifth point as it pertains to World Help's attorney's fees claim against Leisure and decline to rule on the point as it pertains to World Help's claim against Turner and Kingdom.

## XIV. Turner's Attorney's Fees

In its sole cross point, Turner asserts that the trial court erred in failing to award Turner attorney's fees.

Turner contends it is entitled to recover attorney's fees from both World Help and Leisure under *section 38.001 of the Texas Civil Practice and Remedies Code*. We [*685] disagree. [HN34] To be entitled to [**67] attorney's fees under *section 38.001*, Turner was required to prevail on at least a portion of its claims. *See Atlantic Richfield Co., 860 S.W.2d at 449*. The final judgment in this case does not award Turner any relief against Leisure because Turner did not sue Leisure in this case.

Turner's only claim against World Help within the scope of *section 38.001* was derivative of C&I's alleged breach of the June 1989 letter agreement. Turner did not prevail on its claim that C&I breached the letter agreement. In its findings of fact, the trial court found that C&I breached its "set-aside agreement" with Turner

but did not find that the breach caused Turner any damages. Because Turner did not prevail on any claims under *section 38.001*, it is not entitled to attorney's fees based on that statute.

Turner also contends that it is entitled to recover attorney's fees from World Help under *section 53.156 of the Texas Property Code* because it prevailed against World Help on the lien priorities issue, which is covered by the statute. [HN35] *Section 53.156* provides:

In any proceeding to foreclose a lien . . . or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole [**68] or in part, the court *may* award costs and reasonable attorney's fees as are equitable and just.

*TEX. PROP. CODE ANN. § 53.156* (Vernon 1995) (emphasis supplied).

This language indicates that a trial court's award of attorney's fees under this statute is discretionary, not mandatory. *See id.; see also Texas Constr. Assocs. v. Balli, 558 S.W.2d 513, 522* (Tex. Civ. App.--Corpus Christi 1977, no writ) (holding that trial court's award of attorney's fees under predecessor statute was discretionary, not mandatory). Thus, [HN36] an award of attorney's fees under *section 53.156* is not automatic, even to a prevailing party.

Moreover, in light of our holding that the summary judgment on lien priorities is improper, Turner is not a prevailing party on the lien priority issue. Accordingly, without deciding whether Turner's claims below fell within the purview of *section 53.156*, we hold that Turner is not, at this point, entitled to attorney's fees under *section 53.156*. We overrule Turner's cross point.

## XV. Conclusion

We affirm the trial court's judgment in part, reverse and remand in part, and reverse and render in part as follows:

. We reverse the trial court's judgment that [**69] Turner's and Kingdom's liens are superior to World Help's mortgage liens and remand the lien priorities issue for trial on the merits.

. We reverse the trial court's judgment granting Turner an equitable lien on the rental proceeds from Rylee's Landing and render judgment that Turner does not have an equitable lien on the rental proceeds.

. We affirm the trial court's judgment that the acquisition and development loans comprised a single contract, which C&I breached but Leisure did not.

. We reverse the trial court's judgment denying World Help recovery from Leisure for the $ 218,031 in paid delinquent property taxes and render judgment that

EXHIBIT "F"

067-250449-11

World Help recover that additional amount from Leisure as part of the mortgage debt. We reform the trial court's judgment awarding World Help damages from Leisure on the promissory notes to reflect the additional $ 218,031, or $ 2,319,968 in total damages and affirm the damages award as reformed. We remand to the trial court for recalculation of interest on the reformed damages award.

. We reverse the trial court's judgment denying World Help's claim to the rental proceeds from Rylee's Landing and render judgment that World Help has a security [**70] interest in the rental proceeds, which has the same priority as World Help's mortgage liens because it was granted in the acquisition and development loan documents.

. We affirm the trial court's judgment that World Help has a first priority lien against [*686] Rylee's Landing for $ 34,860 -- the amount of the 1993 ad valorem taxes.

. We affirm the trial court's judgment that World Help is not equitably subrogated to HCAD's tax liens for the 1989 through 1992 ad valorem taxes. We render judgment that World Help's lien priority with respect to the delinquent tax amount ($ 218,031) has the same priority as its mortgage liens because the paid delinquent taxes are now part of the mortgage debt.

. We reverse the trial court's judgment denying World Help's claim for attorney's fees against Leisure and render judgment that World Help recover $ 60,000 in attorney's fees from Leisure for trial of the underlying case. We remand to the trial court the issue of what is a reasonable amount of appellate attorney's fees. We also remand the issue of whether World Help can recover attorney's fees from Turner and Kingdom related to the lien priorities issue, in which case Leisure, Turner, and Kingdom would [**71] be jointly and severally liable for the attorney's fee award.

. We affirm the trial court's judgment denying Turner's claim for attorney's fees.

JOHN CAYCE

CHIEF JUSTICE

PANEL A: CAYCE, C.J.; LIVINGSTON and BRIGHAM, JJ.

DELIVERED JUNE 4, 1998

EXHIBIT "F"



RECOGNITION COMMUNICATIONS, INC., Appellant v. AMERICAN
AUTOMOBILE ASSOCIATION, INC. & AAA CLUB SERVICES, INC., Appellees

No. 05-02-01619-CV

COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS

*154 S.W.3d 878*; *2005 Tex. App. LEXIS 543*

January 26, 2005, Opinion Filed

**SUBSEQUENT HISTORY:** Rehearing overruled by *Recognition Communs., Inc. v. AAA, Inc., 2005 Tex. App. LEXIS 829 (Tex. App. Dallas, Jan. 26, 2005)*
Petition for review denied by *Recognition Communs., Inc. v. AAA, 2005 Tex. LEXIS 945 (Tex., Dec. 9, 2005)*

**PRIOR HISTORY:**  [**1] On Appeal from the 193rd Judicial District Court. Dallas County, Texas. Trial Court Cause No. 97-03140-L.
*Recognition Communs., Inc. v. AAA, Inc., 2004 Tex. App. LEXIS 8034 (Tex. App. Dallas, Sept. 1, 2004)*

**DISPOSITION:** Affirmed in part, reversed and rendered in part, and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff advertising company appealed a decision of the 193rd Judicial District Court, Dallas County, Texas, which entered judgment for defendant automobile club in plaintiff's action for breach of contract alleging that the advertising company had an exclusive contract for advertisements. Plaintiff also filed a motion for rehearing of the court's opinion regarding its trial and appellate costs.

**OVERVIEW:** Plaintiff alleged it was entitled to commissions on advertisement sold in plaintiff's territory whether it sold the advertisement or not. Plaintiff pleaded that some paragraphs of the agreement were ambiguous, and the court held that submitting to the jury the question of ambiguity of more than those paragraphs was error, but harmless because the four paragraphs were discussed extensively at trial. There was evidence that defendant reassigned accounts within plaintiff's territory and the jury could have determined that the agreement did not prohibit account-by-account reassignment. The jury

could have rejected the theory that the agreement was exclusive. Plaintiff proved its entitlement to fees in that plaintiff sent letters to defendant complaining that it was not being paid commissions on the house accounts in plaintiff's territories and this was presentment under *Tex. Civ. Prac. & Rem. Code Ann. § 38.002*. Because there was conflicting evidence as to the tortious interference with a contract and fraud, the issues were for the jury to decide. The court granted in part plaintiff's motion for rehearing holding that plaintiff would recover 20 percent of the costs of appeal.

**OUTCOME:** The court affirmed the judgment of the trial court, but reversed as to costs. The court granted in part plaintiff's motion for rehearing regarding attorney's fees and costs on appeal, holding that plaintiff should recover 20 percent of the costs of appeal.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*
[HN1] Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with that right. Waiver can be established by either an express renunciation of a known right or by silence or inaction for so long a period as to demonstrate an intention to yield that known right. Although waiver is generally a fact issue, if facts and circumstances are admitted or clearly established, it then becomes a question of law. Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances.

EXHIBIT "G"

*Civil Procedure > Trials > Jury Trials > Jurors > Misconduct*
*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

[HN2] Generally, in reviewing a complaint of error in a question submitted to the jury, the appellate court employs an abuse of discretion standard. A trial court abuses its discretion if its action is arbitrary, unreasonable, and without reference to any guiding rules or principles. The trial court's clear failure to analyze or apply the law correctly constitutes an abuse of discretion. An appellate court may not reverse a judgment for error in the submission of jury instructions or questions unless an appellate court concludes the error probably caused the rendition of an improper judgment. *Tex. R. App. P. 44.1(a)(1)*. To determine whether an improper jury charge constitutes reversible error, an appellate court considers the pleadings, the evidence, and the charge in its entirety.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

[HN3] A trial court may not submit a jury question that is neither supported by the pleadings nor tried by consent. Submitting a jury question that is not supported by the pleadings or tried by consent is an abuse of discretion.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*

[HN4] Whether a contract is ambiguous is a question of law for the court to decide. Only if the court makes the determination that the contract cannot be given a certain and definite legal meaning, and is therefore ambiguous, can a question of fact be submitted to the jury as to the meaning of the contract.

*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*

[HN5] A party that asks for a certain type of relief cannot complain on appeal if that relief is granted.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*

[HN6] When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. The point of error should be sustained only if the contrary proposition is conclusively established.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*

[HN7] When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.

*Civil Procedure > Appeals > Standards of Review > General Overview*

[HN8] The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. The factfinder may believe one witness and disbelieve another and resolve inconsistencies in testimony. When enough evidence is before the factfinder that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence, the court of appeals may not substitute its judgment for that of the factfinder. The court of appeals may not reverse merely because it concludes that the evidence preponderates toward a different answer.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Governments > Agriculture & Food > General Overview*

[HN9] *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)* permits a prevailing party to recover attorney's fees in a suit on a contract. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)* (1997). When a prevailing party in a breach of contract suit seeks attorney's fees, an award of reasonable fees is mandatory under *section 38.001* if there is proof of the reasonableness of the fees. In such a case, a jury does not have discretion to simply deny an award of attorney's fees if any were properly proven. As a factual

EXHIBIT "G"

matter, a zero award for attorney's fees is proper if the evidence (1) failed to prove (a) that any attorney's services were provided, or (b) the value of the services provided; or (2) affirmatively showed that no attorney's services were needed or that any services provided were of no value. Uncontroverted testimony by an interested witness concerning attorney's fees may establish a fact as a matter of law.

*Civil Procedure > Parties > Required Representation*
*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN10] To recover attorney's fees under Tex. Civ. Prac. & Rem. Code Ann. ch. 38, a claimant (1) must be represented by an attorney; (2) he must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) before the expiration of the thirtieth day after the claim is presented, the opposing party must not tender payment for the just amount owed. *Tex. Civ. Prac. & Rem. Code Ann. § 38.002* (1997).

*Torts > Business Torts > Commercial Interference > Contracts > Elements*
[HN11] The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN12] A cause of action for fraud requires proof of a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.

*Civil Procedure > Appeals > Costs & Attorney Fees*
[HN13] See *Tex. R. Civ. P. 139*.

*Civil Procedure > Appeals > Costs & Attorney Fees*
[HN14] In a civil case, the court of appeal's judgment should award to the prevailing party the appellate costs-- including preparation costs for the clerk's record and the reporter's record--that were incurred by that party. But the court of appeals may tax costs otherwise as required by law or for good cause. *Tex. R. App. P. 43.4*.

*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*

*Civil Procedure > Appeals > Costs & Attorney Fees*
*Tax Law > State & Local Taxes > Administration & Proceedings > Judicial Review*
[HN15] Reading the plain language of both *Tex. R. Civ. P. 139* and *Tex. R. App. P. 43.4*, it has been concluded these rules can be harmonized to give effect to both. It is clear that courts of appeals have considerable discretion in taxing costs on appeal. While the first sentence of *Rule 43.4* directs an appellate court to award costs on appeal to the prevailing party, the second sentence gives an appellate court discretion to tax costs otherwise as required by law or for good cause. Important to an appellate court's decision is the language of the second sentence where it addresses taxation of costs, not simply appellate costs. Also, the rule provides us the alternative of following other provisions of the law on taxing costs or the appellate court may award costs for good cause. This language allows an appellate court to exercise its discretion to determine how costs shall be awarded for an appeal as well as for trial in recognition of the result on appeal.

COUNSEL: For APPELLANT: Wade L. McClure, GIBSON, McCLURE, WALLACE & DANIELS, Jennifer P. Pulley, Dallas, TX.

For APPELLEE: John Zavitsanos, AHMAD, ZAVITSANOS & ANAIPAKOS, P.C., Houston, TX, Jack Thomas Jamison, GODWIN & GRUBER, P.C., Dallas, TX.

JUDGES: Before Justices FitzGerald, Richter, and Lang Opinion By Justice Lang.

OPINION BY: DOUGLAS S. LANG

**OPINION**

 [*881] OPINION ON REHEARING

Opinion By Justice Lang

Appellant's motion for rehearing is **GRANTED** in part. The Court's opinion and judgment of September 1, 2004 are withdrawn, and this opinion is substituted in its place to state good cause for the allocation of costs on appeal and to remand the issue of trial court costs. In all other respects, appellants' motion for rehearing is **DENIED**.

Beginning in 1992, Recognition Communications, Inc. (RCI) contracted with American Automobile Association, Inc. (AAA) to act as a publisher's advertising representative soliciting and selling advertisements for *AAA World*, a magazine published by AAA. After AAA terminated the publisher's advertising agreement in 1997, RCI sued AAA for breach of the agreement. RCI alleged that it had an exclusive contract for advertisements that AAA received from RCI's

EXHIBIT "G"

territory, it was entitled to commissions on certain accounts pursuant [**2] to its agreement with AAA, and AAA failed to pay those commissions. RCI also alleged that AAA fraudulently induced it to add territory by representing those accounts were included in the new territory, but then AAA refused to pay commissions on those accounts. RCI also sued AAA Club Services, Inc., a subsidiary of an AAA member club, for tortious interference with the agreement. RCI alleged that certain agents of AAA Club Services, [*882] Inc. caused AAA to terminate the agreement.

The trial court submitted to the jury issues on ambiguity and interpretation of the agreement, the claims described above, and RCI's requests for attorney's fees. The jury found against RCI on all issues. The trial court entered a judgment that RCI take nothing. In nine issues, RCI challenges (a) the submission of the question regarding the ambiguity of certain paragraphs of the agreement and the factual sufficiency of the jury's failure to find that the accounts for which RCI sought payment were included in the agreement; (b) the trial court's ruling that certain paragraphs were ambiguous; (c) the sufficiency of the evidence supporting the jury's negative answer to RCI's request for attorney's fees incurred in [**3] obtaining a "termination fee"; and (d) the factual sufficiency of the evidence supporting the jury's negative answers to the tort, damages, and attorney's fees for breach of agreement questions. For the reasons that follow, we reverse the trial court's judgment as to the award of attorney's fees for the "termination fee" and render judgment in RCI's favor on that claim, and we affirm the trial court's judgment in all other respects.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### a. RCI's and AAA's History

Matt Kincaid was the president of RCI. His brothers Eric and Lance were also employed by RCI. RCI had contracts with various magazine publishers to solicit and sell advertisements. In turn, RCI had contracts with subrepresentatives to cover RCI's territory.

AAA, a not-for-profit corporation, was a federation of independent member clubs. The member clubs provided various automobile and travel-related services to dues-paying members. The member clubs included whole states, parts of states, or spanned several states. The member clubs communicated with their members, usually through a travel magazine. AAA operated some clubs as divisions. In 1996, AAA sold three divisions, AAA Hawaii, [**4] AAA Texas, and AAA New Mexico, to AAA Club Services, Inc., a wholly owned subsidiary of the Automobile Club of Southern California (ACSC), an AAA member club. AAA Club Services, Inc. was formed in 1996 to be the parent of these three new subsidiaries.

AAA published *AAA World* to communicate with the individual members in the divisions. Among its methods of selling advertising, AAA entered into contracts with advertising representatives, like RCI, to sell advertisements in *AAA World*.

### b. RCI and AAA's Agreement

In 1990, Matt Hamill was hired as national advertising manager of *AAA World*. He was told to increase the amount of advertisements in the magazine. Matt Kincaid contacted AAA soliciting business, and in early 1992, Hamill contacted Kincaid. In February 1992, Hamill and Kinkaid signed the "Publisher's Advertising Representative Agreement" between RCI and AAA, which is at issue here.

### c. RCI and AAA Revised Agreement

The record reflects that possibly before, but certainly after the initial contract was signed, Kincaid requested Hamill to give RCI additional territory by making RCI the national sales representative for AAA. At a meeting in December 1993, at [**5] which Kincaid discussed adding additional territory with Hamill, AAA provided a "Prepaid Commission Report" showing what accounts were already producing income for the advertising agency that held the account in the territory. According to RCI, this report was provided by AAA so [*883] RCI could see the "income stream" RCI could expect to acquire if it received additional territory. The report includes several accounts labeled "In-house": Auto Plan, Auto Insider, and two other accounts. All accounts showed a "net" amount and an advertising representative's identifying number. The previous advertising representative had been paid commissions on the "In-house" accounts.

Beginning in 1994, with AAA's agreement, RCI added the territory shown on the "Prepaid Commission Report." Later in 1994, AAA decided to stop paying commissions on the Auto Insider and Auto Plan accounts. AAA labeled certain accounts, including Auto Insider and Auto Plan, "house accounts." The house accounts, which previously had been "commissionable" were no longer "commissionable." RCI submitted claims to AAA for Auto Insider and Auto Plan advertisements, but AAA refused to pay. In January 1995, with AAA's agreement, RCI [**6] added New Jersey to its territory because RCI believed that New Jersey territory included the Hertz Rental Company, whose headquarters were in New Jersey.

Later in 1995, RCI began a "media buying program" by instituting a "travel planner." RCI provided the travel planner to AAA under an oral agreement separate from the 1992 publisher's advertising agreement. Under the travel planner, RCI purchased advertising space in *AAA World*, sold advertisements in the advertising space, and then submitted the multi-advertisement copy to AAA. AAA paid RCI a commission on this advertising. AAA

EXHIBIT "G"

discontinued the travel planner effective January 1997.

Also, in 1995, the title of *AAA World* changed to *Car & Travel*. When AAA Club Services, Inc. was formed in 1996, it continued to use *Car & Travel* as its member publication. In mid-1996, Harold Yankelevitz replaced Hamill as national advertising manager. In January 1997, AAA Club Services, Inc. stopped using *Car & Travel* and began publishing *Journey*. Bob Bradley and Mark Titel, who were employees of ACSC, the parent of AAA Club Services, Inc., acted as consultants on the publication of *Journey*. Later in 1997, AAA stopped publishing [**7] *Car & Travel*.

### d. RCI's Breach of Contract Claim

AAA canceled the contract with RCI effective January 1997. Shortly thereafter, RCI sued AAA, AAA Club Services, Inc., and other parties not before us in this appeal. RCI alleged that AAA breached the agreement by failing to pay commissions on "in house," "preferred provider," and the Hertz accounts.

RCI's breach of contract theory was that under the agreement, the territory assigned to RCI was exclusive and all the accounts in each geographic area were assigned to RCI. Therefore, according to RCI, no other advertising agency had the right to sell any advertisements, and RCI was entitled to receive commissions on every advertisement placed by any advertiser or sold in RCI's territory, whether RCI sold the advertisement or it was sold by another advertising representative or by AAA itself.

### e. RCI's Other Claims

RCI also asserted a claim against AAA for fraudulent inducement for misrepresenting that the "house accounts," "preferred provider accounts," and the Hertz accounts were part of RCI's territory. As damages, RCI claimed it was entitled to $ 10,000 as a termination fee plus unpaid sales commissions, which RCI estimated [**8] at trial to total about $ 2 million. RCI also requested attorney's fees for both the "termination fee" and the breach of contract claim.

RCI asserted a claim for tortious interference with contract against AAA Club [*884] Services, Inc. RCI alleged that Titel and Bradley, as agents of AAA Club Services, Inc., tortiously interfered with the RCI-AAA agreement by demanding that AAA terminate the agreement.

### f. Pretrial

Before trial, the trial court granted partial summary judgment in RCI's favor by ruling that RCI was entitled to a "termination fee" under paragraph 2(B) of the agreement. Also before trial, the trial court ruled that paragraphs 1(D) and 5(A) of the agreement were ambiguous. [1] Subsequently, RCI amended its pleading by

asserting that paragraph 1(E) was ambiguous. [2]

1 Paragraph 1(D) provided:

Advertising accounts located within the Territory's geographic area are assigned to [RCI]. The advertiser's name and location shall be determined by the parties named and described on the advertising contract or insertion order.

Paragraph 5(A) provided:

[AAA] agrees to pay [RCI] a twenty per cent (20%) commission on the net dollar amount of advertisements sold by [RCI] to advertisers in the Territory. The net shall be based on current published advertising rates less any [AAA's] rate discounts, special services fees, and advertising agency commission.

[**9]

2 Paragraph 1(E) provided:

TEAM ACCOUNT RULE: In the event that any portion of the Territory's geographic area is also assigned to another representative, any account located in that portion will be designated a "Team Account" (see 5D). [RCI] agrees to solicit and service Team Accounts in cooperation with other assigned representatives.

### g. The Jury Charge

Over RCI's objection, the jury charge submitted the issue of the meaning of paragraphs 1(A), 1(D), 1(E), 1(F), 4, and 5(A) and whether the contested advertisements were included in the agreement as modified, re-aligned, or re-assigned. [3] The charge also submitted RCI's contract claims, tort claims, and RCI's requests for attorney's fees pursuant to the "termination fee" and breach of contract. The jury found that the contested accounts were not part of the agreement. The jury did not reach the issues relating to the breach of the agreement claim and found against RCI on all other issues.

3 Paragraph 1(A) provided:

[AAA] hereby contracts with [RCI] for the purpose of soliciting and selling advertising space in the publication *AAA World*. [RCI] will solicit and service advertising as follows: a.) for specific edition sections, and b.) in a geographic area, the sum of "a" and "b" being hereafter referred to as the "Territory" (see Attachment A).

Attachment A was a "rate card" that changed each year and listed the "designated advertising sales territories" effective at the beginning of the year.

Paragraph 1(F) provided:

EXHIBIT "G"

SPLIT ACCOUNT RULE: Should an advertising contract or insertion order determined to be in the Territory also name an agency or agency's client located outside the Territory, the advertiser will be designated "Split Account" (see 5D). [RCI] agrees to solicit and service Split Accounts in cooperation with other assigned representatives.

Paragraph 4 provided:

INVOICES. An advertisement is considered sold only upon publication. [AAA] will invoice advertisers for advertisements that [RCI] has sold and will be responsible for collection activities and any uncollectible revenues (see 5C). Upon request by [RCI], [AAA] shall provide a copy of any invoice.

[**10] RCI filed a motion for judgment notwithstanding the verdict and motion for new trial. Both were denied in a written order. This appeal followed.

## II. AAA CLAIMS RCI WAIVED RIGHT TO APPEAL

Initially, we address AAA's assertion that Kincaid expressly waived RCI's [*885] right to appeal by certain statements during cross-examination.

[HN1] Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with that right. *Jernigan v. Langley, 111 S.W.3d 153, 156, 46 Tex. Sup. Ct. J. 1010 (Tex. 2003)* (per curiam); *U.S. Fid. & Guar. Co. v. Bimco Iron & Metal Corp., 464 S.W.2d 353, 357, 14 Tex. Sup. Ct. J. 251 (Tex. 1971)*. Waiver can be established by either an express renunciation of a known right or by silence or inaction for so long a period as to demonstrate an intention to yield that known right. *Jernigan, 111 S.W.3d at 156*. Although waiver is generally a fact issue, if facts and circumstances are admitted or clearly established, it then becomes a question of law. *Jernigan, 111 S.W.3d at 156*. Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding [**11] facts and circumstances. *Motor Vehicle Bd. v. El Paso Indep. Auto. Dealers Ass'n, Inc., 1 S.W.3d 108, 111, 42 Tex. Sup. Ct. J. 1128 (Tex. 1999)*.

To show waiver, AAA relies on the following italicized statement by Kincaid during cross-examination regarding the location of the Hertz account:

We're agreed that they're in Virginia and New Jersey and/or Florida. We think there's three territories. We've split it half and half. We were just told it was in New Jersey. That's all we're saying, it's on our commission

statements, and if --*whatever the jury defines, we will not appeal*.

The context of this statement shows that it relates to counsel's previous questions regarding the jury's decision as to the location of the Hertz account, not to a waiver of appeal of the jury's verdict on the entire case. Thus, we cannot agree that this statement is an intentional relinquishment of RCI's known right to appeal or intentional conduct inconsistent with RCI's right to appeal. *See Jernigan, 111 S.W.3d at 156; U.S. Fid. & Guar. Co., 464 S.W.2d at 357*.

## III. JURY CHARGE ERROR

In its first issue, RCI contends that the trial court erroneously submitted the question [**12] of ambiguity of paragraphs 1(A), 1(E), 1(F), and 4 of the agreement, which the trial court had not found to be ambiguous and for which ambiguity had neither been pleaded nor tried by consent. RCI contends that the submission of these paragraphs is a clear mistake of law which probably caused the rendition of an improper judgment.

*a. Standard of Review*

[HN2] Generally, in reviewing a complaint of error in a question submitted to the jury, we employ an abuse of discretion standard. *Dallas County Sheriff's Dep't v. Gilley, 114 S.W.3d 689, 691 (Tex. App.-Dallas 2003, no pet.)* (citing *Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649, 34 Tex. Sup. Ct. J. 31 (Tex. 1990))*. A trial court abuses its discretion if its action is arbitrary, unreasonable, and without reference to any guiding rules or principles. *Id.* The trial court's clear failure to analyze or apply the law correctly constitutes an abuse of discretion. *Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241, 29 Tex. Sup. Ct. J. 88 (Tex. 1985)*. We may not reverse a judgment for error in the submission of jury instructions or questions unless we conclude the error probably caused the rendition of an improper judgment. [**13] *TEX. R. APP. P. 44.1(a)(1); Gilley, 114 S.W.3d at 691*. To determine whether an improper jury charge constitutes reversible error, we consider the pleadings, the evidence, and the charge in its entirety. *Gilley, 114 S.W.3d at 691*.

[HN3] A trial court may not submit a jury question that is neither supported by the pleadings nor tried by consent. *Tex. Indus., Inc. v. Vaughan, 919 S.W.2d 798, 803 [*886] (Tex. App.-Houston [14th Dist.] 1996, writ denied)*. Submitting a jury question that is not supported by the pleadings or tried by consent is an abuse of discretion. *Stephanz v. Laird, 846 S.W.2d 895, 902 (Tex. App.-Houston [1st Dist.] 1993, writ denied); Eldridge v. Collard, 834 S.W.2d 87, 90 (Tex. App.-Fort Worth 1992, no writ)*.

[HN4] Whether a contract is ambiguous is a question of law for the court to decide. *Lopez v. Munoz, Hockema*

EXHIBIT "G"

& Reed, L.L.P., 22 S.W.3d 857, 861, 43 Tex. Sup. Ct. J. 806 (Tex. 2000). Only if the court makes the determination that the contract cannot be given a certain and definite legal meaning, and is therefore ambiguous, can a question of fact be submitted to the jury as to the [**14] meaning of the contract. *Gaulden v. Johnson, 801 S.W.2d 561, 564 (Tex. App.-Dallas 1990, writ denied)*.

b. *Discussion*

The two issues raised in this case were, first, whether the contract was exclusive, and, second, whether RCI was entitled to commissions on advertisements from its territory regardless of whether RCI actually sold the advertisements. RCI offered a jury question that asked whether the agreement "assigned RCI an exclusive geographic area within which to solicit and service advertising . . . ." Thus, RCI's jury question did not address the issue of whether RCI had to sell the advertisements or whether any advertisements sold by anyone else in the territory would result in a commission to RCI. The trial court refused RCI's offered jury question. Instead, the trial court submitted a broader question that combined the two issues of whether RCI's territory was exclusive and whether RCI needed to sell an advertisement to obtain a commission and included instructions to the jury regarding its interpretation of the two paragraphs RCI requested in its offered question and the four additional paragraphs. Question 1 reads as follows:

Did the agreement between [**15] [AAA] and [RCI], as modified or re-aligned or re-assigned include any of the matters listed below?

a. In order for the parties to make an enforceable agreement, there must be an offer and acceptance, and there must be a meeting of the minds on all essential terms of the agreement and a communication that each party has consented to the terms of the agreement. An enforceable agreement may be oral or written.

b. In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

i. A "course of dealing" is previous conduct between the parties that indicates the parties' understanding of their contractual obligations. You may not consider thoughts or intentions that the parties have not expressed to each other.

c. A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

i. Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to [**16] perform an act, that other party is also authorized to do whatever else is proper, ususal, and necessary to perform the act expressly authorized.

ii. Apparent authority exists if a party-

[*887] (1) knowingly permits another to hold himself out as having authority or,

(2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment.

Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

d. The parties' 1992 agreement is Plaintiff's Exhibit 15. All references to specific paragraphs ("P") are to Plaintiff's Exhibit 15.

e. Notwithstanding paragraph 10 [4] of Plaintiff's Exhibit 15, [AAA] and [RCI] could agree to modify their agreement in writing or orally or a combination of both.

> 4 Paragraph 10 is titled "Revisions to the Agreement" and provided: "This Agreement may be altered at any time provided that all modifications are in writing and agreed to by both parties."

[**17] f. [AAA] could re-align or re-assign [RCI]'s territory (P 1(B)) [5] without [RCI]'s agreement, if [AAA] did so in an unequivocal notice. If [AAA] did not do so in an unequivocal notice, the parties could have agreed to re-align or re-assign the territory.

> 5 Paragraph 1(B) provided: "[AAA] establishes the Territory and may re-align and re-assign Territory at any time."

g. It is your duty to interpret the following language of the agreement to decide whether the parties' agreement provided for RCI to receive a commission on advertising it did not participate in selling:

[Paragraphs 1(A), 1(D), 1(E), 1(F), 4, 5(A) were quoted.]

You must decide the Agreement's meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the whole agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

Question 1 then listed nineteen separate, specifically identified advertisements, [**18] beginning with the Auto Plan advertisements in *AAA World* during 1994-95

EXHIBIT "G"

and ending with the AAA Auto Club Cellular advertisements in *Car & Travel* during 1995-97. The jury answered "no" to each separate advertisement.

We agree that the submission of paragraphs 1(A), 1(F), 1(E), and 4 to the jury for interpretation was error because RCI did not plead ambiguity as to 1(A), 1(F), and 4, and the trial court did not rule these paragraphs and 1(E) to be ambiguous. *See Tex. Indus., Inc., 919 S.W.2d at 803*; *Stephanz, 846 S.W.2d at 902*; *Eldridge, 834 S.W.2d at 90*.

RCI claims this error requires reversal since Question 1 submitted a valid theory, that is, the jury's interpretation of two paragraphs that the trial court found to be ambiguous, and other theories that were not valid. Because of the jury's negative answers to Question 1 as to interpretation of the agreement, the jury did not reach the questions as to RCI's claim that AAA breached the agreement, which were conditioned on an affirmative answer to Question 1. RCI relies on *Crown Life Ins. Co.v. Casteel, 22 S.W.3d 378, 388-90, 43 Tex. Sup. Ct. J. 348 (Tex. 2000)*, to support its [**19] argument that it is impossible to determine whether the jury's negative answers were based on the erroneous submission of the ambiguity issue, a finding that the nineteen separate advertisements were not included in the agreement, [*888] or a finding that the agreement was modified, re-aligned, or re-assigned. In *Casteel*, the appellant/defendant sought to set aside the jury's answer to a broad-form question that submitted both valid and invalid liability theories. Since a reviewing court could not tell which theories the jury relied on to reach its verdict, the submission was error and probably caused an improper verdict.

*Casteel* does not apply. Here, there was no harm from a broad-form submission. AAA argues that RCI presented evidence throughout the trial regarding the meaning of the four paragraphs, which RCI now contends are not ambiguous. AAA contends that the issue of the ambiguity of these four paragraphs was tried by consent. RCI responds that the evidence merely explained how these paragraphs fit together to support RCI's position.

Assuming, without deciding, that the issue of ambiguity as to the four paragraphs was not tried by consent, we still conclude there was no harm. [**20] Question 1 submitted the issue of whether RCI had to actually sell an advertisement to obtain a commission (an issue not addressed in RCI's offered question), along with the issue of exclusivity, so that the jury could consider both issues. Additionally, the four paragraphs were discussed extensively in both sides' evidence. Question 1 simply allowed RCI to freely make its argument as to the contract provisions, consistent with its trial presentation, and allowed the jury to consider those paragraphs RCI argued were relevant to the meaning of

the agreement. AAA, not RCI, argued that no part of the agreement was ambiguous. We conclude that Question 1 as submitted by the court tended to favor RCI, not hinder it. Accordingly, we decide the first issue against RCI.

## IV. TRIAL COURT'S AMBIGUITY RULING

In its second issue, RCI contends that the trial court erred in its pretrial order that paragraphs 1(D) and 5(A) are ambiguous. However, RCI pleaded in its seventh amended petition that these paragraphs were ambiguous. RCI repeated this allegation in its eighth amended petition, which was its live trial pleading. In addition, RCI proposed a jury question regarding the interpretation [**21] of paragraphs 1(D) and 5(A). [HN5] A party that asks for a certain type of relief cannot complain on appeal if that relief is granted. *Nesmith v. Berger, 64 S.W.3d 110, 119 (Tex. App.-Austin 2001, pet. denied)* (citing *Litton Indus. Prods., Inc. v. Gammage, 668 S.W.2d 319, 321-22, 27 Tex. Sup. Ct. J. 166 (Tex. 1984))*. Accordingly, we conclude RCI waived its complaint on appeal that the trial court erred in ruling the contract ambiguous by requesting this same ruling from the trial court. We decide the second issue against RCI.

## V. SUFFICIENCY OF THE EVIDENCE SUPPORTING JURY'S ANSWERS

In issues three and six, RCI contends the evidence is legally and factually insufficient to support the jury's award of zero attorney's fees for a "termination fee." In issue four, RCI contends the jury's failure find that the agreement included the nineteen advertisements was against the great weight and preponderance of the evidence. In issues five and seven through nine, RCI contends the jury's negative answers to the questions regarding RCI's claims for intentional interference with the agreement, fraud, attorney's fees for the breach of contract claim, and damages were against the great weight [**22] and preponderance of the evidence.

[*889] *a. Standard of Review*

[HN6] When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241, 44 Tex. Sup. Ct. J. 664 (Tex. 2001)* (per curiam). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The point of error should be sustained only if the contrary proposition is conclusively established. *Id.*

[HN7] When a party attacks the factual sufficiency

EXHIBIT "G"

067-250449-11

of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Id. at 242.* The court of appeals must consider and weigh all of the evidence, and [**23] can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

[HN8] The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761, 46 Tex. Sup. Ct. J. 1133 (Tex. 2003).* The factfinder may believe one witness and disbelieve another and resolve inconsistencies in testimony. *McGalliard v. Kuhlmann, 722 S.W.2d 694, 697, 30 Tex. Sup. Ct. J. 96 (Tex. 1986).* When enough evidence is before the factfinder that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence, the court of appeals may not substitute its judgment for that of the factfinder. *Herbert v. Herbert, 754 S.W.2d 141, 144, 31 Tex. Sup. Ct. J. 453 (Tex. 1988).* The court of appeals may not reverse merely because it concludes that the evidence preponderates toward a different answer. *Id.*

### b. Interpretation of the Agreement

In its fourth issue, RCI contends that the jury's negative answers to subparts (1) through (19) of Question 1, which specifically asked [**24] if various advertisements for Hertz, Auto Plan, Auto Insider, and other advertisements were included in the agreement, was contrary to the great weight and preponderance of the evidence.

Kincaid testified that RCI was entitled to payment for commissions on all the listed accounts because the agreement was exclusive and included all advertising accounts located within RCI's territory. Kincaid also testified that individual accounts were not considered "territory" and could not be re-aligned or re-assigned on an account-by-account basis and that no accounts were ever specifically or properly excluded.

There was evidence that AAA re-aligned and re-assigned accounts within RCI's territory, specifically the "house accounts" and "preferred provider accounts." The jury could have determined that, contrary to RCI's theory, the agreement did not prohibit account-by-account re-assignment. Accordingly, the jury could have rejected RCI's theory that the agreement was exclusive in terms of preventing some accounts in RCI's territory from being re-assigned.

Moreover, RCI's argument under this issue and its record references ignore the second issue addressed by Question 1, that is, whether RCI [**25] had to sell an advertisement to receive a commission. It is undisputed that AAA paid RCI for some advertisements that were from advertisers in RCI's territories, but which RCI did not sell. It is undisputed that RCI did not [*890] sell any of the nineteen advertisements. In 1994, RCI told its subrepresentatives that AAA had designated Auto Plan, Auto Insider, and Hertz as "house accounts." Regarding the Hertz account, there was evidence that the advertising copy RCI submitted to AAA for publication in *AAA World*, called an "insertion order," showed the advertisement originated from Virginia, which was not an RCI territory, and that Hertz was a "preferred supplier account." There was evidence that Show Your Card and Save was a "preferred supplier account." These advertisements were for services available to members through deals negotiated with those companies. As to the AAA entities, there was evidence that these advertisements were for AAA's own services. Regarding the internal AAA ads, there was evidence that RCI claimed payment because AAA headquarters were in Florida, an RCI territory. There was evidence that any payments amounts were actually bookkeeping entries crediting transfers [**26] of payments between an AAA department and the magazine.

Even though house accounts and preferred provider accounts are not mentioned in the agreement, paragraph 5(A) provides that RCI would be paid "on the net dollar amount of advertisements sold by the Representative [that is, RCI] to advertisers in the Territory." Thus, the jury could have rejected RCI's theory that "sold by the Representative" meant that RCI would receive a commission on the value of any advertisement published from an advertiser in RCI's territory and accepted AAA's theory that RCI had to actually sell the advertisement to be entitled to a commission or that RCI would not receive a commission on an advertisement for which AAA itself received no payment.

Because the evidence was conflicting on whether the nineteen advertisements were included in the agreement, according to the definitions and instructions in Question 1, we conclude the jury's negative answer is not against the great weight and preponderance of the evidence. We decide adversely to RCI on its fourth issue. Because of our disposition of the fourth issue, we need not address the fifth issue, which challenges the factual sufficiency of the jury's [**27] answer of zero as to the reasonable attorney's fees related to RCI's breach of contract claim.

### c. Attorney's Fees

In its third issue, RCI contends that the trial court erred in entering judgment against RCI based on the jury's answer of zero to Question 5 regarding attorney's fees because RCI proved its entitlement to attorney's fees as a matter of law. In its sixth issue, RCI argues that the jury's answer to Question 5 is contrary to the great weight and preponderance of the evidence.

EXHIBIT "G"

RCI moved for summary judgment on the issue of its entitlement to the $ 10,000 final commission, or termination fee, pursuant to paragraph 2(B) of the agreement. The trial court granted partial summary judgment in RCI's favor by ruling that RCI was entitled to $ 10,000 under paragraph 2(B). The trial court's order also stated that RCI was "entitled to recover its reasonable and necessary attorney's fees incurred in the pursuit and/or collection of this breach of contract claim."

Question 5 asked: "What is a reasonable fee for the necessary services of [RCI's] attorney in this case related to the P 2(b) 'termination fee' claim?" The question then defined "reasonable and necessary attorney's [**28] fees" and listed eight factors that should be considered when considering the reasonableness of a fee. The jury answered zero.

[HN9] *Section 38.001(8) of the civil practice and remedies code* permits a prevailing [*891] party to recover attorney's fees in a suit on a contract. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8)* (Vernon 1997); *Serv. Fin. v. Adriatic Ins. Co., 46 S.W.3d 436, 461 (Tex. App.-Waco 2001), judgm't vacated w.r.m., 51 S.W.3d 450 (Tex. App.-Waco 2001, no pet.), disapproved of on other grounds by Brown v. De La Cruz, 156 S.W.3d 560, 2004 Tex. LEXIS 1254, 48 Tex. Sup. Ct. J. 164, 168 n.40, 2004 WL 2754651, at *5 n.40 (Tex. Dec. 3, 2004).* When a prevailing party in a breach of contract suit seeks attorney's fees, an award of reasonable fees is mandatory under *section 38.001* if there is proof of the reasonableness of the fees. *Id.*; *World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 683 (Tex. App.-Fort Worth 1998, pet. denied)*; *Caldwell & Hurst v. Myers, 714 S.W.2d 63, 65-66 (Tex. App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.).* In such a case, a jury does not have discretion [**29] to simply deny an award of attorney's fees if any were properly proven. *Cale's Clean Scene Carwash, Inc. v. Hubbard, 76 S.W.3d 784,787 n.4 (Tex. App.-Houston [14th Dist.] 2002, no pet.).* As a factual matter, a zero award for attorney's fees is proper if the evidence (1) failed to prove (a) that any attorney's services were provided, or (b) the value of the services provided; or (2) affirmatively showed that no attorney's services were needed or that any services provided were of no value. *Id. at 787.* Uncontroverted testimony by an interested witness concerning attorney's fees may establish a fact as a matter of law. *Id.*

Tom Melsheimer, an attorney, testified that $ 76,764 was a reasonable amount of attorney's fees for the $ 10,000 claim. He detailed the protracted procedural history of RCI's claim. Cross-examination on this issue consisted of questions whether RCI could have obtained the $ 10,000 through a simple procedure such a motion for summary judgment. Melsheimer agreed hypothetically but disagreed that those facts occurred

here. AAA produced no evidence that a lesser amount of fees was reasonable in this case. We conclude that this testimony established [**30] that attorney's services were provided and the value of those services.

Nevertheless, appellees contend that RCI is not entitled to these attorney's fees because RCI failed to prove presentment. [HN10] To recover attorney's fees under Chapter 38, a claimant (1) must be represented by an attorney; (2) he must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) before the expiration of the thirtieth day after the claim is presented, the opposing party must not tender payment for the just amount owed. *TEX. CIV. PRAC. & REM. CODE ANN. § 38.002* (Vernon 1997).

The record shows that, beginning in 1994, RCI sent letters to AAA complaining that it was not being paid commissions on the "house accounts" in RCI's territories. We conclude that these communications constitute presentment under *section 38.002*.

We conclude that RCI proved its entitlement to attorney's fees of $ 75,764 as a matter of law. *See Cale's Clean Scene Carwash, Inc., 76 S.W.3d at 787* & n.4. Accordingly, we decide RCI's third issue in its favor. Because RCI proved its entitlement to this amount of attorney's fees as a matter of [**31] law, we need not address RCI's sixth issue.

### d. Intentional Interference with the Agreement

In its seventh issue, RCI challenges the jury's negative answer to Question 6 regarding RCI's claim of intentional interference with the agreement, saying it is contrary to the great weight and preponderance of the evidence. Question 6 asked: "Did AAA Club Services, Inc. intentionally interfere with the agreement you found in answer to Question No. 1?" [*892] Question 6 included the following instruction: "Interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result." Question 6 also included an instruction regarding agency.

[HN11] The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *Powell Indus., Inc. v. Allen, 985 S.W.2d 455, 456, 42 Tex. Sup. Ct. J. 283 (Tex. 1998).*

RCI contends that the testimony shows that Bradley and Titel acted as agents of AAA Club Services, Inc. They said they would "handle" the Kincaids and RCI shortly [**32] before the agreement was terminated. However, the record reflects that this testimony about "handling" RCI related to RCI's submission of travel planner advertisements for publication in *Journey* magazine. RCI did not have a contract regarding

EXHIBIT "G"

*Journey*. There was evidence that RCI's travel planner was published in the Texas/New Mexico edition of *Car & Travel* and that RCI expected travel planner to be published in *Journey* after the sale of these divisions to ACSC. There was testimony that Bradley urged AAA to discontinue the travel planner. There was also testimony that the travel planner was unprofitable for AAA and Yankelevitz informed RCI in June 1996 that the travel planner would stop. Specifically, in a letter dated June 4, 1996, Yankelevitz informed Kincaid that travel planner would "not be continued into 1997." Yankelevitz testified that he and his predecessor alone decided to stop the travel planner program and that Bradley and Titel played no role in that decision. Thus, there was conflicting evidence as to Bradley's and Titel's actions in relation to the termination of RCI's travel planner agreement with AAA.

RCI argues that Bradley sent a letter to Yankelevitz [**33] mere days before Yankelevitz terminated the publisher's agreement, which is evidence of interference. However, the evidence shows that Yankelevitz decided to terminate the agreement in order to hire more representatives, rather than rely on a three-person company to cover the extent of RCI's territory. The jury resolves any conflicts in the testimony. Accordingly, we cannot conclude that the jury's answer to Question 6 is against the great weight and preponderance of the evidence. Issue seven is decided against RCI.

### e. Fraud

In its eighth issue, RCI argues that the jury's negative answer to Question 11 regarding the fraud claim was contrary to the great weight and preponderance of the evidence. Question 11 asked: "Did [AAA] commit fraud against [RCI] concerning commissions to be paid for newly assigned Territories?" Question 11 included an instruction regarding a corporation's responsibility for fraud committed by an individual in a managerial capacity. The charge gave two definitions of "fraud." First, the charge defined "fraud" as:

a. A party makes a material misrepresentation,

b. The misrepresentation is made with knowledge of its falsity or made recklessly without any [**34] knowledge of the truth and as a positive assertion,

c. The misrepresentation is made with the intention that it should be acted on by the other party, and

d. The other party acts in reliance on the misrepresentation and thereby suffers injury.

"Misrepresentation" was defined as "a false statement of fact of a promise of future performance with an intent not to [*893] perform as promised." Second, the charged defined "fraud" as:

a. A party conceals or fails to disclose material facts within the knowledge of that party,

b. The party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. The party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. The other party suffers injury as a result of acting without knowledge of the undisclosed fact.

[HN12] A cause of action for fraud requires proof of a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47, 41 Tex. Sup. Ct. J. 289 (Tex. 1998).* [**35]

RCI contends that the evidence shows that AAA committed fraud when it promised certain commissions to RCI when RCI assumed new territory under the agreement. Specifically, RCI contends the Prepaid Commission Report, which it reviewed in 1993 before accepting new territory, was a misrepresentation of the commissions RCI would receive because AAA had determined that it would not pay commissions on the house accounts. However, there was evidence that RCI sought to add new territory by becoming AAA's national advertising representative before RCI reviewed the Prepaid Commission Report. Accordingly, the evidence is conflicting whether RCI relied on any misrepresentation in that report in its decision to assume new territory under the agreement. The eighth issue is decided adversely to RCI.

## VI. CONCLUSION

Because of our disposition of RCI's issues regarding liability, we need not address RCI's ninth issue, in which it argues that the failure of the jury to award damages for the contract and tort claims is against the great weight and preponderance of the evidence. Because of our disposition of RCI's third issue, we reverse the final judgment of the trial court as to the issue of [**36] attorney's fees for the "termination fee" and render judgment that RCI is entitled to $ 75,764 in attorney's fees. The final judgment is affirmed as to other claims by RCI against AAA.

## VII. MOTION FOR REHEARING

In its motion for rehearing, RCI contends that it should be awarded all of its trial and appellate costs. We grant RCI's motion for rehearing in part and deny it in part.

First, RCI claims that it prevailed on appeal since it

EXHIBIT "G"

recovered its attorney's fees. Therefore, pursuant to *rule of appellate procedure 43.4*, it contends since it was the prevailing party on appeal, we must tax the costs on appeal against AAA. *See TEX. R. APP. P. 43.4*. Also, relying on *rule of civil procedure 139*, RCI argues that since it was the prevailing party we must award it all trial court costs. *See TEX. R. CIV. P. 139* (providing, in part: "If the judgment of the court above be in favor of the party appealing and for more than the original judgment, such party shall recover the costs of both courts . . . ."). In support of its argument as to trial court costs, RCI cites several cases in which the court of appeals applied *rule 139* to award [**37] trial court costs to an appellant since it recovered more on appeal than it had recovered at the trial court. [6] As to costs on appeal, AAA contends [*894] that costs should not be awarded to RCI since it recovered on only a minor portion of the relief it requested and cannot be considered the prevailing party. Additionally, AAA contends that the trial court's assessment of costs against RCI cannot be disturbed since the trial court has not been shown to have abused its discretion.

> 6 *See, e.g., Stalcup v. Eastham, 330 S.W.2d 237, 240 (Tex. Civ. App.-El Paso 1959, writ ref'd n.r.e.)* ("Since by this opinion we have enlarged the judgment, costs in both courts shall be assessed against appellees.").

We conclude that neither party has suggested the proper basis for our authority to award costs after an appeal. Our research discloses that two rules direct how we are to award costs after an appeal. *Rule of civil procedure 139*, adopted in 1941, sets out four rules that direct how costs of both trial and appeal [**38] are to be taxed, depending on the difference between the result for appellant on appeal and in the trial court. [7] However, *rule 139* does not address fine distinctions which might occur in a complex case, where, as here, the appellant did not prevail on any claims at the trial court, but prevailed on one discrete issue of attorney's fees on appeal. The more recently promulgated *rule of appellate procedure 43.4* provides this Court with latitude within which to award costs in a fashion which is not "all or nothing." *Rule 43.4* provides for judgment for costs in civil cases:

> 7 *Rule 139* comes within section 6 of the rules of civil procedure, which is titled "Costs & Security Therefor." *Rule 139* is titled "On Appeal & Certiorari" and provides:
>
> [HN13] When a case is appealed, if the judgment of the higher court be against the appellant, but for less amount than the original judgment, such party shall recover the costs of the higher court but shall be adjudged to pay the costs of the court below; if the judgment be against him for the same or a greater amount than in the court

below, the adverse party shall recover the costs of both courts. If the judgment of the court above be in favor of the party appealing and for more than the original judgment, such party shall recover the costs of both courts; if the judgment be in his favor, but for the same or a less amount than in the court below, he shall recover the costs of the court below, and pay the costs of the court above.

> *TEX. R. CIV. P. 139*.

[**39] [HN14] In a civil case, the court of appeal's judgment should award to the prevailing party the appellate costs--including preparation costs for the clerk's record and the reporter's record--that were incurred by that party. But the court of appeals may tax costs otherwise as required by law or for good cause.

> *TEX. R. APP. P. 43.4*.

[HN15] When we read the plain language of both *rule of civil procedure 139* and *rule of appellate procedure 43.4*, we conclude these rules can be harmonized to give effect to both. *See Burke v. Union Pac. Res. Co., 138 S.W.3d 46, 75 (Tex. App.-Texarkana 2004, pet. filed)*. It is clear that courts of appeals have considerable discretion in taxing costs on appeal. While the first sentence of *rule 43.4* directs an appellate court to award costs on appeal to the prevailing party, the second sentence gives an appellate court discretion to "tax costs otherwise as required by law or for good cause." Important to our decision is the language of the second sentence where it addresses taxation of "costs," not simply "appellate costs." Also, the rule provides us the alternative of following other provisions of the law on taxing costs "or" we [**40] may award costs "for good cause." We conclude this language allows us to exercise our discretion to determine how "costs" shall be awarded for an appeal as well as for trial in recognition of the result on appeal.

First, we address the award of costs on appeal. The relief requested in the trial court by RCI includes damages for breach of contract, the $ 10,000 termination [*895] fee, and attorney's fees. RCI did not recover on any claims in the trial court. We have determined that RCI is not entitled to damages for breach of contract, but RCI has prevailed on the right to attorney's fees based on recovery of the termination fee. RCI's attorney's fees recovery is not insignificant in amount. However, it is much less substantial than the many millions of dollars in relief RCI requested in its suit. Nevertheless, there is good cause for RCI to recover some of its costs on appeal. Accordingly, we have concluded that in this hard fought case it is equitable and just and good cause exists to allocate the costs on appeal so that RCI recovers twenty percent of those costs, which we have calculated is $ 4,160 of the costs of the clerk's and reporter's records. *See TEX. R. APP. P. 43.4* [**41] ; *In re A.B.B.,*

EXHIBIT "G"

*785 S.W.2d 828, 834 (Tex. App.-Amarillo 1990, no writ)* (applying percentage allocation of costs on appeal).

Second, we conclude that some of the taxable costs at the trial court level should also be awarded to RCI in view of our disposition of this appeal. We have before us in the record a listing of the taxable trial costs. However, this record will not provide us with sufficient facts to evaluate the proper taxation of costs at the trial court level to reflect the result on appeal. As a general rule, this Court will not initially find facts. Accordingly, the trial court must hear evidence and conclude how costs should be taxed in view of the result on appeal.

## CONCLUSION AS TO MOTION FOR REHEARING

RCI's motion for rehearing is granted in part and denied in part. RCI shall recover twenty percent of the costs of appeal, or $ 4,160. We reverse the final judgment as to costs of the trial court and remand the issue of allocation of trial court costs between the parties to the trial court for the sole purpose of holding a hearing to tax costs for good cause based upon the result on appeal. *See TEX. R. APP. P. 43.4*; *TEX. R. CIV. P. 141* [**42] ; *Price Constr., Inc. v. Castillo, 147 S.W.3d 431, 443 (Tex. App.-San Antonio 2004, no pet.)* (supplemental opinion on motion for en banc consideration).

DOUGLAS S. LANG

JUSTICE

EXHIBIT "G"



Kay Lynn MAYNARD f/k/a Kay Lynn Maynard Booth, Appellant v. William
William BOOTH, Appellee

No. 04-12-00585-CV

COURT OF APPEALS OF TEXAS, FOURTH DISTRICT, SAN ANTONIO

*421 S.W.3d 182*; *2013 Tex. App. LEXIS 14474*

November 27, 2013, Delivered
November 27, 2013, Filed

**SUBSEQUENT HISTORY:** Petition for review denied by *Maynard v. Booth, 2014 Tex. LEXIS 324 (Tex., Apr. 25, 2014)*

**PRIOR HISTORY:** [**1]
From the 111th Judicial District Court, Webb County, Texas. Trial Court No. 2010-CVH-001376-D2. Honorable Monica Z. Notzon, Judge Presiding.

**DISPOSITION:** AFFIRMED; MOTION TO DISMISS DENIED.

**CASE SUMMARY:**

**OVERVIEW:** HOLDINGS: [1]-On appeal of an action for breach of a settlement agreement in a divorce case, the wife's prayer for relief requesting that the appellate court reverse the trial court's judgment and render in her favor was construed as a legal sufficiency challenge; [2]-The wife failed to prove she lost hog hunting income in the amount of $42,000 as a result of the delay between signing the settlement agreement and the divorce decree; [3]-Where the wife prevailed on the claim that her husband breached a settlement agreement, the trial court did not err by awarding her less attorney's fees that she requested under *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8)* (2008) because the trial court had discretion in determining what amount of attorney's fees was reasonable.

**OUTCOME:** Judgment affirmed; motion to dismiss denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
[HN1] "No evidence" points require rendition of a judgment in favor of the appealing party. The appellate court may construe an appellant's challenge as a legal sufficiency challenge where he asks the appellate court to render judgment in his prayer for relief.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN2] When the party who had the burden of proof at trial complains of the legal insufficiency of an adverse finding, that party must demonstrate the evidence establishes conclusively i.e., as a matter of law, all vital facts in support of the finding sought. A reviewing court must examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. If more than a scintilla of evidence supports the adverse finding, the issue is overruled. If there is no evidence to support the adverse finding, the entire record must be examined to determine whether the contrary proposition is established as a matter of law. The issue is sustained only if the contrary proposition is conclusively established. The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded fact finder to reach the verdict under review.

*Evidence > Procedural Considerations > Weight & Sufficiency*
*Evidence > Testimony > Credibility > General Overview*
[HN3] The trier of fact is the sole judge of the credibility

EXHIBIT "H"

of the witnesses and the weight to be given their testimony.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Contracts Law > Breach > Causes of Action > General Overview*
[HN4] In an action for breach of an agreement, an award of reasonable attorney's fees to the prevailing party is mandatory if there is proof of the reasonableness of the fees. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (2008).* However, the amount of the award lies within the discretion of the trial court. A meaningful review of the hours claimed is particularly important, because the usual incentive to charge only reasonable attorney's fees is absent when fees are paid by the opposing party.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > General Overview*
*Legal Ethics > Client Relations > Attorney Fees > General Overview*
[HN5] Attorneys are encouraged to use the lodestar method to shift their fees to the opponent to keep contemporaneous records of their time as they would for their own client.

**COUNSEL:** For APPELLANT: James K. Jones Jr., Jones & Gonzalez, Laredo, TX; Adan Gonzalez, Jones & Gonzalez, P.C., Laredo, TX; Cheryl L. Wilson, Wilson & Pennypacker, L.L.P., San Antonio, TX.

For APPELLEE: Dan Pozza, Law Offices of Dan Pozza, San Antonio, TX.

**JUDGES:** Opinion by: Sandee Bryan Marion, Justice. Sitting: Catherine Stone, Chief Justice, Sandee Bryan Marion, Justice, Patricia O. Alvarez, Justice.

**OPINION BY:** Sandee Bryan Marion

**OPINION**

[*183] AFFIRMED; MOTION TO DISMISS DENIED

On September 22, 2011, in connection with their divorce, Kay Lynn Maynard and William Booth signed a hand-written agreement dividing their marital assets ("the settlement agreement"). Later a dispute arose over whether William breached the settlement agreement. The trial court found William breached the agreement and signed a Final Judgment and Decree of Divorce on August 10, 2012. Kay has appealed the judgment, and William filed a motion to dismiss that was carried with

the appeal.[1] Kay raises two issues on appeal: (1) in the decree, she should have been awarded $42,000 in lost [**2] hog hunting income instead of only $18,000 and (2) the trial court should have awarded her an additional $178,000 in attorney's fees. We affirm.

> 1 William died after the appeal was filed and an administrator was later appointed. We deny the motion as moot.

**STANDARD OF REVIEW**

Kay cites this court to both legal and factual sufficiency standards of review in her briefing. However, in her prayer for relief, Kay requested only that this court reverse the trial court's judgment and render in her favor. Kay did not request, in the alternative, a remand for a new trial. During oral argument, Kay's attorney stated Kay wanted a judgment rendered in her favor. Therefore, we review the evidence only under a legal sufficiency standard. *Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176 (Tex. 1986)* (per curiam) (reiterating well-settled rule that [HN1] "no evidence" points require rendition in favor of appealing party); *Elias v. Mr. Yamaha, Inc., 33 S.W.3d 54, 59 & n.6 (Tex. App.--El Paso 2000, no pet.)* (construing appellant's challenge as a legal sufficiency challenge because he asked appellate court to render judgment in his prayer for relief).

[HN2] When the party who had the burden of proof at trial complains [**3] of the legal insufficiency of an adverse finding, that party must demonstrate the evidence establishes conclusively (i.e., as a matter of law) all vital facts in support of the finding [*184] sought. *Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).* A reviewing court must examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. *Id.* If more than a scintilla of evidence supports the adverse finding, the issue is overruled. *Id.* If there is no evidence to support the adverse finding, the entire record must be examined to determine whether the contrary proposition is established as a matter of law. *Id.* The issue is sustained only if the contrary proposition is conclusively established. *Id.* The ultimate test for legal sufficiency is whether the evidence would enable a reasonable and fair-minded fact finder to reach the verdict under review. *City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).* [HN3] The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id. at 819.*

**HOG HUNTING INCOME**

As a result of the delay between signing the settlement agreement and the divorce decree, Kay claimed [**4] she lost income because she was not able to allow hog hunting on her side of the ranch. The trial court awarded Kay $18,000 as lost hog hunting income.

EXHIBIT "H"

On appeal, Kay contends she proved lost hog hunting income in the amount of $42,000 as a matter of law. Kay offered into evidence several hog hunting contracts from people who knew she and William were getting a divorce and who she knew "would love to come back on my side of the ranch." However, the contracts were from 1991 to 1997, years before the divorce. Kay admitted that no hog hunting had been conducted on the ranch for six to seven years. When such hunts were conducted, she and William would schedule about six men for a three-day hunt during January, February, and March. She said if she could have done that again starting in January 2012, she would charge $200 per day per man. Kay calculated that at $600 per man per weekend, times four weekends a month for three months, she would have earned $42,000.

A report prepared by Kay's expert stated hunting operations were "substantially ceased due to concerns over legal liability issues." Kay stated the hunting and cattle operations on the ranch were always profitable. However, the report [**5] stated the community estate suffered tremendous losses from the hunting and cattle operations from 1996 through 2011, and after 2003 there was no revenue from hunting operations. Her expert's report showing the ranch suffered a loss contradicts Kay's testimony. William's expert acknowledged, after reviewing the report that the purpose of the report was to determine whether the community estate was entitled to an offset. William's expert conceded whether the ranch suffered a loss for the purpose of an offset had nothing to do with whether Kay could have or should have gotten any hog hunting revenue.

Although Kay's testimony that she could have earned $42,000 was not contradicted, this testimony was based on her hope that hunters would have contracted with her in January, February, and/or March 2012. However, she also testified no hog hunting had been conducted on the ranch for six to seven years preceding the divorce. In this case, the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. Based on this record, we cannot say Kay established, as a matter of law, her entitlement to $42,000 in lost hog hunting income.

## ATTORNEY'S FEES

In [**6] the divorce decree, the trial court awarded Kay attorney's fees as follows:

> [*185] IT IS FURTHER ORDERED, ADJUDGED and DECREED that KAY LYNN MAYNARD BOOTH recover attorney's fees reasonably and necessarily incurred after October 12, 2011, for services rendered in the trial through June 28, 2012, in the amount of Two Hundred Thousand Dollars ($200,000); provided

however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted.

Contrary to Kay's contention on appeal that the trial court erred in not awarding her attorney, James Jones, *any* fees, the judgment does not award fees specific to any attorney. Instead, the judgment awards a net lump sum to Kay for reasonable fees. Kay asserts she should have been awarded an additional $178,002.00, which is the amount of fees billed by Jones.

The parties agreed to a bench trial only on the issues of whether William breached the settlement agreement and attorney's fees. The court agreed with William's lawyer that the agreement called for [**7] each party to pay their own attorney's fees. Kay's attorneys argued they were not seeking fees prior to the date of the settlement agreement, but were instead, seeking fees resulting from William's breach of the agreement. The court again stated Kay was responsible for her own fees, but allowed her attorneys to make a bill of exception record.

Kay's attorneys stated the breach of contract claim was first asserted in February 2012. Kay's three attorneys then each testified in "bills of exception." Adan Gonzalez testified his time was spent on both the divorce and the breach of contract action, and he averaged about $10,000 per month in fees, from February 2012 to June 2012, for a total of approximately $50,000. Cheryl Wilson testified she was retained in February or late March 2012, after William breached the agreement. She billed approximately $40,000. Jones testified his fee invoice was dated "6/22" but it should be "9/22" for services rendered since the date of the agreement. His fees totaled $178,002, at his hourly rate of $450.00 multiplied by 395.56 hours.

On appeal, Kay asserts William never contested the qualifications or invoices of any of her attorneys, and Jones's testimony [**8] was uncontradicted. This is true in part because the trial court did not allow any cross-examination during the bills of exception; however, William did raise an objection to Jones's Invoice No. 11084. Invoice 11084 indicates services for "Additional Charges" in the amount of $67,192.65, and "Professional Services" in the amount of $178,002.00. William objected that the invoice did not segregate fees related to the breach of contract claim from fees related to the divorce. The portion of the invoice related to "Professional Services" states as follows:

EXHIBIT "H"

For services rendered from the date of settlement by [Kay] including preparation for and attendance of mediation of case; preparation for and attendance of multiple meetings with client and client's parents and witness[es]; preparation of settlement documents; review of multiple drafts of same; preparation for and attendance of multiple hearings for entry of judgment; preparation for and attendance of depositions of Kay, William, Mrs. Booth, Teresa McComas, Dr. Jack Ferrel, Sterling, Redmond, and Hill; preparation for and attendance of further hearings of various motions by court; preparation for trial; research of issues; analysis of [**9] evidence.

[*186] The trial court determined William [HN4] breached the settlement agreement; therefore, an award of reasonable attorney's fees to the prevailing party was mandatory if there was proof of the reasonableness of the fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. *§ 38.001(8)* (West 2008); *Hassell Constr. Co. v. Stature Commercial Co., 162 S.W.3d 664, 668 (Tex. App.--Houston [14th Dist.] 2005, no pet.)*. However, the amount of the award lies within the discretion of the trial court. *Hassell Constr. Co., 162 S.W.3d at 668*. And, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller, 168 S.W.3d at 819*. Finally, "[a] meaningful review of the hours claimed is particularly important because the usual incentive to charge only reasonable attorney's fees is absent when fees are paid by the opposing party." *El Apple I, Ltd. v. Olivas, 370 S.W.3d 757, 762 (Tex. 2012)*.

Here, although Kay's attorney's fees evidence was not controverted, the trial court has discretion in determining what amount of attorney's fees is reasonable. Jones stated he dictated the invoice a few days before trial. At trial, to arrive at the number of hours he [**10] expended on the case, Jones divided $178,002.00 by his hourly rate of $450 to arrive at 395.56 hours. The invoice does not indicate and Jones did not testify about any record of his time attributable to each of the various tasks mentioned in the invoice. Nor did he segregate fees related to the breach of contract claim from any fees related to the divorce. The trial court awarded fees of $200,000 for services rendered after the date of October 12, 2011 "provided however, if this case is not appealed to the court of appeals, One Hundred-Thirty Thousand Dollars ($130,000) shall be remitted; provided further, if this case is appealed to the Court of Appeals, but not to the Texas Supreme Court, Fifty Thousand Dollars ($50,000) shall be remitted." On this record, we cannot conclude the trial court abused its discretion in awarding attorney's fees in the amount it did. *See City of Laredo v. Montano, No. 12-0274, 414 S.W.3d 731, 2013 Tex. LEXIS 890, 2013 WL 5763179, at *4 (Tex. Oct. 25, 2013)* ([HN5] encouraging attorneys using lodestar method to shift their fees to opponent to keep contemporaneous records of their time as they would for their own client; concluding attorney's testimony was "devoid of substance" because he did not [**11] itemize specific tasks or the time required for those tasks).

## CONCLUSION

We overrule Kay's issues on appeal, and affirm the trial court's judgment.

Sandee Bryan Marion, Justice